# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| STATON TECHIYA, LLC AND SYNERGY IP CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD. and SAMSUNG ELECTRONICS AMERICA, INC.<br><br>Defendants. | CIVIL ACTION NO. 2:21-CV-00413-JRG-RSP (LEAD CASE)<br><br>CIVIL ACTION NO. 2:22-CV-00053-JRG-RSP (MEMBER CASE)<br><br>**FILED UNDER SEAL** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held a bench trial in the above-titled civil actions on March 26 and 27, 2024. This bench trial proceeded as outlined in Magistrate Judge Payne's February 2, 2024 Order (Dkt. No. 834), which recommended that Samsung's equitable defenses and non-patent counterclaims be adjudicated at a bench trial prior to the jury trial on Techiya's patent infringement claims. The Parties agreed to conduct the bench trial in this manner and waived any Seventh Amendment objections to conducting the bench trial in advance of the jury trial. (Dkt. No. 838 at 5:20-24, 6:13-24, 6:25-7:3).

The Court makes these findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52. The Court's findings of fact are based on the admissible evidence.[1] For the reasons set forth below, the Court concludes that Samsung established by clear and convincing evidence the required elements of its unclean hands defense. As such, the Court finds that Techiya's asserted

---

[1] Any finding of fact that is actually a conclusion of law should be treated as such. Any conclusion of law that is actually a finding of fact should be treated as such.

patents are unenforceable due to unclean hands. Given that the Court finds unclean hands, being an equitable defense raised by Samsung, the Court need not address Samsung's additional grounds, including its Counterclaims for (1) Knowingly Participating in, or Aiding and Abetting, Breach of Fiduciary Duty and (2) Civil Conspiracy, under which Samsung seeks the same relief.[2]

## I.    INTRODUCTION

This case involves accusations by Techiya in conjunction with Samsung's former in-house counsel that Samsung's Bixby AI feature and mobile phones infringe patents owned by Techiya. Evidence presented by the parties at the bench trial demonstrates subversion of our adversarial system of litigation and an invasion of the attorney-client privilege.  The clear and convincing weight of the evidence shows that the patent claims underlying this litigation are infected by the theft of Samsung's sensitive confidential and attorney-client privileged information. This theft was enabled by Techiya's engagement with its litigation-agent, Synergy—in particular with former Samsung IP Center Head Dr. Seungho Ahn ("Dr. Ahn") and former Samsung in-house IP attorney Mr. Sungil Cho ("Mr. Cho").

Synergy—the party with whom Techiya jointly prepared for and litigated this case— improperly acquired Samsung's privileged information, both before and during the pendency of this case, and leveraged it along with inside knowledge of Samsung's IP dispute protocols and practices.  These actions were taken in furtherance of Techiya's and Synergy's litigation interests, as contemplated by the contractual arrangement between the parties.  The clear and convincing evidence establishes that, with respect to this litigation, Synergy's hands are unclean.  The evidence further shows that Synergy acted as Techiya's agent in this litigation, and that Synergy's

---

[2] On March 24, 2024, the Court "accept[ed] Samsung's stipulation that it will no longer pursue the claim that Techiya is liable under the DTSA," which was Count XXI of Samsung's Counterclaims. (Dkt. No. 881 at 2).

unclean hands are imputable to Techiya. While Synergy is a separate business entity, under these facts Dr. Ahn and Mr. Cho are effectively Synergy. There is no significant distinction between them within the evidence presented.

The same body of evidence proves an irreparable harm to Samsung—patent claims and a public record infected with Samsung's confidential and attorney-client privileged information. The attorney-client privilege and the right to engage in adversarial litigation free of its subversion are principles that this Court views seriously and which warrant affirmative protection by the courts. Accordingly, this Court is persuaded that these serious wrongs and their proper imputation to Techiya require the patent case be dismissed with prejudice.

The below findings of fact, conclusions of law, and application of the facts to the law of the case set forth in detail why dismissal with prejudice of Techiya's patent claims is the appropriate remedy given the misconduct at issue.

In this regard, the Proposed Findings of Fact outline the facts demonstrating:

(1) the procedural background of Techiya's patent case and Samsung's counterclaims (Section II.A);

(2) that the Techiya patent case has been infected with Samsung's confidential and attorney-client privileged information (Section II.B);

(3) the responsibility of Techiya as a result of Techiya's agency relationship with Synergy (Section II.C); as underscored by the

(4) lack of credibility by Techiya witnesses on each of Techiya's primary defenses (Section II.D).

Techiya raises three principal arguments as to why its patent case should not be impacted by the actions of Dr. Ahn, Mr. Cho, and Synergy. As explained below, the Court finds each unavailing.

Techiya's first argument is that Synergy operated autonomously. However, the evidence shows that Techiya exercised control over Synergy's conduct in the licensing negotiations and in

3

this case. Techiya and Synergy were joint actors in the preparation and litigation of the underlying patent case. Further, as Mr. Firestone put it, Synergy was a "licensing agent" for Techiya. Day 2 Trial Tr. (Firestone) 182:11-19.

Techiya's second defense—that if Samsung sent it a grievance letter, none of this would have happened—is similarly unpersuasive. Samsung's failure to send a grievance letter to Synergy and Techiya in this matter regarding Samsung's conflict-of-interest objections to Dr. Ahn and Mr. Cho did not constitute waiver of those objections. The evidence, as discussed below, establishes that Samsung was required to address Techiya's licensing request through Synergy and Dr. Ahn. At minimum, Techiya was provided with clear notice of Samsung's objections to Dr. Ahn and Mr. Cho's involvement when it received Samsung's counterclaims on February 10, 2022. No evidence shows that Techiya investigated the allegations in Samsung's counterclaims to determine if they were true. Instead, Techiya left its engagement with Synergy in place for another entire year—a time frame over which the use and theft of Samsung's privileged information continued.

Techiya's third argument that Samsung's stolen information was inconsequential to the litigation is also unavailing. As an initial matter, the Court finds it highly implausible that knowing an adversary's internal privileged non-infringement, invalidity, and exposure analysis could be immaterial to a patent case. Any patent case necessarily turns on these very issues. Additionally, the Court finds it difficult to reconcile this argument with the purported goal behind hiring Dr. Ahn—namely, to us his "intimate knowledge of Samsung" to stay "one step ahead of it on this case." DBTX-0096.

For the reasons set forth above and below, the Court finds that Techiya acted with unclean hands and that equity directs as a result that Techiya's patent claims are held to be unenforceable as part of this action. To give effect to these findings the Court **DISMISSES** Techiya's patent

claims asserted herein **WITH PREJUDICE.**

## II.     FINDINGS OF FACT

### A.      Procedural Background

#### 1.      *Procedural History of the Patent Case*

1.      On November 5, 2021, Staton Techiya, LLC ("Techiya") and Synergy IP Corporation ("Synergy") filed a complaint against Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung") in this Court.  (Dkt. No. 1 (the "First Complaint")).

2.      Dr. Seungho Ahn and Mr. Sungil Cho, discussed herein, control Synergy.

3.      The First Complaint was signed by Bradford A. Cangro of PV Law LLP and listed Robert Gaybrick of PV Law, among others, as counsel of record for Plaintiffs Techiya and Synergy.  (*Id*. at 49).  Shortly thereafter, Mr. Cangro was designated as "lead counsel" for Plaintiffs Techiya and Synergy.  (Dkt. No. 22).

4.      In the First Complaint, Techiya and Synergy asserted infringement of ten patents against Samsung.  (Dkt. No. 1).   This includes U.S. Patent Nos. 8,111,839 ("'839 Patent"), 8,254,591 ("'591 Patent"), 8,315,400 ("'400 Patent"), 9,124,982 ("'982 Patent"), 9,270,244 ("'244 Patent"), 9,491,542 ("'542 Patent"), 9,609,424 ("'424 Patent"), 10,405,082 ("'082 Patent"), 10,966,015 ("'015 Patent"), and 10,979,836 ("'836 Patent").  (*Id*. ¶¶ 7–16, 45–220).

5.      The "Accused Products" in the First Complaint are "certain Bixby-enabled smartphones and earphones."  (*Id*. ¶ 29).  These products include various Galaxy smartphones and Galaxy Buds earphones.

6.      On February 14, 2022, Techiya and Synergy filed a second patent infringement lawsuit in this Court against Samsung.  Civil Action No. 2:22-CV-00053-JRG-RSP, Dkt. No. 1 (2022) (the "Second Complaint").

7.      The Second Complaint was also signed by Bradford A. Cangro of PV Law LLP and listed Robert Gaybrick of PV Law, among others, as counsel of record for Plaintiffs Techiya and Synergy.  (*Id*. at 28).

8.      In the Second Complaint, Techiya and Synergy asserted infringement of four additional patents against Samsung's Galaxy Buds family of earbud products and Samsung mobile devices.  (Second Complaint at 2–3).  This includes U.S. Patent Nos. 11,244,666 ("'666 Patent"), 11,217,237 ("'237 Patent"), 11,057,701 ("'701 Patent"), and 11,039,259 ("'259 Patent").  (*Id*.).

9.      The Second Complaint defines the "Accused Products" to include "Samsung Galaxy S21 5G and other similar smartphones, the Samsung Galaxy Buds, Buds Pro, Buds Live, Buds+, Buds2, and other similar earphones, the Samsung Wearable app, and the Bixby Personal Assistant app."  (*Id*. ¶ 20).

10.      On March 2, 2022, Techiya and Synergy served infringement contentions for the ten patents asserted in the First Complaint.  (Dkt. No. 35).

11.      On March 28, 2022, Techiya, Synergy, and Samsung filed a Joint Motion to Consolidate the two co-pending lawsuits.  (Dkt. No. 39).  On May 4, 2022, the Court issued an order consolidating Case Nos. 2:21-CV-00413-JRG-RSP and 2:22-CV-00053-JRG-RSP, designating 2:21-CV-00413-JRG-RSP as the Lead Case.  (Dkt. No. 47 at 1–2).

12.      On April 6, 2022, Techiya and Synergy served infringement contentions for the four patents asserted in the Second Complaint.  (Dkt. No. 45).

### 2.      *Procedural History for Samsung's Counterclaims*

#### a.      General Procedural History for Samsung's Counterclaims

13.      On February 10, 2022, Samsung filed counterclaims alleging breach of fiduciary duty against Dr. Ahn and Mr. Cho, aiding and abetting that breach of fiduciary duty against Synergy and Techiya, conspiracy against Dr. Ahn, Mr. Cho, Synergy, and Techiya, and trade secret

misappropriation against Dr. Ahn, Mr. Cho, Synergy, and Techiya.  (Dkt. No. 27 at 62-67).  Samsung also pled unclean hands and unenforceability as affirmative defenses.  (Dkt. No. 27 at 40).

14.    On May 11, 2022, counsel from the law firm of Nelson Bumgardner Conroy PC entered appearances for Dr. Ahn, Mr. Cho, Synergy, and Techiya and subsequently handled the joint defense of the counterclaims for all four counterclaim defendants.  (Dkt. Nos. 48-51).  Nelson Bumgardner Conroy withdrew from the case after the close of fact discovery, for reason explained further below.  (Dkt. No. 343).  When those lawyers withdrew, lawyers from Whitaker Chalk Swindle & Schwartz PLLC took over the counterclaim defense for Synergy, Dr. Ahn, and Mr. Cho.  (Dkt. No. 342).  Lawyers from Bilzin Sumberg Baena Price & Axelrod LLP took over the counterclaim defense for Techiya.  (Dkt. Nos. 329, 331).

15.    On July 13, 2022, Samsung amended its aiding and abetting claim to plead, in the alternative to aiding and abetting, that Synergy and Techiya had "knowingly participated" in Dr. Ahn's and Mr. Cho's breaches of fiduciary duties.  (Dkt. No. 94 at 69 ¶ 150).

16.    On August 31, 2022, Samsung moved to disqualify Dr. Ahn and Mr. Cho from participating in the patent infringement case, arguing that the rules of professional responsibility applicable to lawyers prohibited Dr. Ahn and Mr. Cho from working on the patent infringement claims in this case because they had, as in-house counsel for Samsung, worked on matters that were substantially related to the patent infringement claims in this case.  (Dkt. No. 128).  Techiya and Synergy objected that, among other things, Samsung had waived the conflict by not objecting to the representation.  (Dkt. No. 144 at 11-14).  The Court granted Samsung's motion and disqualified Dr. Ahn and Mr. Cho from participating in the patent case.  (Dkt. Nos. 183, 198).

17.     On March 31, 2023, Techiya moved to dismiss Synergy as a plaintiff in the patent case, arguing that it had terminated Synergy's exclusive license in February 2023, and thus that Synergy no longer had standing to be a plaintiff in the patent case.  (Dkt. No. 365).  Magistrate Judge Payne recommended that the motion be granted on October 18, 2023.  (Dkt. No. 700).  At this time, Synergy formally remains a plaintiff in this case.

18.     On December 12, 2023, Samsung moved to dismiss Techiya's patent claims based on several theories arising out of new evidence discovered in November 2023 as a result of a Korean criminal investigation of, among others, Dr. Ahn and Mr. Cho.  (Dkt. No. 779).  Samsung also moved for default judgment on its counterclaims against Synergy, Dr. Ahn, and Mr. Cho. (Dkt. No. 880).

19.     On December 27, 2023, Synergy, Dr. Ahn, and Mr. Cho moved to sever and stay the counterclaims against them.  (Dkt. No. 808).  The basis for the request was that Dr. Ahn and Mr. Cho are under criminal investigation in the Republic of Korea for some of the same conduct at issue in Samsung's counterclaims and could not travel to the United States for trial due to a travel ban imposed by Korean authorities while the Korean criminal investigation was pending. The Court granted the motion to sever and stay the counterclaims as to Synergy, Dr. Ahn, and Mr. Cho.  (Dkt. No. 840).

20.     On January 3, 2024, Magistrate Judge Payne recommended denying Samsung's motion to dismiss without prejudice.  (Dkt. No. 818).  In the Report & Recommendation, Magistrate Judge Payne noted that "Samsung has raised serious issues about unclean hands, and it would be inefficient to go through an entire trial on infringement, invalidity and damages before even reaching the potentially dispositive issue of the litigation misconduct at issue on this motion." (*Id*. at 4).  Magistrate Judge Payne also found, however, that there were factual disputes on certain

issues raised in Samsung's motion that warranted a bench trial, which is what was recommended. (*Id.*).

21.     Samsung and Techiya consented to a bench trial and waived any right they might have had to a jury trial on these issues, other than damages or other monetary remedies.  (Dkt. No. 841).

22.     On February 14, 2024, the Court set a bench trial on these issues, to begin March 26, 2024.  (Dkt. No. 841).  The Court held that bench trial on March 26 and 27.

>   b.     Findings on Samsung's Disclosure of "Late-Breaking" Evidence

23.     Techiya objected to certain evidence during pretrial and trial proceedings on the grounds that Samsung allegedly disclosed the evidence too late.

24.     Samsung's counterclaims alleged, among other things, that "upon information and belief" Dr. Ahn was "using Samsung's confidential and privileged information" to negotiate and litigate against Samsung.  (Dkt. No. 94 at 48 ¶ 20).  Throughout discovery, Dr. Ahn, Mr. Cho, and Synergy denied this allegation. *See, e.g.*, (Dkt. No. 373 ¶ 20 (denying allegation)); Day 1 Trial Tr. (Cho) 220:5-7 ("Q. Have you received any Samsung confidential information since leaving Samsung? A. No."); Day 2 Trial Tr. (Ahn) 15:10-14 ("Q. Since you left Samsung, has Mr. Lee shared with you any Samsung privileged information? A. No privileged -- no privileged information. Q. And no confidential information? A. No confidential.").

25.     In January 2023, Samsung launched an internal investigation into an employee named Chunghyo Lee.  Day 1 Trial Tr. (Kang) 151, 163.  That investigation revealed suspicious activity and communications suggesting that Chunghyo Lee might be aiding Dr. Ahn and Mr. Cho in their post-Samsung patent enforcement efforts by funneling them information from inside Samsung.  Samsung promptly disclosed what it learned from that investigation—which amounted to suspicion but no direct evidence that Chunghyo Lee had provided confidential Samsung

9

evidence to Dr. Ahn or Mr. Cho.  (Dkt. No. 276 (Ex. 1 at 16-18)).  Counterclaim Defendants (*including Techiya*) initially moved to strike Samsung's supplemental interrogatory response discussing these suspicions, disparaging it as "a sensational tale of Ahn engaging in a conspiracy with an existing Samsung employee (Chunghyo Lee) … to funnel Samsung privileged and confidential information to Ahn."  (Dkt. No. 276 at 1).  Counterclaim Defendants subsequently withdrew that motion.  (Dkt. No. 324).

26.     Later in 2023, the Seoul Central District Prosecutor's Office in Seoul, Republic of Korea began a criminal investigation into Dr. Ahn and Mr. Cho.  Day 1 Trial Tr. (Jongmin Lee) 48, (Lim) 82, (Kang) 125; *see also id.* at 50.  As explained more fully below (*see infra* § II.B.6), the investigation uncovered direct evidence of what Samsung had suspected but which Dr. Ahn, Mr. Cho, and Techiya had consistently denied.  In audio recordings of phone calls between Dr. Ahn and Mr. Cho, the two individuals discuss receiving and analyzing Samsung's confidential and privileged assessment of Techiya's patents and Dr. Ahn's infringement accusations.  The recordings were seized by the Korean prosecutors from an SD memory card attached to Mr. Cho's mobile phone.  The calls occurred shortly before Synergy and Techiya filed this patent case.  From the recordings, Chunghyo Lee is identified as the source inside Samsung providing information to Dr. Ahn and Mr. Cho.  He continued to funnel information to Dr. Ahn and Mr. Cho during discovery in this litigation, including by providing documents listed on Samsung's privilege log in this case.

27.     Samsung first learned of this evidence when the Korean prosecutor presented it to Samsung during a witness interview on November 29, 2023 in Korea.  At that interview, the prosecutor presented a Samsung witness (Sunghyuk Lim) with evidence collected during the prosecutor's investigation, including multiple audio recordings.  DBTX-35; Day 1 Trial Tr. (Lim)

at 90:8-10 ("Was your interview with the prosecutor on November 29th, 2023, the first time that Samsung learned the truth? A. Yes."). Another Samsung employee, Ms. Yunhee Kang, subsequently sat for a witness interview on December 18, 2023. DBTX-41. The prosecutor presented Ms. Kang with additional evidence, including additional documents and audio recordings showing further misconduct by Dr. Ahn, Mr. Cho, and Chunghyo Lee related to the Techiya case.[3]

28.     Samsung relayed the information to its U.S. counsel in this litigation at the end of the day in Korea on November 29, 2023, which was early on the morning of November 29 in the United States. The parties were scheduled that morning to resume a hearing in front of Magistrate Judge Payne on a spoliation motion filed by Samsung against Dr. Ahn and Mr. Cho. Samsung's counsel raised this new evidence in chambers before resuming the hearing. As a result of this new evidence, Samsung requested a continuance of the hearing and a continuance of trial on all patent counts and counterclaims. 11/29/23 Hr'g Tr. 224-27. Counsel for Synergy and Techiya did not oppose the request. The Court granted the requested continuance. *Id.* at 227.

---

[3]     Ms. Kang sat for other witness interviews earlier in the Korean prosecutor's investigation. Samsung produced to Techiya the witness statements from these other interviews as well as Ms. Kang's declaration to the Korean prosecutor, but Techiya complained at trial to the timing of their production. Techiya has not identified in those earlier witness statements or declaration any facts or evidence relevant to this case that Samsung had not already produced in this case. None of those earlier witness statements were introduced as exhibits at trial or were the subject of questions to any witness at trial. The declaration was used at trial only to refresh Ms. Kang's recollection regarding a single date on an ancillary matter, which Ms. Kang confirmed was a separate investigation that involved many matters (including ones unrelated to Techiya). In view of the declaration, Ms. Kang reconfirmed that it was not until January 2023 that Chunghyo Lee's computer was collected and imaged. Day 1 Trial Tr. (Kang) 163:5-7. As in-house counsel involved in the January 2023 internal investigation of Chunghyo Lee, Ms. Kang merely served as a conduit for sharing facts and evidence uncovered by that investigation with the Korean prosecutor.

29.     When these facts came to light at the end of November 2023, Samsung immediately moved to compel Dr. Ahn and Mr. Cho to obtain and produce the underlying evidence in the hands of the Korean prosecutor, including the underlying audio recordings and documents seized by the Korean prosecutor, as well as Dr. Ahn's and Mr. Cho's witness statements from the Korean prosecution, which were taken in November and December 2023.  (Dkt. No. 767).  To assess the scope of infection caused by Dr. Ahn's and Mr. Cho's theft of Samsung's privileged documents, Samsung also moved to compel Techiya to produce a log of communications that included Dr. Ahn or Mr. Cho and Techiya's outside patent counsel and litigation funders.  (Dkt. No. 768).

30.     Samsung shortly thereafter moved to dismiss Techiya's patent infringement claims, arguing that the case was irreversibly infected by Dr. Ahn's and Mr. Cho's use of Samsung's privileged information.  (Dkt. No. 779).  In response, Techiya moved to sever its patent case from Samsung's counterclaims and related arguments.  (Dkt. No. 805).

31.     Once Samsung obtained copies from the Korean prosecutor of the witness statements from the interviews of Mr. Lim and Ms. Kang, Samsung began work on producing them and the relevant Samsung documents discussed in those witness statements.  Producing these documents raised a difficult issue, because embedded in the interview statements were Samsung's own privileged information that had been illicitly obtained by Dr. Ahn and Mr. Cho and seized from Dr. Ahn and Mr. Cho by the Korean prosecutor.  This difficulty was compounded by the fact that the witness statements and underlying documents discussed therein were in Korean.  On December 14, 2023, Samsung produced a certified translation of Mr. Lim's witness statement and Samsung documents discussed therein, with Samsung's privileged information redacted.  (Dkt. No. 787).  The next day Samsung produced redacted versions of the original Korean-language

documents.  (Dkt. No. 788).  On January 12, 2024, Samsung produced Ms. Kang's witness statement, in Korean and English.  (Dkt. No. 842 at 2).

      32.     In the weeks and months that followed the November 29, 2023 witness interview in Korea, Samsung pressed Synergy and Techiya to produce the cited documents and audio files in Mr. Lim's and Ms. Kang's witness statements, along with other related documents (all within Synergy and/or Techiya's possession, custody, or control).  *See, e.g.*, (Dkt. No. 839 at 5-7 (outlining discovery needed before bench trial to collect underlying evidence raised in Samsung witness interviews)); 2/27/24 Hr'g Tr. 12-23.  Techiya and Synergy refused to provide any additional discovery.  Techiya opposed Samsung's request for a log of communications with outside counsel and litigation funders, and the Court sustained Techiya's objection to that discovery.  (Dkt. No. 844 at 1).  As to Synergy, the Court ordered production of "the audio files seized from Mr. Cho's phone, the witness statements provided by Ahn and Cho to the Korean authorities, and the note seized from Cho by the authorities," (Dkt. No. 844 at 1), and concluded that further depositions of Dr. Ahn and Mr. Cho were relevant.  3/8/24 Hr'g Tr. 73:2-4.  Dr. Ahn and Mr. Cho invoked a privilege against self-incrimination, and on that ground refused most discovery. *See e.g.*, 2/27/24 Hr'g Tr. 28-29; (Dkt. No. 851).  Of the discovery Synergy was ordered to produce, Synergy only agreed to produce witness reports from Dr. Ahn's and Mr. Cho's interviews with the Korean prosecutor.  (Dkt. No. 851).

      33.     Techiya, for its part, asked the Court to go forward with a bench trial on the record that existed **before** November 29, 2023, and to block introduction of any exhibits or witnesses that could prove what the Parties and the Court had learned on November 29.  (Dkt. No. 839 at 7-9). The Court denied that request and set a schedule for pretrial disclosures.  (Dkt. No. 843).

34.     Pursuant to the Court's order (Dkt. No. 843), on February 29, 2024, Samsung disclosed its witness list for the bench trial, including Mr. Lim, Ms. Kang, and a Korean criminal lawyer (Mr. Jongmin Lee) who had attended Mr. Lim's interview.  (Dkt. No. 848).  Samsung disclosed its exhibit list on March 2, 2023, which included Mr. Lim's and Ms. Kang's witness statements (DBTX-0035; DBTX-0041), as well as a "placeholder" for any witness statements later produced by Dr. Ahn or Mr. Cho pursuant to the Court's Order (DBTX-0060), which notified Techiya of Samsung's intent to use those materials if they became available before trial.  (Dkt. No. 854).

35.     On March 1, 2024, the Court ordered Samsung to produce unredacted versions of certain documents including Mr. Lim's witness statement and the Samsung documents referred to therein, subject to a screening procedure and non-waiver of privilege provision.  (Dkt. No. 850).

36.     In the ensuing weeks, Techiya objected to the disclosure of Mr. Lim, Ms. Kang, and Mr. Jongmin Lee and objected to the admissibility of Mr. Lim's and Ms. Kang's witness statements.  Magistrate Judge Payne heard arguments on these objections during a two-day pretrial conference occurring on March 8 and March 11. The Court overruled the objections. (Dkt. No. 862 (Hr'g Tr.) 13-19, 28, 61-63).

37.     On March 13, 2024, counsel for Synergy produced three Korean-language witness statements for interviews with Mr. Cho.  (Dkt. No. 868).  An hour later, however, counsel for Synergy clawed those documents back, claiming that they needed to be reviewed for privilege. (Dkt. No. 870).  Before Synergy clawed them back, Samsung's counsel had skimmed the documents quickly.  Almost the entirety of the documents were in Korean, but Samsung's counsel noticed one sentence in English in one of the documents that appeared to be a highly relevant and non-privileged email in English.  (Dkt. No. 875).  As of March 22, 2024, none of the clawed-back

witness statement from Mr. Cho or any witness statements from Dr. Ahn had been produced in Korean or English to Samsung.

38.     On March 22, 2024, the Court held a telephonic hearing to address, among other things, Synergy's failure to produce Dr. Ahn's and Mr. Cho's witness statements.  Since the documents were in Korean, Synergy claimed it was unable to conduct a privilege review.  Synergy also informed the Court that it had not retained a translator to assist in that review, and presented no procedure that would result in the documents being produced before the March 26 bench trial. To expedite review, Samsung retained at its expense an independent, bilingual attorney unaffiliated with Samsung or any Samsung retained law firm to review the documents for privilege.  Magistrate Judge Payne agreed to meet with Synergy's counsel (and the independent Korean-speaking attorney) to review the materials and resolve any privilege claims.  The Court also ordered Synergy to produce the page of Mr. Cho's witness statement containing the English-language email Samsung had seen.  (Dkt. No. 881).

39.     Leading up to a final pretrial conference scheduled for March 25, 2024, Techiya repeatedly renewed its objections to the introduction of any evidence showing what the Parties and Court learned on November 29.  (Dkt. Nos. 872, 873, 874, 875).  Magistrate Judge Payne again heard arguments on these issues at the final pretrial conference on March 25, and the Court overruled Techiya's objections.  (Dkt. No. 894).

40.     The English-language email embedded in Mr. Cho's witness statement was a non-privileged email from PV Law (Techiya's outside patent counsel) to Dr. Ahn a few weeks before filing the patent infringement complaint in this case.  *See* DBTX-0096.  Following his review of the email after the final pretrial conference on March 25, Magistrate Judge Payne ordered its production.  (Dkt. No. 882).  This email is DBTX-0096.

41.     In the email, Robert Gaybrick of PV Law told Dr. Ahn that "with your intimate knowledge of Samsung I hope that we can stay one step ahead of it on this case." DBTX-0096.[4]

42.     In the days leading up to trial, Samsung worked diligently with Synergy's counsel and Korean translators to obtain certified translations of Dr. Ahn's and Mr. Cho's witness statements and promptly produce these materials to Techiya. *See* Trial Tr. Day 2 at 34-39, 41-46 (describing the chronology). The output of those efforts was DBTX-0097 and DBTX-0098.

43.     At trial, Techiya continued its attempts to block facts and evidence learned on and after November 29, 2023 from being used at trial, repeatedly re-raising arguments the Court had already rejected regarding the admissibility of evidence uncovered in the Korean prosecutor's investigation. *See, e.g.*, Day 1 Trial Tr. (Jongmin Lee) 56:14-19 ("THE COURT: This is a document that you've lodged your objection at before opening statements. MS. PALLETT-VASQUEZ: Yes, Your Honor. THE COURT: And I've overruled it. You've got a running objection, but we don't need to have it repeated time and time again."); *see also* Day 1 Trial Tr. (Opening) 6-7, 43, (Jongmin Lee) 52-54, (Lim) 84-85, 96, (Kang) 138, 140-41, 168.

---

[4]     One of the recipients of this email is an individual named Sariel Engel, who was involved closely with Techiya from the beginning of its relationship with Synergy and the decision to sue Samsung. DBTX-0015; DBTX-0017; DBTX-0030; DBTX-0046; DBTX-0047; DBTX-0050; DBTX-0053; DBTX-0059; DBTX-0096. Indeed, Mr. Engel ███████████████████████ ██████████████. Day 2 Trial Tr. (Ahn) 19. At the pretrial conference on March 11, 2023, Techiya argued that it "never had an opportunity" to discover its own relationship with Mr. Engel, and that Samsung's suggestion that he was closely involved in this matter was a late-breaking theory that the Court should reject. 3/11/2024 Hr'g Tr. 13-14, 20-22. In its order compelling production of DBTX-96, the Court noted that Mr. Engel was copied on the email and that "Techiya has repeatedly told the Court [that Mr. Engel] was not an agent, but merely a 'common friend.'" (Dkt. No. 882 at 2). Despite this admonishment, Techiya re-raised this same argument during trial to suggest that Samsung had unfairly sprung Mr. Engel's role on Techiya. Day 1 Trial Tr. (Opening) 44:1-8. That argument lacks credibility in light of Techiya's relationship with Mr. Engel, and the fact that Techiya entered into a contractual relationship with Mr. Engel (April 2020 Agent Agreement, CCDX-0009) related to the assertion of Techiya's patents well before this case was even filed.

44.     Mr. Lim's and Ms. Kang's witness statements did not exist until November and December 2023, they contain highly relevant evidence, and Samsung produced them promptly, months before trial.  Likewise, Samsung promptly disclosed Mr. Lim, Ms. Kang, and Jongmin Lee as trial witnesses, and their testimony only became relevant after Mr. Lim's and Ms. Kang's witness interviews in the Korean prosecution.  There was therefore good cause for the timing of these disclosures, and little prejudice to Techiya, especially since Techiya deposed them before trial.

45.     At trial, Techiya also repeatedly complained that the "late-breaking" production of PV Law's email to Dr. Ahn should be excluded because of its late production.  Day 1 Trial Tr. (Opening) 27:23-28:1 ("[T]here's been a lot of late-breaking productions in this case, including the email that Mr. Gaybrick email that we got yesterday evening."); *see also* Day 1 Trial Tr. (Opening) 11, 31.  But this is an email produced by Techiya, not Samsung.  Moreover, this highly relevant email was in the possession of Techiya's counsel since before the filing of its patent case, and ***Techiya*** or its counsel at PV Law should have produced it during discovery.  It is incredulous for Techiya to argue that it was prejudiced by its own withholding of highly relevant evidence until the day before trial.  Indeed, one of the recipients of the email was Techiya's lead patent counsel at PV Law, Brad A. Cangro, who sat at counsel's table throughout trial. Day 1 Trial Tr. (Appearances) 2; Day 2 Trial Tr. (Appearances) 2.  Plainly Mr. Cangro could not have been surprised by this email that he personally received.

46.     Techiya also objected to the admission of Dr. Ahn's and Mr. Cho's witness statements, arguing that their production came too late. Day 1 Trial Tr. (Opening) 24; Day 2 Trial Tr. 40-41, 46; Day 2 Trial Tr. 243-245.  The Court heard the objection and overruled it.  Day 2 Trial Tr. 46-47.  Moreover, the only portions of these witness statements that Samsung relied on

pertain to conduct involving Techiya's patent counsel (PV Law) or litigation funder (Purplevine). Techiya itself should have disclosed these facts and cannot now claim prejudice from Samsung's discovery of these facts on the eve of trial.

 **B. The Patent Case Is Tainted.**

  **1. *Dr. Ahn and Mr. Cho Were Samsung Attorneys***

 47. Dr. Seungho Ahn is licensed to practice as an attorney at law. He graduated from Santa Clara Law School in 2000 with a J.D. and is admitted to the California Bar. DBTX-0015.0004; Day 2 Trial Tr. (Ahn) 17:5-6; Day 1 Trial Tr. (Injung Lee) 172:19-21.

 48. Samsung paid for Dr. Ahn's legal education as part of his employment. Day 1 Trial Tr. (Injung Lee) 172:19-24. After law school, Dr. Ahn worked at Samsung in intellectual property ("IP") legal roles. DBTX-0015.0004.

 49. In 2010, Dr. Ahn became Head of Samsung's IP Center. Day 1 Trial Tr. (Injung Lee) 172:14-16; DBTX-0015.0004. In that role, Dr. Ahn was responsible for all IP matters of Samsung including U.S. patent litigation, patent analysis, patent acquisition, and patent licensing. DBTX-0015.0004; Day 2 Trial Tr. (Ahn) 16:16-17:1; Day 1 Trial Tr. (Injung Lee) 173:4-9. Dr. Ahn provided legal advice to Samsung as an attorney while IP Center Head including advising Samsung's senior management on legal issues. Day 1 Trial Tr. (Injung Lee) 172:25-173:3, 187:24-188:1; *see also id.* (Lim) 75:17-24, (Kang) 137:20-136:3.

 50. Like Dr. Ahn, Mr. Sungil Cho is a licensed attorney at law. He received a J.D. from Fordham Law School and is a member of the New York Bar. DBTX-0015.0004; Day 1 Trial Tr. (Cho) 214:25-215:7. Samsung also paid for Mr. Cho's legal education as part of his employment. Day 1 Trial Tr. (Cho) 213:3-9. When Mr. Cho returned to Samsung after law school, he worked as an in-house patent lawyer on the technology and patent analysis team. Day 1 Trial Tr. (Cho) 213:10-18; DBTX-0015.0004. As part of his role, Mr. Cho reviewed patents for infringement and

validity, managed patent prosecutions, and managed patent litigation in various U.S. jurisdictions. Day 1 Trial Tr. (Cho) 213:10-25; DBTX-0015.0004.

51.     Techiya was aware of Dr. Ahn's and Mr. Cho's status as U.S.-licensed attorneys who had worked at Samsung prior to entering into an exclusive license arrangement with Synergy in 2020.  Day 2 Trial Tr. (Firestone) at 161:1-4, 171:16-172:2.

52.     On November 16, 2022, the Court disqualified Dr. Ahn and Mr. Cho from Techiya and Synergy's patent infringement claims against Samsung under the Texas Disciplinary Rules governing attorneys as well as the ABA Model Rules of Professional Conduct.  (Dkt. No. 183). Magistrate Judge Payne concluded that:

> [A] substantial relationship exists between Ahn's and Cho's former employment with Samsung and the instant suit. Ahn worked for Samsung as inhouse intellectual property counsel since 2002 culminating in the position of Head of Samsung's global IP Center responsible for legal issues surrounding Samsung's worldwide intellectual property programs including development of patent rights, licensing strategies, and patent litigation oversight.

(*Id*. at 2).

53.     The Court overruled Techiya, Synergy, Dr. Ahn, and Mr. Cho's objection to the Disqualification Order on December 20, 2022.  (Dkt. No. 208).

54.     Techiya, Synergy, Dr. Ahn, and Mr. Cho did not dispute that Dr. Ahn and Mr. Cho were attorneys for Samsung as part of their response to Samsung's disqualification motion. *See e.g.*, 11/10/2022 Hr'g Tr. 7:5-15 (counsel for Samsung stating that Dr. Ahn's and Mr. Cho's attorney client relationship with Samsung was not disputed); (Dkt. No. 183 (no mention of dispute regarding Dr. Ahn's and Mr. Cho's status as former Samsung attorneys)).  At a hearing on motions to compel privileged information filed by both sides a few months after Dr. Ahn and Mr. Cho were disqualified, when asked by the Court, "You are not contending that your clients were not counsel

for Samsung," counsel for Techiya, Synergy, Dr. Ahn, and Mr. Cho replied: "No, we're not, Your Honor."  (Dkt. No. 297 (Hr'g Tr.) 16:6-8).

**2.     *Dr. Ahn's and Mr. Cho's Work at Samsung***

55.     Dr. Ahn was the founder and first Head of Samsung's IP Center.  Day 1 Trial Tr. (Injung Lee) 172:14-16; DBTX-0015.0004.  The IP Center was established in 2010 and Dr. Ahn was responsible for setting up and organizing its structure and functions and had ultimate responsibility over all Samsung IP matters.  DBTX-0015.0004; Day 2 Trial Tr. (Ahn) 16:16-17:1; Day 1 Trial Tr. (Injung Lee) 174:1-4, 182:10-13.

56.     As IP Center Head, Dr. Ahn was exposed to a significant amount of Samsung's confidential, privileged, and work product information.  Day 1 Trial Tr. (Injung Lee) 173:13-25. This information included patent strategy, research, and analysis data, licensing terms, agreements, and strategy, product plans and data, research and development information, marketing information, litigation information, and business and technical plans and data.  *Id*.  Information of this type regarding Samsung's mobile phone products came up frequently when Dr. Ahn was head of the IP Center.  Day 1 Trial Tr. (Injung Lee) 174:5-7.

57.     Dr. Ahn's work while Head of the IP Center included specific features of Samsung's artificial intelligence ("AI") assistant, Bixby.  Day 1 Trial Tr. (Injung Lee) 174:12-18. Bixby uses voice recognition technology and is a product used in Samsung's mobile phones.  *Id.* An example of Dr. Ahn's work related to Bixby is his role as head of Samsung's AI Patent Task Force.  DBTX-0002; DBTX-0005; Day 1 Trial Tr. (Injung Lee) 174:21-175:23.  The AI Patent Task Force was created by Samsung to help secure patents related to AI including acquiring patents related to Bixby differentiation features.  DBTX-0005.0002; Day 1 Trial Tr. (Injung Lee) 175:18-23.  As head of the task force, Dr. Ahn was responsible for its activities and reported on its status to Samsung's senior leadership.  DBTX-0005; Day 1 Trial Tr. (Injung Lee) 175:18-23.

58.     Dr. Ahn also oversaw Samsung's response to patent infringement claims related to Bixby.  For example, Seoul National University approached Samsung in 2017 and accused Samsung's mobile phones and Bixby of using its patent.  DBTX-0003.0004-06.  In response to Seoul National University's claim, Samsung conducted an analysis of Bixby and Bixby related patents so it could assess and deal with the issue.  DBTX-0003; Day 1 Trial Tr. (Injung Lee) 177:18-20.  Dr. Ahn was involved in Samsung's analysis and Samsung's response.  DBTX-0003; Day 1 Trial Tr. (Injung Lee) 177:18-22.  As another example, Dr. Ahn oversaw and was consulted on a U.S. patent lawsuit filed by Speak Ware related to a voice recognition patent and Samsung's mobile products with Bixby.  DBTX-0006.0013; Day 1 Trial Tr. (Injung Lee) 178: 5-9.

59.     In April 2018, while Dr. Ahn was Head of the IP Center, Samsung was approached by Techiya's previous patent agent S4S regarding a potential acquisition of the Techiya patents.  DBTX-0022; Day 1 Trial Tr. (Injung Lee) 179:23-180:16.  When approached with patents like those Techiya raised in 2018, Samsung's IP Center conducts a detailed analysis of the proposed patents.  Day 1 Trial Tr. (Injung Lee) 181:1-10.  Samsung's analysis includes substantial work related to infringement, validity, and enforceability of the patents.  *Id*.  The Techiya patents were analyzed in this manner in 2018 and Dr. Ahn, as Head of the IP Center, was responsible for the patent analysis team's work related to the Techiya patents.  Day 1 Trial Tr. (Lim) 73:25-74:17, (Injung Lee) 181:11-14, 184:7-13.  Throughout his time as IP Center Head, Dr. Ahn was very interested and hands-on in patent acquisition matters.  Day 1 Trial Tr. (Injung Lee) 182:4-17.

60.     Ultimately, after Dr. Ahn reviewed Samsung's analysis of the Techiya patents in 2018, he made the decision not to go forward with the proposed acquisition.  Day 1 Trial Tr. (Injung Lee) 184:4-17.  This decision was conveyed to S4S through the IP Center's Silicon Valley office (DBTX-0024.0001 ("Samsung has decided not to pursue the Techiya opportunity")) and

reported to IP Center executives and leadership in the July 6, 2018 Weekly Report. DBTX-0004.0008 ("decision had been made to not pursue the Techiya portfolio").[5]

61. Dr. Ahn left his position as Head of the IP Center in December 2018. Day 2 Trial Tr. (Ahn) 8:19-20. He then served as a consultant for Samsung until July 2019 when he left the company. DBTX-0013; Day 1 Trial Tr. (Injung Lee) 178:11-14. Dr. Ahn's successor as Head of the IP Center was Mr. Injung Lee. Day 1 Trial Tr. (Injung Lee) 171:11-14. Prior to taking over as IP Center Head, Mr. Injung Lee worked closely with Dr. Ahn, directly reporting to him as the IP Center's Head of Licensing for five years and as a Litigation Manager for one year prior to that. Day 1 Trial Tr. (Injung Lee) 171:15-23.

62. Mr. Cho spent 16 years at Samsung before leaving in the spring of 2020. DBTX-0015.0004; Day 2 Trial Tr. (Cho) 235:15-19.

### 3. Techiya Engages Dr. Ahn to Assert Some of the Same Techiya Patents Dr. Ahn Previously Evaluated for Samsung

63. After leaving Samsung, Dr. Ahn and Mr. Cho formed Synergy. Day 1 Trial Tr. (Injung Lee) 178:15-18; Day 2 Trial Tr. (Ahn) 7:15-16; DBTX-0015.0004. Dr. Ahn, his wife, and Mr. Cho are the sole owners of Synergy. Day 2 Trial Tr. (Ahn) 7:16-8:6. In addition to serving as Synergy's owner and CEO, Dr. Ahn served as an attorney for Synergy. Day 2 Trial Tr. (Ahn) 10:18-22; (Dkt. No. 895 at 10).

---

[5] The purpose of the Weekly Reports is to keep the Head of the IP Center apprised of the major issues within the IP Center. Day 1 Trial Tr. (Injung Lee) 183:2-5. When he was Head of the IP Center, Dr. Ahn attended a weekly meeting where his executives walked him through the Weekly Report. Day 2 Trial Tr. (Ahn) 19:21-20:4.

64.     In November 2020, after Samsung had rejected Techiya's prior approaches regarding its patents, Techiya contracted with Synergy giving Dr. Ahn's entity exclusive rights to enforce the Techiya patents.  DBTX-0028.[6]

65.     Shortly thereafter, in early February 2021, Dr. Ahn approached Samsung to accuse it of infringing the Techiya patents.  DBTX-0056; Day 1 Trial Tr. (Injung Lee) 179:14-16. Dr. Ahn's approach ultimately led to Techiya and Synergy filing suit against Samsung nine months later in November 2021.  (Dkt. No. 1).

66.     Dr. Ahn's February 2021 assertion via Synergy of the Techiya patents against Samsung included significant crossover from the Techiya patents Samsung had previously analyzed in 2018.  Indeed, 12 of the 15 patents asserted by Dr. Ahn in February 2021 were expressly listed in Techiya's 2018 presentation that was provided to Samsung.  *Compare* DBTX-0057 (claim charts for Techiya patents: '905, '982, '899, '141, '400, '692, '044, '839, '799, '591, '457, '244) *with* DBTX-0022.0016-0019 (listing the same patents).  Synergy drafted the claim charts and selected the patents used to assert the Techiya portfolio against Samsung in February 2021.  Trial Tr. Day 1 (Cho) 217:5-21.  This overlap continued when Techiya and Synergy filed their complaint against Samsung with seven of the patents-in-suit listed in Techiya's 2018 presentation.  *Compare* (Dkt. No. 11 (patents-in-suit include: '839, '591, '400, '982, '244, '542, '424)) *with* DBTX-0022.0016-0019 (listing the same patents).

67.     In addition to the significant patent overlap, Dr. Ahn and Techiya's infringement claims against Samsung included products that Dr. Ahn and Mr. Cho were intimately familiar with

---

[6]     As discussed below, the contractual arrangement between Techiya and Synergy provided that Synergy could keep nearly 50% of the proceeds from any deal it could strike for the Techiya patents (DBTX-0028; DBTX-0033)—roughly two and a half times what Techiya offered its original licensing agent, S4S.  *See, e.g.*, *infra* ¶ 132.

from their time at Samsung: Bixby and mobile phones. *See e.g.*, DBTX-0056.0010-0022, 0025-0029, 0034-0038, 0044-0064, 0069-0072. Dr. Ahn and Mr. Cho had worked extensively on patent-related issues for these same products while at Samsung. DBTX-0002; DBTX-0003; DBTX-0005; DBTX-0006; DBTX-0015.0004; Day 1 Trial Tr. (Injung Lee) 174:5-7.

### 4. *Samsung Did Not Consent to or Otherwise "Waive" Its Objection to Dr. Ahn and Mr. Cho Switching Sides or Using Samsung's Privileged Information*

68. Samsung never consented to Dr. Ahn or Mr. Cho being adverse to it regarding the Techiya patents. Day 2 Trial Tr. (Ahn) 20:12-17.

69. Instead, Injung Lee objected to Dr. Ahn's assertion of the Techiya patents against Samsung at the parties' first meeting in February 2021. Day 1 Trial Tr. (Injung Lee) 185:9-16. In response, Dr. Ahn informed Samsung that he had an exclusive license from Techiya to the Techiya patents and that he was the only one who could license and enforce the Techiya portfolio. Day 1 Trial Tr. (Injung Lee) 185:17-21. Given Synergy's serious infringement allegations and Dr. Ahn's clear statement that Samsung had to deal with him for any license negotiation or enforcement of the patents, Samsung felt it had no choice but to negotiate directly with Dr. Ahn. Day 1 Trial Tr. (Injung Lee) 185:22-186:9.

70. In early May 2021, after Samsung had objected to Dr. Ahn being adverse to Samsung several times, Samsung, Techiya, and Synergy entered into a nondisclosure agreement. Day 1 Trial Tr. (Injung Lee) 209:10-20. In the nondisclosure agreement, Techiya confirmed that "Techiya has granted Synergy IP and exclusive right to discuss and negotiate with potential licensees regarding the license terms and conditions to the Techiya patents." Day 1 Trial Tr. (Injung Lee) 210:9-211:1.

71. Just days after the nondisclosure agreement was signed, Samsung asked Dr. Ahn whether it could negotiate directly with Techiya. DBTX-0047. In response, Dr. Ahn made it clear

that Synergy had the exclusive right to negotiate regarding the Techiya patents. *Id.*  Techiya directed that Dr. Ahn not waver from this position, instructing Dr. Ahn "to make this very clear so that [Samsung] stay focus [sic] on negotiating with Synergy IP."  DBTX-0047.0001; Day 2 Trial Tr. (Keady) 121:14-25.

72.    Nothing in the parties' nondisclosure agreement constitutes consent or waiver of Dr. Ahn's or Mr. Cho's duties owed to Samsung. Indeed, Dr. Ahn and Mr. Cho are not mentioned in the agreement at all.  CCDX-0034.0006.  As Magistrate Judge Payne concluded regarding this issue in the Disqualification Order:

> Samsung has not consented or otherwise waived the duties and obligations Ahn and Cho owe Samsung as former counsel. Both Texas Disciplinary Rule 1.09 and ABA Model Rule of Professional Conduct 1.9(a) require written consent. Here, Samsung never provided such. The nondisclosure agreement entered into between Synergy and Samsung during the pre-suit license negotiations does not even mention Ahn and Cho, let alone waive a conflict of interest by them. Nothing in that NDA can reasonably be understood as a waiver or a consent.

(Dkt. No. 183 at 3).

73.    The Court, citing the Disqualification Order, reached the same conclusion in response to Techiya's waiver arguments in its motion for summary judgment. *See* (Dkt. No. 731 at 9 ("Having already considered the waiver argument previously when determining the disqualification motion, the Court reaches the same conclusion, namely that a waiver is not present.")); *see also* (Dkt. No. 852).

74.    In addition to Samsung's repeated objections to Dr. Ahn's actions related to the Techiya patents, just two months earlier when Dr. Ahn asserted another company's (Blaze Mobile's) patents against Samsung, Dr. Ahn agreed that Samsung made it "crystal clear" that "Samsung has not, does not consent to ***any*** waiver of the duties and obligations you owe it as a former leader and an attorney of the IP group."  Day 2 Trial Tr. (Ahn) 28:13-25.  Unlike the Blaze matter, Techiya forced Samsung to deal with the Techiya patent matter through Dr. Ahn, who,

citing his exclusive license to negotiate, refused to remove himself or Synergy from the Techiya negotiations despite Samsung's objections. Day 1 Trial Tr. (Injung Lee) 178:25-179:10.

75. The timing of Samsung's counterclaims and motion for disqualification also do not support the conclusion that Samsung waived the duties Dr. Ahn and Mr. Cho owe. Samsung brought its counterclaims three months after Techiya and Synergy's complaint was filed (Dkt. No. 27) and informed Techiya that it intended to move to disqualify Dr. Ahn and Mr. Cho from participating in the patent case just a few months later in July 2022. (Dkt. No. 895 at 10). As Magistrate Judge Payne concluded in the Disqualification Order:

> [I]t was not unreasonable for Samsung to wait until July of [2022] to demand that Ahn and Cho remove themselves from the handling of the patent infringement litigation. The counterclaim, filed just 3 months after the complaint in this action, provided all of the details underlying Samsung's asserted conflict. Samsung did not lay behind the log waiting for some procedural advantage.

(Dkt. No. 183 at 4).

76. Moreover, nothing short of an order from the Court disqualifying Dr. Ahn and Mr. Cho caused Techiya to remove Synergy from the Samsung negotiations. Techiya failed to investigate Samsung's counterclaims and did not remove Synergy as its exclusive licensee until February 6, 2023, nearly a year after the counterclaims were filed and more than six months after Samsung informed Techiya it was moving to disqualify Dr. Ahn and Mr. Cho. Day 2 Trial Tr. (Firestone) 189:14-190:4 (Q. "Now, there was absolutely no investigation done by Techiya of the allegations in the counterclaim. Correct?" A. "That's correct, sir.").

### 5. *Samsung's Privileged "Techiya Status Report"*

77. In May 2021, Samsung in-house legal counsel Sunghyuk Lim drafted the Techiya Status Report, a confidential and privileged internal report with Samsung's legal analysis, conclusions, and response strategies to Synergy's assertion. DBTX-0038; Day 1 Trial Tr. (Lim) 72:15-23, 76:2-25, (Injung Lee) 209:16-20.

78.     The Techiya Status Report contains Samsung's assessment of the risk that Samsung infringes Techiya's patents. DBTX-0038; Day 1 Trial Tr. (Lim) 77:8-17. Samsung uses a six-tier rating standard for relevance which includes high, mid-high, mid-plus, mid-minus, mid-low, and low. These rankings incorporate information about the strength of Samsung's non-infringement arguments, such as whether they depend on a particular claim construction or whether they would apply under any reasonable claim construction. Day 1 Trial Tr. (Lim) 77:18-78:3. The Report also assesses and ranks each patent's validity. These rankings differentiate based on the strength of the invalidity defenses, such as whether they are based on anticipation or obviousness. Day 1 Trial Tr. (Lim) 78:8-19. As a result, these ratings convey a significant amount of information to someone familiar with Samsung's rating standard. Day 1 Trial Tr. (Lim) 78:20-24.

79.     Samsung has used this ranking system since 2016. Dr. Ahn and Mr. Cho are familiar with Samsung's rating standard and these types of reports from their time at Samsung. Day 1 Trial Tr. (Lim) 78:25-79:10, (Injung Lee) 189:19-21.

80.     The Techiya Status Report also contains a response plan with legal response strategies to Dr. Ahn's assertions. This section discusses Samsung's grounds for certain responses and assertions that Samsung believed it could make against Dr. Ahn, Mr. Cho, and Techiya. DBTX-0038.

81.     The Techiya Status Report also contains a detailed assessment of each of the 18 patents asserted by Dr. Ahn through Synergy. DBTX-0038.0005-0013. This section of the Report contains Samsung's internal legal conclusions and analysis regarding specific non-infringement and invalidity arguments for each patent. DBTX-0038.0005-0013; Day 1 Trial Tr. (Lim) 79:16-22.

82.     The Techiya Status Report was prepared to assist Samsung's senior leadership in forming Samsung's response and negotiation strategy to Dr. Ahn's assertation of the Techiya patents.  The Techiya Status Report was one of the most important documents for Samsung on the Techiya matter because it includes a comprehensive analysis of the patents asserted by Techiya. Day 1 Trial Tr. (Lim) 82:2-5, (Injung Lee) 189:7-12.  Mr. Injung Lee, the head of the IP Center at the time the Techiya Status Report was drafted, reviewed and discussed the Report in May, 2021 with his IP Center staff and used the Report to form Samsung's strategy regarding the Techiya patents that was conveyed to senior management.  Day 1 Trial Tr. (Injung Lee) 189:13-18.  The Court has held that the Techiya Status Report is protected by the attorney client privilege and that Samsung would be "seriously prejudiced if the counsel representing Staton Techiya on the issues of infringement, damages, and validity in the main demand have had access to the unredacted documents."  Dkt. No. 844; *see also* Day 1 Trial Tr. (Lim) 72:18-73:19, 76:4-12.

###### 6.     *Audio Recordings and Other Evidence Presented in Mr. Lim's Interview Reveal Dr. Ahn and Mr. Cho Obtained the Techiya Status Report in August 2021*

83.     On November 29, 2023, Mr. Lim was interviewed by the Seoul Central District Prosecutor's Office in Seoul, Republic of Korea.  DBTX-0035.  The interview was part of the prosecutor's criminal investigation of Dr. Ahn and Mr. Cho.  Day 1 Trial Tr. (Jongmin Lee) 48:10-25, 53:6-11.

84.     As part of its investigation, the prosecutor prepared a witness interview statement to memorialize Mr. Lim's interview.  DBTX-0035; Day 1 Trial Tr. (Jongmin Lee) 54:15-25, (Lim) 14-21.  Witness interview statements generated by the Korean prosecutor are a standard part of Korean criminal investigations.  Day 1 Trial Tr. (Jongmin Lee) 52:6-13, 22-53:5.  Mr. Lim and Mr. Jongmin Lee, a Korean criminal attorney who attended Mr. Lim's interview, reviewed the witness statement after it was completed by the Korean prosecutor and signed the interview

statement as true and accurate. DBTX-0035.0036-0037, 0069-0070; Day 1 Trial Tr. (Jongmin Lee) 55:11-25. The Court admitted Mr. Lim's interview statement under Federal Rule of Evidence 803(8).[7] (Dkt. No. 862 (Hr'g Tr.) 13:14-19 (The Court: "if Lim and Kang are coming live, the primary concern about these exhibits I think is resolved. The surrounding contents of them seem to be well-covered by the 803(8) public records exception…"), 28:18-25 ("As to the findings, they are being admitted under 803(8) … I haven't seen anything in this case to persuade me that these documents are not trustworthy. I'm not going to presume that because they're from a foreign country that they are not.")).

85. During Mr. Lim's interview, the Korean Prosecutor's office showed him evidence that it had collected during the criminal investigation into Dr. Ahn and Mr. Cho. Day 1 Trial Tr. (Lim) 82:25-83:4. This information included a file named "Tony.docx" (or "the Tony document") that was discovered by the Korean Prosecutor on Mr. Chunghyo Lee's work laptop as part of the criminal investigation. DBTX-0035.0006-0009. Mr. Chunghyo Lee was a Samsung employee who had a close relationship with Dr. Ahn. Day 1 Trial Tr. (Lim) 91:7-9. "Tony" is a nickname for Dr. Ahn from his time at Samsung. Day 1 Trial Tr. (Lim) 92:14-17, (Cho) 215:12-20. Each time the last name "Lee" appears in Mr. Lim's witness statement, it is referring to Mr. Chunghyo Lee. Day 1 Trial Tr. (Lim) 90:20-91:6.[8]

---

[7]  The interview statements for Samsung's witnesses Mr. Lim and Ms. Kang contain transcriptions of audio recordings between Dr. Ahn and Mr. Cho; documents collected by the prosecutor as part of its investigation; certain findings by the prosecutor about that evidence; and answers to questions by Mr. Lim and Ms. Kang. Samsung has not relied on Mr. Lim's or Ms. Kang's answers reported in the interview statements, but instead their live testimony about the underlying evidence presented to them in the Korean prosecution interviews.

[8]  Ms. Yunhee Kang, a Korean attorney, testified that the Korean Prosecutor is required to redact first names in witness statements under Korean privacy law. Day 1 Trial Tr. (Kang) 125:13-20, 126:13-127:1.

86.    The Tony document is an exact copy of the Techiya Status Report except for the title "Techiya Status Report." The confidential and privileged, attorney work product markings on the first page of the Techiya Status Report were removed from the Tony document.  *Compare* DBTX-0038 (Techiya Status Report) *with* DBTX-0037 (Tony document); Day 1 Trial Tr. (Lim) 93:4-11.  Below is the first page of the Tony document presented to Mr. Lim by the Korean Prosecutor next to the first page of the Techiya Status Report, which was Lim Demonstrative 4 at trial.  Dkt. No. 908-1 at 4.



87.    As part of the security measures employed by Samsung, documents marked as privileged are screened by Samsung's internal email system when sent to someone outside of Samsung and hard copies of privileged documents are not allowed to be removed from Samsung's offices.  Day 1 Trial Tr. (Lim) 93:19-94:5.  Mr. Chunghyo Lee was not authorized to have the Techiya Status Report in his possession.  Day 1 Trial Tr. (Lim) 91:10-12.

88.    Other evidence presented to Mr. Lim by the Korean Prosecutor during his interview were audio recordings of Dr. Ahn and Mr. Cho taken from Mr. Cho's mobile phone that was seized

as part of the criminal investigation.  DBTX-0035.0012-0014, 0015-0020, 0028-0029; Day 1 Trial Tr. (Lim) 83:15-25.  These recordings were played for Mr. Lim during the interview and Mr. Lim immediately recognized the voices as Dr. Ahn and Mr. Cho.  Day 1 Trial Tr. (Lim) 83:15-21.  The voices of Dr. Ahn and Mr. Cho are familiar to Mr. Lim because he worked closely with them during their time at Samsung.  Day 1 Trial Tr. (Lim) 75:5-12.  In addition to playing the audio during the interview, Mr. Lim was also given a transcript of the audio to review while listening to the recording.  Day 1 Trial Tr. (Lim) 83:22-25.  Mr. Lim confirmed that the transcriptions of the audio recordings in his witness interview statement accurately reflect the audio that was played for him during the interview.  Day 1 Trial Tr. (Lim) 84:1-4.  Mr. Jongmin Lee also confirmed that the audio transcripts contained in Mr. Lim's interview statement are true and accurate.  Day 1 Trial Tr. (Jongmin Lee) 57:2-20.

89.    The audio conversations between Dr. Ahn and Mr. Cho make clear that they were discussing content from the Techiya Status Report.  For example, in a conversation between Dr. Ahn and Mr. Cho on August 14, 2021, Dr. Ahn tells Mr. Cho that he will "read it out loud for you. I mean ... the report" (DBTX-0035.0018) and then proceeds to read the first page of the Techiya Status Report to Mr. Cho, as reflected in Lim Demonstrative 1 below (Dkt. No. 908-1 at 1):



90.  Dr. Ahn also read the second section of the Report to Mr. Cho as part of the same conversation, as reflected in Lim Demonstrative 2 below (Dkt. No. 908-1 at 2):



91.  In addition to reading directly from the Report, on August 11, 2021, Dr. Ahn and Mr. Cho discussed Samsung's internal relative risk ratings for patent infringement and patent validity contained in the Techiya Status Report for a number of the Techiya patents and discussed their prediction of Samsung's management's thinking:

| From Audio Recording of August 11, 2021, 18:48 Phone Call | | |
|---|---|---|
| [00:00:06] | [redacted] Ahn | Well, this isn't too urgent, but there is some news. |
| [00:00:13] | [redacted] Cho | Yes. |
| [00:00:14] | [redacted] Ahn | It seems that someone has viewed the Techiya document on the internal system.   From the company..., but you see, we gave them around 17 patents.   Of that, 10.. I mean,                                          , and the rest, for 10 patents, the infringement rating is |
| [00:00:37] | [redacted] Cho | |
| [00:00:38] | [redacted] Ahn | Next, now the validity is all |
| [00:00:50] | [redacted] Cho | |
| [00:00:53] | [redacted] Ahn | Also, out of the 10, 7 are related only to         Two relate only to                 and one relates to                  .   And, it states that the mobile development office considers |

| From Audio Recording of August 11, 2021, 18:48 Phone Call | | |
|---|---|---|
| [00:01:37] | [redacted] Ahn | That must be the objective instructed by upper management. |

| From Audio Recording of August 11, 2021, 18:48 Phone Call | | |
|---|---|---|
| [00:04:12] | [redacted] Ahn | But the ten patents did. If rated         or             like this, it means they're generally      . |
| [00:04:19] | [redacted] Cho | well, the ten may technically overlap somewhat, and in terms of products, they might consider a significant portion of them just as a single product. That could perhaps explain the reason why. |

DBTX-0035.0015-0017; Day 1 Trial Tr. (Lim) 87:23-89:4.

92.     Dr. Ahn admitted receiving the Techiya Status Report document from Mr. Chunghyo Lee in a sworn declaration to this Court on December 18, 2023.  DBTX-0061.0036.  He stated "Chunghyo Lee presented" the Techiya Status Report document to him "at a meeting that Chunghyo Lee requested at a restaurant in Seoul in August 2021."  *Id.*; Day 2 Trial Tr. 30:6-10. Dr. Ahn also confirmed "that after the meeting I called Sungil Cho to discuss what had just happened, including some of the contents of the document."  DBTX-0061.0036; Day 2 Trial Tr.

31:9-15.  Dr. Ahn also admitted that he knew "it was not appropriate for me to have the document."
DBTX-0061.0037; Day 2 Trial Tr. 31:28-23.  Unfortunately for the integrity of discovery in this
litigation, Dr. Ahn claims to have "destroyed" the document, and he never confessed (and indeed
denied) having had the document until after the Korean prosecutor played the audio recordings to
Samsung's witness in November 2023.

93.      The audio transcript of a conversation between Dr. Ahn and Mr. Cho on September
22, 2022, as reflected in Mr. Lim's witness statement, also confirm that Dr. Ahn and Mr. Cho
received the Techiya Status Report from Chunghyo Lee.  Dr. Ahn tells Mr. Cho that he is
concerned about the internal file that Chunghyo "Lee sent. The Techiya evaluation":

| From Audio Recording of September 22, 2022 Phone Call | | |
|---|---|---|
| [00:00:31] | [redacted] Ahn | The reason I say this is because, just in case, they may copy and take all our files in Korea. |
| [00:00:40] | [redacted] Cho | Yes. |
| [00:00:41] | [redacted] Ahn | What concerns me is, you know that thing [redacted] Lee sent us before. |
| [00:00:45] | [redacted] Cho | Yes. |
| [00:00:46] | [redacted] Ahn | That's what concerns me, whether that will show up. |
| [00:00:49] | [redacted] Cho | By that thing [redacted] Lee sent us, you mean that Sony thing? |
| [00:00:56] | [redacted] Ahn | No.. You know that internal file he sent us using an unconventional method. The one that [redacted] Lee sent. The Techiya evaluation. |
| [00:01:04] | [redacted] Cho | Th.. that we actually don't have. |
| [00:01:07] | [redacted] Ahn | Don't have it, but it is on the PC. |
| [00:01:11] | [redacted] Cho | Whose? [redacted] Lee's PC? |
| [00:01:12] | [redacted] Ahn | Ours. Our PC. |
| [00:01:15] | [redacted] Cho | No, at the time, we brought it through that way. |
| [00:01:18] | [redacted] Ahn | What way? |
| [00:01:18] | [redacted] Cho | It was brought as a print out. On paper. |
| [00:01:25] | [redacted] Ahn | Oh did we receive it as a print out? That's right. Well, even if that's the case, I've been thinking about it non-stop. For now, please tell him not to do it until we instruct him otherwise. |

DBTX-0035.0013; Day 1 Trial Tr. (Lim) 90:15-91:1.

94.     The prosecutor also presented Mr. Lim with evidence regarding a folder on Mr. Chunghyo Lee's laptop called "T Weekly Report." DBTX-0035.0032.  Within the T Weekly Reports folder were several Samsung Weekly Reports and the "Tony.docx."  DBTX-0035.0032; Day 1 Trial Tr. (Lim) 94:6-13.  Samsung's Weekly Reports are privileged reports prepared for the head of IP Center that include patent assessments and key legal issues.  Day 1 Trial Tr. (Lim) 94:14-16.

95.     The prosecutor played audio for Mr. Lim during his interview showing that after Dr. Ahn and Mr. Cho reviewed Samsung's privilege log produced in this case (DBTX-0057), they requested Mr. Chunghyo Lee to collect the Weekly Reports in the T Weekly Report folder on Mr. Chunghyo Lee's laptop.  Specifically, in a conversation that took place on August 8, 2022, at 14:11, or 2:11 p.m., Dr. Ahn and Mr. Cho discussed Samsung's privilege log and Dr. Ahn asked that Mr. Cho "Please ask [Chunghyo] Lee."  Mr. Cho confirmed that he understood and then later in the conversation after discussing Samsung's Weekly Reports stated that he was "going to now ask [Chunghyo] Lee to check on them."  DBTX-0035.0029; Day 1 Trial Tr. (Lim) 97:25-99:1.

96.     Less than an hour after Dr. Ahn and Mr. Cho's 2:11 p.m. call, Mr. Chunghyo Lee began to collect and save Samsung Weekly Reports in the T Weekly Reports folder with each of the eight Weekly Reports related to Techiya saved in the folder from 2:52 p.m. to 3:37 p.m. on August 8, 2022:

| T Weekly Report Folder on [redacted] Lee's Work Laptop | | | |
|---|---|---|---|
| [redacted] Lee's PC > 2023-07-14_1 > ChungHyo_[redacted] Lee.E01 > E_ > Users > chunghyo.SECDS > Documents > T Weekly Report | | | |
| □ Name | Date Modified | Type | Size |
| 200123_IP Strategy Team_4th Wk.docx | August 8, 2022, 2:52 pm | Microsoft Word Doc... | 1,988KB |
| 200206_IP Strategy Team_6th Wk.docx | August 8, 2022, 3:36 pm | Microsoft Word Doc... | 191KB |
| 200305_Licensing Team_10th Wk.docx | August 8, 2022, 3:36 pm | Microsoft Word Doc... | 156KB |
| 200319_Technical Analysis Team_12th Wk.docx | August 8, 2022, 3:09 pm | Microsoft Word Doc... | 138KB |
| 200326_Technical Analysis Team_13th Wk.docx | August 8, 2022, 3:35 pm | Microsoft Word Doc... | 145KB |
| 200416_Technical Analysis Team_16th Wk.docx | August 8, 2022, 3:21 pm | Microsoft Word Doc... | 128KB |
| 200820_Technical Analysis Team_34th Wk.docx | August 8, 2022, 3:37 pm | Microsoft Word Doc... | 134KB |
| 200929_Technical Analysis Team_40th Wk.docx | August 8, 2022, 3:31 pm | Microsoft Word Doc... | 196KB |
| Tony.docx | August 9, 2022, 2:35 pm | Microsoft Word Doc... | 1,279KB |

DBTX-0035.0032; Day 1 Trial Tr. (Lim) 99:1-16; Dkt. No. 908-1 at 6.

97.     At the time of these events, this case was in the middle of fact discovery.  Day 1

Trial Tr. (Lim) 99:17-20.  Accordingly, in the middle of discovery Dr. Ahn and Mr. Cho reviewed

Samsung's privilege log containing the Weekly Reports.  Mr. Cho said he would ask Chunghyo

Lee about them, and about an hour later Chunghyo Lee's laptop has a date modified for having

accessed the documents.  DBTX-0035.0029-0032; Day 1 Trial Tr. (Lim) 98:1-100:4.

**7.     *Audio Recordings and Other Evidence Presented in Ms. Kang's Interview Reveal Dr. Ahn and Mr. Cho's Further Reliance on Samsung's Privileged Information***

98.     On December 18, 2023, Ms. Yunhee Kang, a Samsung in-house attorney who led

Samsung's internal investigation into Mr. Chunghyo Lee, was summoned to an interview with the

Korean prosecutor. Day 1 (Kang) 125:11-126:11 DBTX-0041. As with Mr. Lim's interview, the

prosecutor's office generated a witness interview statement to memorialize Ms. Kang's interview.

DBTX-0041; Day 1 Trial Tr. (Kang) 126:13-17; Day 1 Trial Tr. (Jongmin Lee) 52:6-13, 22-53:5.

The Court admitted Mr. Kang's interview statement under Federal Rule of Evidence 803(8).  (Dkt.

No. 862 (Hr'g Tr.) 13:14-19, 28:18-25).

99.    During the interview, Ms. Kang was presented with evidence that was seized by the Korean prosecutor during the criminal investigation of Dr. Ahn and Mr. Cho including audio recordings, the transcript of audio recordings, and documents. Day 1 Trial Tr. (Kang) 127:13-19. The audio recordings presented to Ms. Kang consisted of conversations between Dr. Ahn and Mr. Cho. Day 1 Trial Tr. (Kang) 127:20-23. Ms. Kang was able to confirm that the conversations were between Dr. Ahn and Mr. Cho because she recognized their voices from her many years of working with them while at Samsung. Day 1 Trial Tr. (Kang) 128:3-13. Ms. Kang personally heard the Korean prosecutor play all the audio recordings reflected in the transcripts of audio recordings within DBTX-0041 and followed along from a transcript of the audio recordings provided by the prosecutor while listening to the recordings.  Day 1 Trial Tr. (Kang) 128:22-129:4. Through this process, Ms. Kang confirmed that the transcript she was reading was true and correct for each transcript of an audio recording contained in DBTX-0041. Day 1 Trial Tr. (Kang) 128:22-129:11. At the end of her interview, Ms. Kang reviewed the interview statement for accuracy and confirmed that each page was accurate.  Day 1 Trial Tr. (Kang) 129:12-16.

100.    During the interview, the Korean prosecutor played audio from the same call that was played during Mr. Lim's interview on August 8, 2021 at 2:11 p.m. regarding Samsung's privilege log and Dr. Ahn's request that Mr. Cho "ask [Chunghyo] Lee" about the weekly reports. *See* § II.B.6, *supra*; DBTX-0041.0012-0013.  Additional audio from this call was played at Ms. Kang's interview that made it even more clear that Dr. Ahn and Mr. Cho asked Mr. Chunghyo Lee to obtain Samsung's Weekly Reports for their review.  Mr. Cho told Dr. Ahn that, "if I specify the year and week, [he] should be able to get it for us." To which Dr. Ahn responded "[t]o see the content inside."  Cho then stated, "Yes, to see what they say. I'm going to ask him for only four reports relating to Techiya."  DBTX-0041.0015.  Whenever the name "Lee" appears in the audio

recording transcripts in Ms. Kang's interview statement it is a reference to Mr. Chunghyo Lee. Day 1 Trial Tr. (Kang) 126:18-127:12.

101. Just two hours after the 2:11 p.m. call, Dr. Ahn and Mr. Cho had another call in which Mr. Cho indicated to Dr. Ahn that Mr. Chunghyo Lee "saw three [weekly] reports" and discussed their contents with Mr. Cho. DBTX-0041.0016-0017; Day 1 Trial Tr. (Kang) 131:13-132:11. As part of Samsung's internal investigation, Ms. Kang confirmed that Mr. Chunghyo Lee downloaded Samsung's Weekly Reports with Techiya related information. Day 1 Trial Tr. (Kang) 132:12-24.

102. Also played for Ms. Kang during her interview was audio from a January 12, 2023 call between Dr. Ahn and Mr. Cho regarding a call that Dr. Ahn had just received from Mr. Chunghyo Lee. Mr. Chunghyo Lee had called to inform Dr. Ahn that Samsung was going to image his laptop as part of its internal investigation. DBTX-0041.0024. Ms. Kang was mentioned specifically by Mr. Chunghyo Lee as the person conducting the investigation. *Id*. Ms. Kang had no idea at the time that Mr. Chunghyo Lee was closely coordinating with Dr. Ahn and Mr. Cho regarding the investigation. Day 1 Trial Tr. (Kang) 133:8-134:11.

103. The Korean prosecutor also played for Ms. Kang a conversation between Dr. Ahn and Mr. Cho from January 13, 2023. As part of that conversation, Dr. Ahn and Mr. Cho expressed concern about emails from Mr. Chunghyo Lee's computer being viewed by Samsung as part of Samsung's internal investigation. DBTX-0041.0027-0029; Day 1 Trial Tr. (Kang) 134:12-136:7. Mr. Cho told Dr. Ahn that Chunghyo Lee "seemed worried about" emails "slipp[ing] through, without him deleting them." Dr. Ahn responded that while one or two slipping through might not matter, "there might be a large number of those, which would expose me." DBTX-0041.0028; Day 1 Trial Tr. (Kang) 134:12-136:7.

104. In fact, there were emails between Dr. Ahn and Mr. Chunghyo Lee that had slipped through. Day 1 Trial Tr. (Kang) 136:5-7. An example is an email from May 23, 2023, from Dr. Ahn to Mr. Chunghyo Lee regarding this case. DBTX-0010; Day 1 Trial Tr. (Kang) 136:8-18, 137:12-19. Another email was found through Samsung's internal investigation showing that Mr. Chunghyo Lee had sent himself a message with the "Tony.docx" document attached. DBTX-0036; Day 1 Trial Tr. (Kang) 138:23-140:3. Other than the removal of the title and privileged markings, the Tony document attached to this email contains identical content as the privileged and confidential Techiya Status Report. Day 1 Trial Tr. (Kang) 138:23-140:3; *see* § II.B.6, *supra*. Mr. Chunghyo Lee was not authorized to view the contents of the Techiya Status Report. Day 1 Trial Tr. (Kang) 140:6-15. Nor were Dr. Ahn or Mr. Cho.

105. Ms. Kang's investigation also revealed that Mr. Chunghyo Lee had printed the Techiya Status Report on August 11, 2021 at 5:45 p.m. DBTX-0042; Day 1 Trial Tr. (Kang) 141:17-142:19. Mr. Chunghyo Lee's printing of the Techiya Status Report occurred just one hour before Dr. Ahn and Mr. Cho's first conversation regarding the contents of the Techiya Status Report on August 11, 2021 at 6:48 p.m. DBTX-0035.0015-0017. Dr. Ahn's sworn statement admits that Mr. Chunghyo Lee presented the Techiya Status Report document to him in August 2021. DBTX-0061.0036; Day 2 Trial Tr. 30:6-10. Dr. Ahn also admits that after receiving the Report, he "called Sungil Cho to discuss what had just happened, including some of the contents of the document." DBTX-0061.0036; Day 2 Trial Tr. 31:9-15. Accordingly, the evidence shows that Mr. Chunghyo Lee provided the Techiya Status Report to Dr. Ahn on August 11, 2021 after printing the document at 5:45 p.m. DBTX-0042; DBTX-0061.0036.

106. The Korean prosecutor also presented Ms. Kang with evidence that on February 11, 2023 at 4:45 p.m. Korean Time, just hours after the Court ordered Mr. Cho to sequester his

devices for forensic examination at a hearing beginning at 9:00 a.m. on February 10, 2023 Central Time, *see* (Dkt. No. 290), Mr. Cho installed "Andro Shredder" on his phone.  DTBX-0041.0042-0045; Day 1 Trial Tr. (Kang) 145:10-146:12.  Andro Shredder is an application that permanently destroys files and makes data recovery impossible.  DTBX-0041.0044.  In addition, the prosecutor seized a handwritten note from Mr. Cho's residence that included phrases such as "overwrite w/ random data," "Can file type, date of creation, date of deletion be determined," and "If deleted after adjusting the system clock, can the adjustment be identified?"  DBTX-0041.0040.

### 8. *After Obtaining the Techiya Status Report, Synergy and Techiya Prepare and then Litigate the Patent Case*

107.    Shortly after Dr. Ahn and Mr. Cho obtained Samsung's privileged and confidential Techiya Status Report in August 2021, Synergy and Techiya began to prepare for litigation.  On August 27, 2021, Techiya's Majority Shareholder Daniel Staton told Dr. Ahn that his "strong belief is that if Samsung does NOT gives [sic] us an acceptable offer by September 1st, together with a fairly quick closing date we file a lawsuit for a multiple of the amount we are asking."  DBTX-0053.  Dr. Ahn responded, "I agree with you. Since 3 or 4 months ago I have considered a litigation option and prepared for it with an outside counsel.  For that purpose, he and I have worked on the prior art research on a number of litigation candidate patents.  I think prior art research result is positive."  *Id.*  Dr. Ahn further stated that during Techiya and Synergy's next conference on September 4, he would further discuss the litigation option.  *Id.*

108.    On September 30, 2021, Techiya provided consent to Synergy to pursue litigation. DBTX-0077.  In response to Techiya's letter of consent, Dr. Ahn stated that he was "discussing with potential litigation counsels" and that he would "make a report about the initial litigation preparation" soon.  DBTX-0050.  Mr. Cho was also working with outside counsel PV Law in the weeks leading up to filing the complaint.  Day 1 (Cho) Trial Tr. 219:7-14.

109.     Techiya, Synergy, and PV Law prepared the complaint against Samsung.  Day 2 Trial Tr. (Ahn) 228:16-17, (Firestone) 186:20-187:4 (Dr. Ahn "helped to construct the complaint"), (Keady) 139:19-140:3 (stating that he had input into the complaint).  Mr. Cho had originally selected the patents and products to include in the claim charts sent to Samsung, Day 1 Trial Tr. (Cho) 217:19-21, and Dr. Ahn signed off on the patents and the products that were included in the complaint.  Day 2 Trial Tr. (Ahn) 18:24-19:1.

110.     Synergy and Techiya, through their outside counsel PV Law, filed suit against Samsung for patent infringement on November 5, 2021.  (Dkt. No. 1).  Eight of the ten patents-in-suit included in Techiya's November 5 complaint were included in the Techiya Status Report that Dr. Ahn and Mr. Cho obtained just a few months earlier.  *Compare* DBTX-0038 (analyzing the '982, '839, '400, '542, '591, '082, '015, '244 patents) *with* (Dkt. No. 1) at 11-43.  The other two asserted patents, the '836 and '424 patents—overlap in accused products with the eight other patents.  *Id.*

111.     After the complaint was filed Dr. Ahn and Mr. Cho communicated with outside patent counsel about the management of the litigation.  Day 2 Trial Tr. (Ahn) 18:13-17, (Keady) 140:8-10.  Techiya also communicated with outside patent counsel from the beginning of the case.  Day 2 Trial Tr. (Keady) 140:22-141:2.  Together, Synergy, Techiya, Dr. Ahn, Mr. Cho, and PV Law ran the litigation.  Day 2 Trial Tr. (Staton) 217-18, (Keady) 140-141, (Firestone) 217:16-218:17.

### 9.     *Dr. Ahn and Mr. Cho Provided PV Law with the Contents of the Techiya Status Report*

112.     The evidence reveals that Dr. Ahn and Mr. Cho used the privileged and confidential Techiya Status Report to select the patents for filing in this lawsuit, and provided information from

the Report to outside patent counsel PV Law in the weeks leading up to filing the complaint against

Samsung. DBTX-0096; DBTX-0097; DBTX-0098.

113.    During his December 27, 2023 witness interview, Dr. Ahn admitted that he and Mr.

Cho used the Techiya Status Report in selecting patents for this case:

> Q. "In the end it appears that you and Sungil Cho had used the Techiya Status Report document in determining the priority (tier) of the patents as well as selecting the patents for filing lawsuits. Is this right?"
>
> A. "Looking at it now, Sungil Cho appears to have referred to the Techiya Status Report document."

DBTX-0097.0040.

114.    Dr. Ahn also admitted during his interview that on or around October 1, 2021, Mr.

Cho "sent a list of [Techiya] patents and relevant claim chart per each which he selected from the

Techiya Status Report" to outside patent counsel PV Law. DBTX-0097.0041-0042.

115.    Dr. Ahn further admitted that the prior art identified in the Techiya Status Report—

prior art Samsung identified and analyzed in the Techiya Status Report in May 2021—were sent

to PV Law around October 6, 2021.

> Q. "It seems that prior arts provided to Purplevine were pertaining to 6 patents classified as tier 1 or 2. They included prior arts listed in the Techiya Status report and those from the analysis of Irell. Is it correct?"
>
> A. "Yes it is correct. He sent the relevant prior arts to PV Law, the law firm so that it can assess them."

DBTX-0097.0043.

116.    Mr. Cho admitted that he copied part of the Techiya Status report containing "the

relevance, prior arts, and prior arts, and validity analysis results pertaining to the [Techiya] patents

that Samsung evaluated to be [redacted] or higher" "verbatim onto" a spreadsheet that was seized

by the Korean prosecutor. DBTX-0098.0018-0019. Mr. Cho also admitted that he used the

Techiya Status Report "to find the prior arts." DBTX-0098.0020.

117.    Mr. Cho further admitted that he (1) "sent to Purplevine the list of 10 patents that [he] handpicked from the Techiya Status Report" on October 1, 2021, and (2) the prior arts that he provided to Purplevine included "all of the prior arts specified in Samsung Electronics' Techiya Status Report." DBTX-0098.0035.  Purplevine is funding this litigation for Techiya.  Day 1 Trial Tr. (Keady) 136; CCDX-0085.0002.

118.    After Dr. Ahn and Mr. Cho provided PV Law and Purplevine with the detailed information taken from the privileged and confidential Techiya Status Report, PV Law partner Robert Gaybrick told Dr. Ahn that "[w]ith your intimate knowledge of Samsung, I hope that we can stay one step ahead of it on this case." DBTX-0096.

119.    DBTX-0096, 0097, and 0098 confirm that the information contained in the privileged Techiya Status Report was used by Synergy, Techiya and PV Law to prosecute the patent case.

C.    **Techiya Incentivized, Enabled, and Participated in the Misuse and Theft of Samsung's Confidential and Privileged Information.**

1.    *Techiya Engages Synergy to Target Samsung*

120.    In 2017, Techiya hired its first patent agent—S4S, LLC—to monetize its patents in exchange for up to 20% of any deal it could strike.  CCDX-0001.  After Samsung informed S4S in 2018 that it would "not pursue the Techiya opportunity," DBTX-0022; DBTX-0024; Day 2 Trial Tr. (Keady) 92:20-22, 93:1-7, 93:10-94:20, 95:4-12, 95:15-19, Techiya replaced S4S with a patent licensing agent called Sonder.  When Sonder approached Samsung with the Techiya patents, Samsung again declined.  DBTX-0076; Day 2 Trial Tr. (Keady) 102:5-16.

121.    Techiya's third choice for an agent—Synergy IP, LLC—was one with significant ties with Samsung.

122.    In late May 2020, Sariel Engel of Sonder contacted Dr. Ahn and asked for his assessment of the Techiya portfolio.  DBTX-0014; Day 2 Trial Tr. (Keady) 102:17-104:6.  From the get-go, Engel contemplated that Samsung would be Dr. Ahn's first licensing target, writing that "[m]aybe if we get [Techiya] an initial licensee (such as Samsung) they will agree to entrust the licensing to you."  DBTX-0014; Day 2 Trial Tr. (Keady) 104:7-20.

123.    Soon thereafter, Engel introduced Synergy and Dr. Ahn to Techiya.  DBTX-0044; Day 2 Trial Tr. (Keady) 55:6-11, (Firestone) 159:16-19.  On July 15, 2020, Dr. Ahn met with Techiya CEO Brian Firestone, Assistant General Counsel John Keady, and Majority Shareholder Daniel Staton.  DBTX-0063; Day 2 Trial Tr. (Keady) 96:24-97:2, (Firestone) 170:25-171:5.  The next day, Dr. Ahn stated that Synergy "will be responsible for Techiya licensing program" and circulated a document titled "Introduction to Synergy IP."  DBTX-0015; Day 2 Trial Tr. (Keady) 97:5-98:11, 98:17-23.

124.    The "Introduction to Synergy IP" document disclosed that Dr. Ahn had been a Samsung "IP executive" for 17 years (including 9 years "as the Head of the IP Center") and "was ultimately responsible for all IP matters" at Samsung.  DBTX-0015.0004.  It also introduced Sungil Cho as a former Samsung "in-house patent expert" who focused on analyzing patent infringement and validity.  *Id.*  Both Dr. Ahn and Mr. Cho were identified as U.S.-barred attorneys with U.S. law degrees.  *Id.*

125.    Techiya's principals, Dr. Keady, Mr. Firestone, and Mr. Staton, all concurred with the decision to hire Synergy as Techiya's licensing agent for the Techiya patent portfolio, which Techiya believed has immense value.  Day 2 Trial Tr. (Keady) 105:12-15, 107:14-15.  Firestone testified that he and Dr. Keady "had discussions about Synergy's background" when Techiya "made the joint decision about hiring Synergy."  Day 2 Trial Tr. (Firestone) 170:3-6.

126.     Despite admitting that they had discussed Synergy's background before hiring it as its licensing agent, Techiya's witnesses professed to have conducted very little due diligence on Synergy and gave conflicting testimony regarding their knowledge of Dr. Ahn's and Mr. Cho's work responsibilities at Samsung.   For example, CEO Firestone admitted that he knew that Dr. Ahn and Mr. Cho were lawyers who had worked at Samsung.   Day 2 Trial Tr. (Firestone) 161:1-4, 171:16-172:2.   In contrast, CTO and Assistant General Counsel Keady testified that he did not know Dr. Ahn and Mr. Cho were lawyers until he read it in the counterclaims that were filed in February 2022.   Day 2 Trial Tr. (Keady) at 109:13-20.   And Majority Shareholder Staton claimed to not have learned Dr. Ahn was a lawyer until just days before his deposition on January 24, 2023, almost a year after the counterclaims were filed and two months *after* the Court's order disqualifying Dr. Ahn and Mr. Cho from the case for having switched sides as former Samsung lawyers.   Day 2 Trial Tr. (Staton) at 211:20-212:15.

127.     This inconsistent testimony is despite the fact that Dr. Keady, Mr. Firestone, and Mr. Staton were all regularly copied on emails and involved in bi-weekly Zoom calls related to this matter. They were jointly involved in setting and executing on the strategy for this case both before and after filing.   DBTX-0047; DBTX-0030; DBTX-0048; DBTX-0046; Day 2 Trial Tr. (Keady) 140:22-141:2, (Firestone) 162:8-10, 217:16-218:17.

128.     In late July 2020, Techiya and Synergy signed a Common Interest and Confidentiality Agreement.   CCDX-0016.   By that time, Techiya was already contemplating litigation against Samsung.   Day 2 Trial Tr. (Keady) 105:16-106:22.

129.     In early November 2020, Mr. Engel told Mr. Firestone that Dr. Ahn "believ[ed] he need[ed] to meet S[amsung] first with 10 top quality claim charts prepared by his team."   DBTX-0059; *see also* Day 2 Trial Tr. (Keady) 111:17-113:3.

130.    Ultimately, the decision to target Samsung first was a "joint decision on the part of Synergy and Techiya."  Day 2 Trial Tr. (Firestone) 180:23-181:3.

131.    On November 24, 2020, Techiya and Synergy entered a Patent License Agreement that made Synergy Techiya's exclusive agent for the Techiya patent portfolio.  DBTX-0028; Day 2 Trial Tr. (Keady) 108:13-23.

132.    In the Patent License Agreement, Techiya required that Synergy possess the "exclusive right to enforce" the Techiya patents and insisted Synergy have "control" over litigation involving those patents.  DBTX-0028; *see also* Day 2 Trial Tr. (Ahn) 17:23-18:8.  In exchange for Synergy assuming this role as Techiya's agent, Techiya agreed to give Synergy nearly 50% of the proceeds from any deal it could strike for the Techiya patents (DBTX-0028; DBTX-0033)— roughly two and a half times what Techiya offered S4S.  *Compare* CCDX-0001.

133.    Although Techiya knew that Dr. Ahn had previously held a senior position at Samsung (Day 2 Trial Tr. (Keady) 109:25-110:4), and was an attorney who had litigated for Samsung in IP-related matters (Day 2 Trial Tr. (Firestone) 159:20-24, 161:1-4, 171:16-172:16), Techiya never asked Dr. Ahn about potential conflicts (Day 2 Trial Tr. (Keady) 141:19-142:3, (Firestone) 189:2-9), such as whether Dr. Ahn had worked on matters related to the accused products here (Day 2 Trial Tr. (Keady) 142:4-8), which Dr. Ahn had done (*see, e.g.*, DBTX-0002; DBTX-0003; DBTX-0005; DBTX-0006).  Nor did Techiya ever consider whether using Samsung's former lawyers, Dr. Ahn and Mr. Cho, might pose ethical questions.  Day 2 Trial Tr. (Firestone) 189:14-18.  Even without further investigation, however, Dr. Ahn's inside information and the overlap between Techiya's claims and Dr. Ahn's time at Samsung were apparent from the disclosures to Techiya.  DBTX-0046; DBTX-0015.

134.     On December 2, 2020, Dr. Ahn told Techiya that Synergy had "started to prepare the claim charts against Samsung products."  DBTX-0081; Day 2 Trial Tr. (Keady) 113:5-24. Dr. Ahn emphasized that "[f]inding good 6 patents for earbuds [c]ould be relatively easy," but that "a careful study of all Techiya patents should be done to find good patents for the handsets." DBTX-0081.   Dr. Ahn suggested that, "[f]or a better communication between Techiya and Synergy," the parties should "have a zoom call every two weeks."  *Id.*

### 2.     *Dr. Ahn Negotiated with Samsung with Input from Techiya*

135.     "[S]hortly after" Techiya "retained" Synergy, Synergy's discussions with Samsung commenced.  Day 2 Trial Tr. (Firestone) 162:13-15.  From the outset, Synergy and Techiya sought "to get as much payment as possible from Samsung."  DBTX-0080; Day 2 Trial Tr. (Keady) 123:23-25.

136.     On January 8, 2021, Dr. Ahn called Samsung's General Counsel to make a dinner appointment, which ultimately was scheduled for February 2, 2021.  DBTX-0017.

137.     On February 1, 2021, Dr. Ahn provided Techiya with draft claim charts for Samsung. DBTX-0045.  The claim charts were drafted by Synergy.  Day 2 Trial Tr. (Keady) 114:21-115:9, (Firestone) 179:18-21, 182:20-184:8.  Techiya did not inquire whether Synergy used insider knowledge of Samsung when drafting the charts because it was Dr. Ahn's "job … to handle the litigation and licensing management."  Day 2 Trial Tr. (Keady) 115:16-116:12.

138.     Dr. Ahn sent his claim charts to Samsung on February 4, 2021.  CCDX-0026; Day 2 Trial Tr. (Keady) 116:13-117:1.

139.     Throughout Dr. Ahn's negotiations with Samsung, according to Techiya CEO Firestone, Dr. Ahn "represented [Techiya] as a licensing agent."  Day 2 Trial Tr. (Firestone) 181:4-12, 181:25-182:19.

140.    Techiya knew Dr. Ahn was negotiating with "Samsung people" who had "worked for [Dr. Ahn] for many years."   DBTX-0046; Day 2 Trial Tr. (Keady) 129:17-131:9; *see also* DBTX-0017 (Dr. Ahn makes dinner appointment with Samsung general counsel).  Yet Techiya witnesses claimed to have never asked how Dr. Ahn knew or had ready access to key Samsung business leaders like the CFO of the mobile business unit, the head of licensing, or the general counsel, or how Dr. Ahn knew the inner workings of Samsung's IP Center.  CCDX-0032; CCDX-0035; Day 2 Trial Tr. (Keady) 125:4-126:1, 127:11-128:11.

141.    Techiya expressed no concern over the fact that Dr. Ahn contacted Samsung business leaders outside the presence of Samsung lawyers (Day 2 Trial Tr. (Keady) 126:2-12), but rather inquired whether Dr. Ahn's pressure campaign on Samsung business leaders was yielding results (DBTX-0048; Day 2 Trial Tr. (Keady) 126:13-127:10).  And when Dr. Ahn responded and suggested the likelihood that the "Samsung IP Center hasn't found the prior arts which can invalidate all the patents with claim charts," which "means that they know[] the risk related to Techiya patents" and "haven't decided how to manage this case," Techiya's Majority Shareholder, Daniel Staton, offered his suggestion on how Samsung could manage the case: Samsung could pay a lot of "$$$$$."  DBTX-0048; Day 2 Trial Tr. (Keady) 128:12-18.

142.    Dr. Ahn frequently discussed strategy and shared information with Techiya regarding the negotiations with Samsung. Between 2020 and the filing of this litigation in November 2021, Techiya and Synergy exchanged dozens of emails and had dozens of Zoom meetings about licensing and enforcing Techiya's patents. (Day 2 Trial Tr. (Keady) at 62:15-63:13.)

143.    In May 2021, Dr. Ahn demanded Samsung pay ███████ to license the Techiya patents, which Samsung said was excessive based on its patent analysis.  DBTX-0047; DBTX-

0030.  Although Techiya witnesses claimed at trial that they did not have any say in the ███████ demand amount, Dr. Ahn's email to them reporting on his meeting with Samsung in which he made the demand reflected that the offer was made "as planned."  DBTX-0047; Day 2 Trial Tr. (Keady) 128:19-25, 129:3-10.

144.    By August 2021, Techiya began losing patience with the pace of the negotiations and urged the filing of litigation against Samsung.  On August 27, 2021, Mr. Staton wrote in an email that it was his "strong belief" that "if Samsung does NOT give[] us an acceptable offer by September 1st, together with a fairly quick closing date we file a lawsuit for a multiple of the amount we are asking. They've had enough time."  DBTX-0053; Day 2 Trial Tr. (Keady) 131:21-132:1, 132:5-11; Day 2 Trial Tr. (Firestone) 184:13-185:7.  Dr. Ahn "agree[d] with Mr. Staton's directions to file a lawsuit against Samsung" (Day 2 Trial Tr. (Firestone) 185:8-186:2), responding, "I agree with you" (DBTX-0053).

145.    Dr. Ahn also explained that for three or four months he had been preparing for "a litigation option" with outside counsel.  DBTX-0053.  Dr. Ahn stated that he and outside counsel had been working on "the prior art research on a number of litigation candidate patents," and that "the prior art research result is positive."  DBTX-0053; Day 2 Trial Tr. (Keady) 132:13-24.

### 3.    *Techiya Demanded and Authorized Synergy to File Patent Case Against Samsung*

146.    On September 30, 2021, after Samsung made a counteroffer—and its agent was armed with Samsung's internal analysis—Techiya gave Synergy its "written consent to pursue Licensee initiated litigation."  DBTX-0077; Day 2 Trial Tr. (Keady) 133:8-134:5.  In response, Dr. Ahn confirmed he was discussing the suit with "potential litigation counsels" and would "report about the initial litigation preparation" soon.  DBTX-0050.

147.    Ultimately, Dr. Ahn selected PV Law as counsel for both Synergy and Techiya. Day 2 Trial Tr. (Keady) 134:17-135:8.  Upon being selected as counsel, Robert Gaybrick of PV Law wrote Dr. Ahn that "[w]ith your intimate knowledge of Samsung I hope that we can stay one step ahead of it on this case."  DBTX-0096; Day 2 Trial Tr. (Keady) 135:11-136:15.  PV Law jointly represented Synergy and Techiya.  Day 2 Trial Tr. (Keady) 85:16-21.

148.    Just before suing Samsung, Techiya executed a new license agreement with Synergy that obligated Techiya and Synergy to sue Samsung and allowed Synergy to recover even more money. DBTX-33. The agreement provided that Synergy "***shall*** initiate a legal proceeding to enforce the Licensed Patents against a third-party infringer," but only "[w]ith the ***mutual agreement***" of both Synergy ***and*** Techiya.  DBTX-0033 (emphases added); Day 2 Trial Tr. (Keady) 136:17-137:19, 137:24-25, 138:1-20.

149.    On November 5, 2021, after Dr. Ahn tried to persuade Techiya not to file a lawsuit against Samsung (Day 2 Trial Tr. (Ahn) 9:6-9), Techiya and Synergy filed this lawsuit against Samsung.  (Dkt. No. 1).  When he informed Samsung of the complaint, Dr. Ahn stated that he could not "persuade Techiya anymore to let me negotiate further without filing a lawsuit."  DBTX-0069; Day 2 Trial Tr. (Keady) 143:7-144:2.

150.    Dr. Ahn and Mr. Cho each worked with Techiya's outside patent counsel to prepare and revise the complaint (Day 2 Trial Tr. (Keady) 140:4-7, (Firestone) 186:6-187:4), but Techiya also had input into the complaint and even edited it.  Day 2 Trial Tr. (Keady) 139:13-140:3 ("I edited the complaint.").

151.    Synergy picked the asserted patents and the accused products, with a particular effort to "tr[y] to add more patents related to mobile phones" because "mobile phone account for a large share of Samsung Electronics' sales."  DBTX-0098.0026-0027; Day 1 Trial Tr. (Cho)

217:5-21; Day 2 Trial Tr. (Ahn) 18:24-19:1. Mr. Cho admitted that Synergy and Techiya asserted mobile phone patents as a tool to increase damages. DBTX-98.0026-0027. Unsurprisingly, ***eight of the ten patents selected*** for assertion were among the 18 patents analyzed in the internal Samsung report that Synergy misappropriated from Samsung via Chunghyo Lee. *Compare* DBTX-0038 (analyzing the '982, '839, '400, '542, '591, '082, '015, '244 patents), *with* (Dkt. No. 1 at 11-43). Dr. Ahn and Mr. Cho assessed patent infringement, invalidity, and damages, and also participated in hundreds of communications with Techiya and outside counsel related to the analysis and enforcement of Techiya's patents. Day 2 Trial Tr. (Keady) 140:8-11, 140:12-141:2.

152.    Techiya argued in its closing that Synergy did not select only the patents Samsung rated as having the highest infringement risks in the Techiya Status Report, and suggested this shows that Synergy must not have used Samsung's privileged report to guide its selection of patents. Day 2 Trial Tr. (Closing) 282:18-283:22. In addition to the evidence above showing that it did use Samsung's privileged Techiya Status Report, Techiya's argument overlooks the fact that other factors captured in that report would also guide patent selection, such as validity and exposure.

153.    From the outset, Dr. Ahn and Dr. Keady jointly oversaw strategy for the lawsuit and (with input from Mr. Firestone) managed the litigation. Day 2 Trial Tr. (Firestone) a187:14-21, (Staton) 217:10-218:17.

### 4.    *Techiya Took No Action After Samsung Filed Its Counterclaims*

154.    On February 10, 2022, Samsung filed counterclaims for breach of fiduciary duty against Dr. Ahn and Mr. Cho, aiding and abetting breach of fiduciary duty against Techiya, and civil conspiracy and trade secret misappropriation against Ahn, Cho, Synergy, and Techiya. *See* (Dkt. No. 27).

155.    Although it claimed to be "[f]labbergasted" by the counterclaims, Day 2 Trial Tr. (Firestone) 164:18-165:2, Techiya never investigated the allegations against Dr. Ahn and Mr. Cho in Samsung's counterclaims.  Day 2 Trial Tr. (Firestone) 190:2-4.  Techiya instead claims that it simply took at face value Dr. Ahn's and Mr. Cho's word that they had not done anything wrong. Day 2 Trial Tr. (Keady) 82:12-20; *but see* Day 1 Trial Tr. (Cho) 219:23-25 ("Q. Has Techiya asked you if the allegations in the counterclaims are true? A. No.").  Accordingly, Techiya did not implement a screen preventing Dr. Ahn's and Mr. Cho's continued participation in the patent litigation until August 17, 2022.  CCDX-0081; Day 2 Trial Tr. (Firestone) 190:7-16.  Further, it did not terminate its relationship with Synergy until a year after the counterclaims were filed. CCDX-0080; CCDX-0085; CCDX-0086; Day 2 Trial Tr. (Firestone) 189:19-190:1.

156.    Even the disqualification motion did not generate scrutiny from Techiya.  Instead, it drew laughter from Mr. Staton, who found the filing an "absolute joke."  Day 2 Trial Tr. (Staton) 218:18-219:4.

### 5.    *Techiya's Conduct Contributed to Dr. Ahn's and Mr. Cho's Theft and Misuse of Samsung's Confidential Information in This Case*

157.    The evidence adduced at trial establishes that Techiya engaged in conduct that materially contributed to the theft of Samsung's confidential information by their agents, Synergy, Dr. Ahn, and Mr. Cho, as well as its improper use in this patent case.

158.    *First*, Techiya's witnesses' professions of ignorance regarding basic background facts of Synergy, Dr. Ahn, and Mr. Cho are not credible. Techiya's assistant general counsel for IP, Dr. Keady, testified that he had only "some interest" in the company to which Techiya was entrusting enforcement of what it believed to be an immensely valuable patent portfolio.  Day 2 Trial Tr. (Keady) 107:14-16, 108:24-109:4.   Techiya's witnesses claimed that they barely investigated Synergy's background and history. Incredibly, before hiring Synergy, both Dr. Keady

and Mr. Staton claim not to have even known that Dr. Ahn and Mr. Cho were former Samsung lawyers. Day 2 Trial Tr. (Keady) 56:19-23; Day 2 Trial Tr. (Staton) 211:20-212:15. Also, Techiya's witnesses claimed that they did not so much as inform themselves of critical information about Synergy, including that Dr. Ahn had previously been the head of Samsung's IP Center (Day 2 Trial Tr. (Keady) 109:21-25), or even generally what Dr. Ahn's role had been at Samsung (Day 2 Trial Tr. (Firestone) 172:3-16).

159. The evidence adduced at trial contradicts Techiya's professed ignorance. Techiya hired Dr. Ahn for the specific reason that he had extensive knowledge of Samsung's inner workings and had ready access to Samsung decision makers. Day 2 Trial Tr. (Firestone) 173:15-20 ("[I]t was valuable to me that he had access to these people, of course.").

160. The evidence at trial established that Techiya was presented with substantial information regarding Dr. Ahn's and Mr. Cho's backgrounds, considered that information in retaining Synergy, and leveraged their backgrounds in subsequent negotiations with Samsung. Before making "the joint decision about hiring Synergy," for example, Mr. Firestone and Dr. Keady "had discussions about Synergy's background." Day 2 Trial Tr. (Firestone) 170:3-6. The day after Techiya had its introductory Zoom call with Ahn in July 2020, Dr. Ahn circulated an "Introduction to Synergy IP" marketing piece that, among other things, touted Dr. Ahn's "serv[ice] as an IP executive for seventeen years at Samsung Electronics in Korea, including the most recent nine years as the Head of IP Center." DBTX-0015.0004. It further explained that, during his tenure as the head of the IP Center, Dr. Ahn "was ultimately responsible for all IP matters of Samsung Electronics," and it disclosed that Dr. Ahn "graduated from Santa Clara University Law School (J.D. 2000) and is admitted to [the] California Bar." DBTX-0015.0004. The Synergy marketing

document also disclosed that Mr. Cho worked for 16 years at Samsung and holds a law degree from Fordham Law School and is a member of the New York Bar.  *Id.*

161.    Moreover, Dr. Ahn frequently communicated with Techiya that he had knowledge of key Samsung senior executives, engaged in outreach and meetings with those executives, and frequently touted his knowledge of the inner workings of the Samsung IP Center.  DBTX-0017 (Ahn makes dinner appointment with Samsung general counsel); CCDX-0032 (Dr. Ahn telling Techiya he had "called the CFO of Samsung Mobile Business" and received an email from "the licensing head of Samsung IP Center"); CCDX-0035 (discussing one-on-one meeting with "the head of licensing, Mr. YS Kim"); DBTX-0046 (Sariel Engel tells Techiya that the "head of licensing," an executive who "deals with licensing and litigations," and the "head of IP center" all "worked for [Dr. Ahn] for many years"); DBTX-0030 (Dr. Ahn forwards an email to Techiya that he sent to the CFO and CEO of Samsung's business unit calling himself a "former executive of Samsung"); Day 2 Trial Tr. (Keady) 125:4-126:1; 127:11-128:11; 129:17-131:9.

162.    *Second*, Techiya never conducted any conflicts checks and alleges it never even asked Dr. Ahn or Mr. Cho if they had been involved as Samsung lawyers in the evaluation of Techiya's patents during previous approaches by S4S and Sonder.  Day 2 Trial Tr. (Keady) 141:19-142:8, (Firestone) at 189:2-9.  Nor did Techiya ever ask itself whether hiring Samsung's former attorneys posed any ethical issues.  Day 2 Trial Tr. (Firestone) 189:14-18.  Indeed, Dr. Keady testified that he *still* does not think it is relevant whether Dr. Ahn and Mr. Cho are former Samsung attorneys.  Day 2 Trial Tr. (Keady) 142:9-25.  Despite this, Techiya refused to answer deposition questions regarding communications with Ahn, on the grounds that communications with Techiya's lawyer (Dr. Ahn) are privileged.  Day 2 Trial Tr. (Staton) 213:3-217:1.  To this day,

Techiya attempts to invoke privilege to shield its communications with Dr. Ahn, while claiming that the fact that he is a former Samsung lawyer is irrelevant.

163.    *Third*, although Techiya was told by Sariel Engel that the "Samsung people" Dr. Ahn was negotiating with had "worked for [Dr. Ahn] for many years" (DBTX-0046; Day 2 Trial Tr. (Keady) 129:17-131:9), and although Techiya understood that Dr. Ahn had ready access to important Samsung executives (*see, e.g.*, DBTX-0017), Techiya witnesses claimed that they never bothered to ask how Dr. Ahn knew Samsung's business leaders or the inner workings of Samsung's IP Center (CCDX-0032; CCDX-0035; Day 2 Trial Tr. (Keady) 125:4-126:1, 127:11-128:11). Also, Techiya never expressed any concern over—to the contrary it encouraged—Dr. Ahn's contacting of Samsung business leaders outside the presence of Samsung lawyers. DBTX-0048; Day 2 Trial Tr. (Keady) at 126:2-12.

164.    *Fourth*, after Samsung filed its counterclaims, Techiya undertook **no investigation** at all.  Day 2 Trial Tr. (Firestone) 190:2-4.  Despite being put on notice by the counterclaims that Dr. Ahn and Mr. Cho had been Samsung lawyers with significant access to Samsung's confidential information, Techiya did nothing more than take at face value Dr. Ahn's word that he had done nothing wrong.  Day 2 Trial Tr. (Keady) 82:12-20.  Rather than investigate the serious allegations in Samsung's counterclaims and disqualification motion, Techiya simply considered the disqualification issue an "absolute joke" (Day 2 Trial Tr. (Staton) 218:18-219:4), and it retained PV Law as patent counsel after Dr. Ahn's and Mr. Cho's disqualification from the case, notwithstanding the fact that Dr. Ahn and Mr. Cho had shared Samsung's confidential information with PV Law to the benefit of Techiya in this very patent lawsuit.  DBTX-0097; DBTX-0098. Indeed, Techiya allowed Synergy to continue participating in the litigation for six months before "voluntarily" implementing a screen (Day 2 Trial Tr. (Keady) 82:21-83:12)—but only after

55

Samsung sent a letter demanding the screen (Day 2 Trial Tr. (Keady) 83:3-7). Techiya did not finally terminate its relationship with Synergy until over a year after the counterclaims were filed. Day 2 Trial Tr. (Firestone) 189:19-190:1.

165. Despite hiring a former Samsung high-level executive and its former in-house lawyers specifically for the purpose of leveraging their insider knowledge of Samsung to stay one step ahead in targeting Samsung in patent licensing negotiations and litigation, Techiya to this day "takes no responsibility whatsoever" for the theft and misuse of Samsung's confidential and privileged information in this case. Day 2 Trial Tr. (Keady) 88:11-89:5.

### D. Techiya's Testimony at Trial

166. Techiya's primary arguments at trial were that (1) Techiya allegedly did not know enough about Synergy or its misconduct to be held responsible for Synergy's misconduct, (2) that Techiya did not engage Synergy as its "agent," and (3) that during pre-suit negotiations Samsung should have notified Techiya directly that it objected to Dr. Ahn representing Techiya. On all three of these critical issues for Techiya's defense, Techiya's witnesses were not credible because their trial testimony flatly contradicted their prior testimony and their own documents.

#### 1. *Techiya Witness Credibility on Techiya's Knowledge and Intent*

167. Dr. Keady is a lawyer, barred in Virginia, and familiar with the rules of ethics governing attorneys. Day 2 Trial Tr. (Keady) 119-120. Perhaps as a result, he attempted to disclaim any knowledge about Dr. Ahn and Mr. Cho that should have triggered him to inquire about conflicts and breaches of ethical duties by Dr. Ahn and Mr. Cho.

168. Dr. Keady repeatedly testified that he did not know until Samsung filed its counterclaims that Dr. Ahn and Mr. Cho were lawyers, or that they had worked in Samsung's IP Center. Day 2 Trial Tr. (Keady) 110:12 ("A. No knowledge."), 55, 56, 109. Given that Techiya claimed to have handed over total control of its valuable patent portfolio to Dr. Ahn (Day 2 Trial

Tr. (Keady) 56), it strains credulity that Dr. Keady and Techiya did not do any vetting of Dr. Ahn's background.  Any level of vetting would have revealed (and in fact did reveal) that Dr. Ahn's and Mr. Cho's "only experience" in patent licensing and litigation was from having spent the previous ten-plus years as in-house IP lawyers for Samsung.  Day 2 Trial Tr. (Ahn) 27; DBTX-0015.0004.

169.    Dr. Keady also refused to admit that he knew that the IP licensing and litigation people Dr. Ahn was negotiating against in Samsung's IP Center had previously reported to Dr. Ahn when he was at Samsung.  Day 2 Trial Tr. (Keady) 130.  However, the evidence showed that he had been told during the negotiations that this was the reason Techiya should trust Dr. Ahn's instincts on negotiating against these people.  DBTX-0046.

170.    Mr. Firestone and Mr. Staton were sequestered during Dr. Keady's testimony.  Day 1 Trial Tr. 46 (invoking the rule).  When they subsequently took the witness stand, they both acknowledged the obvious.   Mr. Firestone, Mr. Staton, and Dr. Keady had indeed discussed Dr. Ahn's work history and qualifications before hiring him.  Day 2 Trial Tr. (Firestone) 176-77, (Staton) 212-13.  Mr. Firestone also testified that he and Dr. Keady knew Dr. Ahn had been an in-house IP lawyer for Samsung.  Day 2 Trial Tr. (Firestone) 172:16 ("Yes, sir.").  Mr. Firestone confirmed that "Dr. Keady's take on Doctor Ahn's background was important" to him, including because "Doctor Keady, too, was a man knowledgeable in IP matters." Day 2 Trial Tr. (Firestone) 176:21-177:8.

171.    Despite Mr. Firestone's testimony indicating that he "relied on Doctor Keady as an attorney for the company" and that Mr. Firestone sought Dr. Keady's advice because his "insights about matters relating to IP were important to" Mr. Firestone, Day 2 Trial Tr. (Firestone) 171:3-15, Dr. Keady tried to downplay his role as in-house IP counsel to Techiya, responsible for the company's licensing efforts.

172.     Dr. Keady also tried to distance Techiya from the decision to sue Samsung.  He suggested that rather than hiring Dr. Ahn to sue Samsung, Apple was the primary target when Techiya hired Dr. Ahn in July 2020. Day 2 Trial Tr. (Keady) 105.  To further that story, he testified that Techiya was not anticipating litigation against Samsung in July 2020.  Day 2 Trial Tr. (Keady) 105:16-23 (". . . at that point in time Techiya anticipated litigation against Samsung. Correct? A. That's incorrect.").  But Dr. Keady's deposition testimony directly contradicted this trial assertion, likely because at the time of his deposition Techiya was arguing work product protection extended back to Techiya's very first contact with Synergy.  Day 2 Trial Tr. (Keady) 106 (impeaching Dr. Keady with contrary deposition testimony); *see also* (Dkt. No. 297 (Hr'g Tr.) 57-59 (arguing work product protection began in July 2020 when Techiya first anticipated litigation against Samsung under common interest agreement with Synergy)).

173.     Dr. Keady likewise tried to dispute the obvious: that Samsung was the "first target" under Techiya's license agreement with Synergy, even though Synergy never contacted Apple and only pursued enforcement against Samsung.  *Compare* Day 2 Trial Tr. (Keady) 139, *with* Day 2 Trial Tr. (Keady) 180.

### 2.     *Techiya Witness Credibility on Control of the Litigation*

174.     As for Techiya's control over Synergy and involvement in the litigation, Techiya tried to disavow control or substantive involvement prior to Dr. Ahn voluntarily screening himself on August 27, 2022.  (Dkt. No. 895 at 9).  However, Techiya's documents and prior testimony repeatedly disproved Techiya's trial story.

175.     For instance, Samsung repeatedly impeached Techiya's witnesses with their own prior deposition testimony on this issue.

| Witness | Techiya's Trial Testimony | Techiya Confronted with Prior Testimony |
|---------|---------------------------|-----------------------------------------|

| Dr. Keady | "Now, **you had input regarding the complaint before it was filed**. Correct? A. **Incorrect**. I reviewed the complaint." <br><br> Day 2 Trial Tr. (Keady) 139:13-15 | "The question was, '**Did you have input into the complaint**?' Do you see that? A. Yes. Q. And your answer was? A. '**Yes.**' Q. Okay. You were under oath then? A. I was. **I edited the complaint**." <br><br> Day 2 Trial Tr. (Keady) 139:21-140:3 |
|---|---|---|
| Mr. Staton | "…Now, **Doctor Ahn ran the litigation with Brian Firestone and J.P. Keady of Techiya**. Correct? A. **Not exactly correct**." <br><br> Day 2 Trial Tr. (Staton) 217:10-12 | "Q. …Question, 'After the lawsuit was filed, **who ran the litigation**?' Do you see that question? A. I do. Q. And the answer was, 'I think the litigation was **a combination of the team of Synergy and input from J.P. and Brian**.' Do you see that? A. I do.…" <br><br> Day 2 Trial Tr. (Staton) 217:16-23 |
| Mr. Firestone | "Both **Doctor Ahn and Doctor Keady oversaw the strategy for the lawsuit** against Samsung. Correct? A. It depends on what time you're referring to, sir.…" <br><br> Day 2 Trial Tr. (Firestone) 187:5-7 <br><br> "Q. So what **your testimony is that at no point in time did they both do it together**. Correct? A. **That's correct**." <br><br> Day 2 Trial Tr. (Firestone) 187:11-13 | "Q. And the question put to you, Mr. Firestone, was, '**Who oversaw strategy for the lawsuit**?' And your answer was, '**Doctor Ahn and Doctor Keady**.'" <br><br> Day 2 Trial Tr. (Firestone) 187:19-21 |

176.    Samsung likewise repeatedly impeached Techiya witnesses with their own documents when they tried to downplay their role:

| Techiya Trial Testimony | Techiya Documents |
|---|---|
| "Now, the plan on the part of Synergy and Techiya was to **get as much payment as** possible from Samsung. Correct? A. **Incorrect**." | DBTX-0080.0001: May 2021 Email from Dr. Ahn to Mr. Staton copying Dr. Keady: "Of course I have to **get as much payment as possible** from Samsung." |

| | |
|---|---|
| Day 2 Trial Tr. (Keady) 123:23-25 | |
| "A. There was a ▮▮▮▮▮ offer, I believe. Q. All right. And I think you testified on direct that you were not aware of the offer before it was made. Correct? A. *I don't recall being aware of it*. That's correct."<br><br>Day 2 Trial Tr. (Keady) 128:22-25 | DBTX-0047.0001: May 2021 Email from Dr. Ahn to Dr. Keady: "Dear JP…I offered ▮▮▮ *as planned*." |

177.    At the end of Dr. Keady's testimony, the Court posed questions to him about Techiya's role: "THE COURT: And if you said in response to something from Doctor Ahn, That's a bad idea, we shouldn't do that, do you expect he would ignore that? THE WITNESS: I expect he'd ignore that, yes." Day 2 Trial Tr. (Keady) 146:14-17.  When Dr. Keady went one step further ("I'm positive he would ignore me"), the Court pressed this belief: "you honestly believe that Synergy, Doctor Ahn, would have ignored any kind of a response like that…?"  Day 2 Trial Tr. (Keady) 147:10, 147:16-18.

178.    While Techiya continued to fight the evidence, the documents and testimony belied Dr. Keady's assertion that Techiya had no control over whether Dr. Ahn would file this suit.  To the contrary, Techiya was in the driver's seat from both contractual and practical perspectives:

| Witness | Techiya Trial Testimony | Techiya Documents |
|---|---|---|
| Dr. Keady | "…[You] did send a letter in to Doctor Ahn giving Synergy *written consent to initiate the litigation* of Samsung against Samsung. Correct? A. *Incorrect.*"<br><br>Day 2 Trial Tr. (Keady) 133:8-13 | DBTX-0077.0001: Email from Dr. Keady to Dr. Ahn: "In accordance with the 24 Nov 2021 agreement [DBTX-0028] *here is written consent* to pursue Licensee initiated litigation in accordance with section 4.4." |
| Mr. Firestone | "…And ultimately Doctor Ahn agreed with Mr. Staton's direction to file a lawsuit against Samsung. Correct? A. *I* | Discussing DBTX-0053: "Q. The question at the deposition was, 'So it appears that Doctor Ahn was agreeing with Mr. |

| | | |
|---|---|---|
| | *don't believe that's what happened, sir.*"<br><br>Day 2 Trial Tr. (Firestone) 185:8-11 | Staton's directions to file a lawsuit against Samsung, seeking a multiple of the amount that Techiya had asked for in licensing discussions. Right?' A. That's what this says, sir, yes. Q. And your answer, sir, was? A. I'm -- '*Yes*.'"<br><br>Day 2 Trial Tr. (Firestone) 185:19-25 |
| Dr. Keady | THE COURT: "So you agree that *both Synergy and Techiya had to agree before litigation would be instituted*, per this [October 2021 Techiya-Synergy Agreement, § 4.2(b)]. A. *No.* We had a list of companies, and anybody on that list could be litigated."<br><br>Day 2 Trial Tr. (Keady) 138:1-8. | THE COURT: Okay. Whether there is or isn't that other list, this particular language provides that *both Techiya and Synergy would have to agree before litigation commenced.* Do you agree with that, that that's what that says? A: *I agree with that.*"<br><br>Day 2 Trial Tr. (Keady) 138:15-20; *see also* DBTX-0033, §§ 1.1, 4.3(b). |

179. Ultimately, while Techiya tried at trial to take the position that Dr. Ahn had simply never been its "agent," during discovery Techiya's CEO admitted that Dr. Ahn was indeed Techiya's "licensing agent," an inescapable conclusion based on the evidence above. As with other testimony, Mr. Firestone had to be impeached with his prior testimony to get to the truth.

| Mr. Firestone Trial Testimony | Mr. Firestone Confronted with Prior Testimony |
|---|---|
| "Q. Now, during the negotiations with Samsung, Doctor Ahn represented to Techiya as a *licensing agent. Correct? A. No, sir*."<br><br>Day 2 Trial Tr. (Firestone) 181:4-6 | "…And the question put to you at the deposition was, 'Did Doctor Ahn represent Techiya as an attorney?' Do you see that question? A. Yes, I do, sir. Q. And your answer was, '*He represented us as a licensing agent*.' Do you see that? A. I do, sir." |

| | Day 2 Trial Tr. (Firestone) 182:11-19 |
|---|---|

180.     In fact, the record shows that the relationship went beyond that of a licensing agent, and that Techiya considered Dr. Ahn to be its counsel in the Samsung assertion effort.  At trial, Mr. Firestone first agreed during his direct examination that Dr. Ahn and Mr. Cho were engaged as Techiya's lawyers on this matter: "Q. Now, to be clear, were you engaging Doctor Ahn and Mr. Cho as Techiya's lawyers?  A. Yes," Day 2 Trial Tr. (Firestone) 163:4-6, but then changed his answer when Techiya's counsel re-asked the question.   Mr. Firestone's initial response is supported by depositions in this case, during which Techiya's counsel instructed Techiya witnesses not to reveal communications with Dr. Ahn on the grounds of attorney-client privilege, and the witnesses followed those instructions.  Day 2 Trial Tr. (Staton) 216-17.

### 3.     *Techiya Witness Credibility on Motives for Termination of Synergy*

181.     As to Techiya's story at trial that Samsung could have resolved the conflict problem by reaching out to Techiya long ago and objecting to Techiya's partnership with Dr. Ahn, Techiya's trial testimony did not hold up to cross-examination and the terms of its own documents.

| **Dr. Keady Trial Testimony** | **Techiya Documents** |
|---|---|
| "So in this non-disclosure agreement, Synergy -- I'm sorry, Techiya is not only communicating to Samsung that Synergy is the exclusive licensee, but it is also communicating that the only party that Samsung has the right to speak with about the matter is Synergy. Correct? A. ***That's incorrect***."<br><br>Day 2 Trial Tr. (Keady) 118:15-20 | CCDX-0034.0006: Synergy-Samsung-Techiya NDA: "Whereas, Techiya has granted Synergy IP an exclusive right to discuss and negotiate with potential licensees…." |
| "Q. Now, at this point in time you knew that Samsung was asking Techiya to negotiate directly with Techiya as opposed to Doctor Ahn. Correct? A. ***I'm sorry. Is there an email*** | DBTX-0047.0001: May 2021 Email exchange:<br><br>Dr. Ahn: "3. Samsung asked whether they can negotiate directly with Techiya I made it clear |

| | |
|---|---|
| *to that effect?*  THE COURT: Doctor Keady…that's non-responsive. You're here to answer the questions."<br><br>Day 2 Trial Tr. (Keady) 118:25-119:8 | that Synergy has an exclusive sublicensing right."<br><br>Dr. Keady: "3.) Yes need to make this very clear so that they stay focus on negotiating with Synergy IP." |

182.    And the notion that Techiya would have cut ties with Dr. Ahn had Samsung contacted Techiya sooner is disproven by Techiya's failure to do so when it read the counterclaims and disqualification motion: it did nothing and, as to the disqualification issues, viewed them as "an absolute joke."  Day 2 Trial Tr. (Staton) 218:24-219:5.  Indeed, Techiya has agreed that Synergy should be compensated for its work on this case.  *See* CCDX-0085.0002.

## III.    CONCLUSIONS OF LAW

183.    Synergy's and Techiya's unclean hands bar enforcement of the asserted patents and warrant entry of a judgment that Techiya take nothing against Samsung pursuant to its claims for patent infringement.

### A.    Plaintiffs' Unclean Hands Warrant Judgment that Techiya Take Nothing from Samsung.

#### 1.    *Legal Framework and Precedent*

##### a.    Legal Standard for Unclean Hands

184.    The doctrine of unclean hands is an equitable defense to enforcement of a claim, including the enforcement of a patent infringement claim for which the plaintiff seeks, among other things, monetary damages.  *See Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1233 (Fed. Cir. 2018) (upholding application of unclean hands to bar enforcement of a patent infringement claim, upon which the jury had previously awarded damages).

185.    The doctrine of unclean hands closes a court's doors "to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  *Gilead*, 888 F.3d at

1239 (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)); *see Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1374 (Fed. Cir. 2001). Unclean hands applies when a party's misconduct "has immediate and necessary relation" to the issues in the case, such as "for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court." *Gilead*, 888 F.3d at 1239 (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

186.    The unclean hands doctrine applies to "pre-litigation business misconduct and litigation misconduct" that "normally would enhance the claimant's position regarding legal rights that are important to the litigation if the impropriety is not discovered and corrected." *Gilead*, 888 F.3d at 1239–40; *see Keystone*, 290 U.S. at 243.  It does not matter whether the misconduct actually "affect[ed] the litigation," so long as it had "objective potential to have done so." *Gilead*, 888 F.3d at 1240.

187.    The doctrine of unclean hands bars the relief sought by a plaintiff who acted inequitably or in bad faith, irrespective of "however improper may have been the behavior of the defendant." *Gilead*, 888 F.3d at 1239 (quoting *Precision*, 324 U.S. at 814–15).

188.    Although the misconduct supporting unclean hands does not need to rise to the level of a crime or tort, *N.Y. Football Giants, Inc. v. L.A. Chargers Football Club, Inc.*, 291 F.2d 471, 474 (5th Cir. 1961); *see also Precision*, 324 U.S. at 815, tortious conduct can constitute unclean hands. *See, e.g.*, *Sunder Energy, LLC v. Jackson*, No. 2023-0988, 2023 WL 8868407, at *6 (Del. Ch. Dec. 22, 2023) (recognizing that "unclean hands can be a vehicle for asserting a defense based on breach of fiduciary duty or fraud"); *In re Gililland*, 234 B.R. 741, 742–43 (Bankr. E.D. Ark. 1999) (concluding "the parties clearly came to the Court with unclean hands" because they committed fraud).  "Any willful act concerning the cause of action which rightfully can be said to

transgress equitable standards of conduct is sufficient cause for the invocation of the maxim" by a court. *Precision*, 324 U.S. at 815.

189.    Unclean hands is especially important and applicable in the patent context.  The Supreme Court has stated that the unclean hands doctrine "assumes even wider and more significant proportions" in cases "where a suit in equity concerns the public interest as well as the private interests." *Precision*, 324 U.S. at 815.  This is because applying that doctrine "to withhold its assistance in such a case . . . not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public." *Id.*

190.    The Supreme Court has recognized that "[t]he possession and assertion of patent rights 'are issues of great moment to the public.'" *Id.* at 815.  The Court explained:

> A patent by its very nature is affected with a public interest.  As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the 'Progress of Science and useful Arts.'  At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market.  The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.

*Id.* at 816.

191.    Although Samsung bears the burden to establish unclean hands by clear and convincing evidence, *In re Omeprazole Pat. Litig.*, 483 F.3d 1364, 1374 (Fed. Cir. 2007), courts are "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion" to deny relief to claimants whose hands are unclean.  *N.Y. Football Giants*, 291 F.2d at 474 (quoting *Keystone*, 290 U.S. at 245).  Instead, the doctrine of unclean hands "necessarily gives wide range" to a court's "use of discretion in refusing to aid the unclean litigant."  *Gilead*, 888 F.3d at 1239 (quoting *Precision*, 324 U.S. at 815).

b.     Precedent Applying Unclean Hands

192.     A wide variety of litigation-related misconduct has warranted application of the unclean hands doctrine in past cases.  For example, concealing or suppressing relevant evidence supports application of the unclean hands doctrine.  In *Keystone*, a patent owner desired to file a patent infringement suit against a company, knew of a prior use of the claimed invention that "was sufficient to cast doubt upon the validity of the patent," obtained "an affidavit prepared by [the patent owner] to the effect that [the prior user's] use of the device was an abandoned experiment," received the prior user's agreement "to assign [the patent owner] any rights he might have as inventor" and "to keep secret the details of the prior use," and thus suppressed relevant evidence. 290 U.S. at 243.  The Supreme Court upheld application of the unclean hands doctrine to dismiss the patent owner's complaints.  *Id.* at 244, 247.  It reasoned unclean hands applies "where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation," which was true in *Keystone* of the patent owner's corruption that suppressed evidence relating to patent validity.  *Id.* at 245–46.

193.     As another example, enforcing a patent with complete disregard to whether the patent was secured by misconduct supports application of the unclean hands doctrine.   In *Precision*, a patent owner attempted to enforce patents that it knew but failed to disclose were obtained based on "false dates as to the conception, disclosure, drawing, description and reduction to practice" of the claimed invention. 324 U.S. at 808–14.  The Supreme Court concluded that the patent owner's "entire cause of action" should have been "dismiss[ed] by resort to the unclean hands doctrine" because "inequitable conduct impregnated" the entire case.  *Id.* at 819.  The Court reasoned that a court's doors should be closed to a patent owner who "had every reason to believe and did believe that [the patent] application [that it now sought to enforce] was fraudulent" and

based upon perjury, but yet who "acted in complete disregard of that belief" by continuing to press its patent infringement claims upon the infected patents. *Id.* at 817.

194.    As a further example, concealing fraud during enforcement of a patent warrants denying relief to the patent owner.  In *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, although the Court did not expressly state it was applying the unclean hands doctrine, the Court cited its unclean hands precedent (including "the doctrine of the *Keystone* case") to deny relief to a litigant who engaged in corrupt activities.  322 U.S. 238, 251 (1944).  The patent owner suppressed evidence that a publication was manufactured "for the deliberate purpose of deceiving the Patent Office" in obtaining the patent during court proceedings regarding infringement of that patent.  *Id.* at 250. The Supreme Court held that the judgment based upon infringement of that patent must be vacated to put the case "in the same position as though [the] corruption had been exposed at the original trial."  *Id.*  The Court stated:

> tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants.  The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

*Id.* at 246.

195.    Pre-litigation business misconduct can also support application of the unclean hands doctrine to bar a patent infringement claim.  In *Gilead*, the patent owner narrowed its patent claims relating to a hepatitis C virus treatment only after a doctor who assisted with the patent prosecution acquired knowledge of the claimed pharmaceutical compound by improper means. 888 F.3d at 1240–41.  The doctor had improperly participated in a conference call with representatives of the accused infringer, in violation of "a clear 'firewall' understanding" between

the accused infringer and the patent owner. *Id.* The Federal Circuit held that the evidentiary record "justif[ied] the equitable determination of unclean hands as a defense to enforcement" of the patents. *Id.* at 1240. The court reasoned that it was wrong for the patent owner to allow the doctor to prosecute patent applications—including one that became the patent-in-suit—in violation of an agreement with the accused infringer, and that this pre-litigation misconduct "had the required connection to [the] patent litigation" because it "taint[ed]" the asserted patent claims. *Id.* at 1241–44.

196.    Moreover, a co-plaintiff's unclean hands can provide a basis for dismissing an action as to all plaintiffs.  In *Gaudiosi v. Mellon*, three shareholders—Phillips, Gaudiosi, and Schwartz—filed a shareholder derivative lawsuit against a railroad company arising out of a proxy contest for a director position that Phillips and six other management nominees sought.  269 F.2d 873, 875 (3d Cir. 1959).  But Phillips had "intimidate[d]" registered shareholders into not executing management proxies or voting their stock for the management nominees.  *Id.* at 879. The Third Circuit upheld the determination that the relief Phillips sought was barred due to his unclean hands.  *Id.*  The court considered the plaintiffs' argument that Phillips's misconduct did not warrant disposing of the rights of his co-plaintiffs under the doctrine of unclean hands, because neither Gaudiosi nor Schwartz "participated in these acts of Phillips" and thus the defense of unclean hands was "totally inapplicable to them" and the other members of the plaintiff class "upon whose behalf all three plaintiffs sued." *Id.* at 882.  The court held the plaintiffs' "contention [was] utterly without merit" because it ignored the "principle that courts are concerned primarily with their own integrity in the application of the clean hands maxim."  *Id.*  The court reasoned that "[p]ublic policy not only makes it obligatory for courts to deny a plaintiff relief once his 'unclean hands' are established but to refuse to even hear a case under such circumstances," and that

consequently one plaintiff's unclean hands may "require dismissal of [an] action" as to all plaintiffs. *Id.* The court further reasoned that, "[a]part from the foregoing," the plaintiffs' argument would permit the case to carry on and potentially result in Phillips obtaining the fruits of his misconduct. *Id.* The court concluded that "[j]ustice may be blind but it isn't 'dumb.'" *Id.*

197.    Contrary to Techiya's arguments, the Third Circuit's decision in *Harris v. City of Philadelphia*, 47 F.3d 1333 (3d Cir. 1995), did not narrow the rule in *Gaudiosi* to its unique facts. In *Harris*, a class of inmates in the Philadelphia prison system sued the City of Philadelphia due to severe overcrowding and harsh conditions in the prisons. *Id.* at 1335; *see also Harris v. City of Phila.*, 47 F.3d 1311, 1314 (3d Cir. 1995). The City was held in contempt and fined after it had entered into a consent decree in which it agreed to "contract for and provide a minimum of 250 beds in a program or programs that provide alcohol and substance abuse rehabilitation, training and other support services," contracted with a company to provide a 250-bed facility, but failed to make it operational in a timely manner and to satisfy a subsequent court order to fill 90% of the available beds at the 250-bed facility. *Harris*, 47 F.3d at 1335–36. The City argued that the plaintiffs' unclean hands—caused by members of the plaintiff class "walk[ing] away from the" facility at issue—barred them from benefitting from the contempt order. *Id.* at 1342. The court disagreed, reasoning that "the misconduct of one or more class members" who would "not necessarily benefit from their allegedly inequitable conduct" if the contempt order against the City remained in place should not "adversely affect the position of a class of plaintiffs" as a whole. *Id.* The court distinguished *Gaudiosi* by noting the facts of that case, unlike the facts in *Harris*, would have allowed the co-plaintiff with unclean hands to become a director despite his misconduct if his co-plaintiffs' claims "were not also dismissed." *Id.* at 1342 n.6. However, *Harris* did not

involve facts in which the misconduct of any plaintiffs infected the judicial proceedings or remedy as to other plaintiffs.

198.    Similarly, although the Federal Circuit in *Aptix Corporation v. Quickturn Design Systems, Inc.* stated that the unclean hands doctrine bars the litigant who acted inequitably (as Techiya argues), the misconduct in that case did not irreparably infect the judicial proceedings such that the other plaintiffs would obtain the fruits of the misconduct had the case continued as to them.  269 F.3d at 1375.  In *Aptix*, the unclean hands doctrine was invoked due to a plaintiff's fabrication of evidence regarding the conception date of the alleged invention. *Id.* at 1374.  Indeed, the Federal Circuit in *Aptix* had no occasion to consider misconduct that irreversibly infected the proceeding, but instead considered the separate issue of whether litigation misconduct by a plaintiff rendered the patent itself unenforceable despite no misconduct in securing the patent. *Id.* at 1375–78.

c.    Precedent Finding Inequitable, Bad Faith Misconduct

199.    Since the Supreme Court has instructed that unclean hands closes a court's doors "to one tainted with inequitableness or ***bad faith***," *Precision*, 324 U.S. at 814 (emphasis added), this Court may turn to precedent regarding bad faith misconduct as informative of the unclean hands inquiry.  Numerous courts have held that surreptitiously acquiring an opposing party's privileged or confidential information outside the discovery process constitutes bad faith misconduct. *See, e.g.*, *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1317, 1327 (D. Utah 2016), *aff'd*, 890 F.3d 868, 873 (10th Cir. 2018); *Site 2020 Inc. v. Superior Traffic Servs., LLC*, No. CV 21-63-M-DLC-KLD, 2023 WL 4060099, at \*10–14 (D. Mont. Mar. 27, 2023), *R&R adopted by* 2023 WL 4248715 (D. Mont. June 29, 2023); *Jackson v. Microsoft Corp.*, 211 F.R.D. 423, 431–32 (W.D. Wash. 2002), *aff'd*, 78 F. App'x 588 (9th Cir. 2003).

i. *Xyngular Corp. v. Schenkel (D. Utah 2016)*

200. In *Xyngular Corp. v. Schenkel*, the counterclaim-plaintiff leveraged an IT service provider of the counterclaim-defendant to steal the counterclaim-defendant's privileged and confidential information relating to issues in the case and used it to support counterclaims in the litigation. 200 F. Supp. 3d at 1278, 1284–87, 1290. The court concluded that the counterclaim-plaintiff "committed sanctionable misconduct by acting willfully, in bad faith, and with fault." *Id.* at 1316. It reasoned that "[i]t is an improper litigation tactic to use a disgruntled employee to secretly obtain non-public internal business documents from an opposing party." *Id.*

201. The Court continued, reasoning that:

> Parties anticipating litigation may not engage in self-help by improperly gathering a potential adversary's property. This conduct is an affront to the established rules of engagement and fair play in lawsuits. It amounts to an end-run around the Federal Rules of Civil Procedure, including the rules governing discovery and the orderly exchange of information relevant to disputes presented for resolution in our courts. This conduct undermines the confidence of both litigants and the public in the fairness of judicial proceedings.

*Id.* at 1317.

ii. *Site 2020 Inc. v. Superior Traffic Services, LLC (D. Mont. 2023)*

202. In *Site 2020 Inc. v. Superior Traffic Services, LLC*, the plaintiff implemented a "deceptive" scheme in which one of its employees used a fake identity to obtain access to the defendant's "product demonstration" for a product that the plaintiff then placed at the center of its patent infringement lawsuit against the defendant. 2023 WL 4060099, at *10–14. These actions effectively permitted the plaintiff to obtain "a lengthy undisclosed recorded interview of its litigation opponent's president and chief operating officer on matters related to the merits of its patent infringement claims." *Id.* at *11. The court had "no difficulty finding by clear and convincing evidence that [the plaintiff] acted willfully and in bad faith." *Id.* at *10. It reasoned

71

that the plaintiff had "willfully engaged in deceptive conduct toward an opposing party during the course of litigation, circumvented the discovery rules to obtain information relevant to the merits of [the plaintiff's] claims, and in doing so deprived [the defendant] of the benefit of counsel," all of "which is tantamount to bad faith and has undermined the integrity of these proceedings." *Id.* at *14. The court determined that such "misconduct was utterly inconsistent with the orderly administration of justice." *Id.* at *15.

### iii.    *Jackson v. Microsoft Corp. (W.D. Wash. 2002)*

203.    In *Jackson v. Microsoft Corp.*, the plaintiff received thousands of privileged emails—including the defendant's "proprietary secrets," "confidential information," and "attorney-client work product"—on CDs, relied "on the stolen documents in the preparation of his case," partially destroyed emails in his possession before turning them over to the defendant, and "told an ever more elaborate series of lies about his misconduct" when questioned about it at his deposition. 211 F.R.D. at 431. The court held the plaintiff's "conduct was willful and exemplifie[d] the bad faith with which he ha[d] pursued [the] litigation." *Id.* The court determined that the plaintiff's "astonishing pattern of deceptive acts and fraudulent testimony" left the court with "no assurance that a trial in [the] matter would indeed be a fact-finding endeavor" given that the plaintiff had "undermined the truth-finding function of the Court beyond repair." *Id.* at 432. Although not necessary for the court's holding, the court also concluded that the defendant had "been prejudiced in its ability to fairly defend itself in [the] litigation" given the "confidential documents" in the opposing party's possession during the litigation. *Id.*

### d.    Law of Agency and Imputation

### i.    *Imputing Unclean Hands*

204.    An agent's unclean hands are imputed to its principal. "A party may invoke the defense of unclean hands against a principal by imputing to the principal the wrongful conduct of

the agent." *Agape Fam. Worship Ctr., Inc. v. Gridiron*, No. 5:15-CV-1465, 2016 WL 3003207, at *2 (C.D. Cal. May 24, 2016); *see Queiroz v. Harvey,* 220 Ariz. 273, 275 (2009) ("Under ordinary principles of agency law, an agent's acts bind the agent's principal. . . . [T]he rule that the principal is bound by his agent's conduct is consistent with long-established principles of equity. . . . Principals may not benefit from the inequitable conduct of their agents." (citations omitted)); *Rogers v. McDorman,* 521 F.3d 381, 385 (5th Cir. 2008) (discussing imputation under analogous *in pari delicto* doctrine, which stands for "the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct").

205.    Imputation was created to incentivize principals "to choose agents carefully and to use care in delegating functions to them." RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006) cmt. b.  Imputation is designed to discourage attempts to "isolate the principal … from facts known to an agent" while simultaneously benefitting from the agent's knowledge and misconduct. *Id.*

ii.    *Traditional Agency Principles*

206.    Techiya has contended that New York law governs the relationship between Techiya and Synergy because "[t]he License Agreements provide they are governed by New York law." (Dkt. No. 877 at 10 n.6).  Since Samsung does not dispute Techiya's contention, and general agency principles are substantially similar in all relevant respects under Texas and New York law, the Court looks to New York law to determine whether an agency relationship existed between Techiya and Synergy, Dr. Ahn, and Mr. Cho.

207.    An agency relationship exists if (1) the principal manifests intent to grant authority to the agent, (2) the agent agrees, and (3) the principal maintains control over key aspects of the undertaking.  *Ajinomoto Co., Inc. v. CJ CheilJedang Corp.*, No. 1:16-cv-03498 (MKV), 2021 WL 4430200, at *5 (S.D.N.Y. Sept. 27, 2021).  "[T]he control asserted need not 'include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent,

may be ineffective.'"  *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) (quoting

RESTATEMENT (SECOND) OF AGENCY § 14 cmt. a).

208.    "[T]he question of whether an agency relation exists and what actions it covers is

very fact-specific, and no bright-line rules control." *Murray Hill Films, Inc. v. Martinair Holland,*

*N.V.*, No. 86 Civ. 7477 (RLC), 1987 WL 14918, at *3 (S.D.N.Y. July 17, 1987); *see also Stripling*

*v. Jordan Prod. Co., LLC*, 234 F.3d 863, 870 (5th Cir. 2000).

209.    The conduct of the parties may give rise to an agency relationship.  *See Interocean*

*Shipping Co. v. Nat'l Shipping & Trading Corp.*, 523 F.2d 527, 537 (2d Cir. 1975) ("Agency is a

legal concept which depends on the manifest conduct of the parties, not on their intentions or

beliefs as to what they have done."); *see also Stripling*, 234 F.3d at 870 (stating agency relationship

may arise from parties' conduct); *IOT Innovations LLC v. Monitronics Int'l, Inc.*, No. 2:22-cv-

0432-JRG-RSP, 2023 WL 6318049, at *6 (E.D. Tex. Sept. 11, 2023) (assessing the parties' course

of conduct to determine whether an agency relationship exists); *Murray Hill*, 1987 WL 14918, at

*3–4 (concluding that conduct of parties could give rise to agency relationship).

210.    As a result, contractual provisions disclaiming an agency relationship are not

dispositive: courts must "look to the accompanying circumstances" regarding the relationship

between the parties to determine whether a principal-agent relationship exists.  *Murray Hill*, 1987

WL 14918, at *3; *see also Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1359 (Fed. Cir.

2016) ("[I]t is well established that parties' statements in a contract are not dispositive as to the

existence of an agency relationship."); *Cleveland*, 448 F.3d at 523 ("Slavish deference to

contractual language is inappropriate in the highly-factual and often nuanced agency analysis.");

*Stripling*, 234 F.3d at 870 (noting that parties' course of conduct may establish an agency

relationship regardless of the label used by the parties to describe their relationship); *In re JVJ*

*Pharm. Inc.*, 630 B.R. 388, 404 (S.D.N.Y. 2021) (recognizing that the parties' contractual disclaimer of an agency relationship was not dispositive); RESTATEMENT (THIRD) OF AGENCY § 1.02 (2006) ("Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling.").

211.   As one example, in *Murray Hill*, the court determined that "an agency relationship" could be established by the principal taking part in each stage of the work, bargaining over the price of the work, approving the agent's agreements with third parties, attending meetings to discuss the scope and development of matters relating to the work, choosing who would participate in the work, and making changes to the work product. *Murray Hill*, 1987 WL 14918, at *4.

212.   Further, independent contractors and agents are not mutually exclusive. "One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor." RESTATEMENT (SECOND) OF AGENCY § 14N (1958); *see also United States v. Thomas*, 377 F.3d 232, 238 (2d Cir. 2004) (rejecting argument that an individual "was an independent contractor and not an agent" because "an independent contractor may also be an agent"). As a result, language in documents governing the relationship between two parties stating that one is an "independent contractor" for the other is not dispositive of whether the former is an "agent" of the latter. *See, e.g., Burrell v. Maciol*, No. 9:19-CV-1629-TJM-ATB, 2022 WL 16755840, at *7 (N.D.N.Y. Aug. 26, 2022), *R&R adopted*, 2022 WL 4719172 (N.D.N.Y. Oct. 3, 2022), *aff'd sub nom. Burrell v. Sowers*, 2023 WL 7320867 (2d Cir. Nov. 7, 2023) (concluding vendor was an agent of the county even though bid documents concerning the relationship between them stated the vendor would be an "independent contractor").

### iii.    *Litigation Representative Agency Principles*

213.    Additionally, irrespective of traditional agency principles, the acts of litigation representatives bind the persons or entities they represent.  The Supreme Court has long recognized that, when a party voluntarily chooses its litigation representative for purposes of a court proceeding, that party cannot "avoid the consequences of the acts or omissions of this freely selected agent."  *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962).  The Supreme Court recognized that "[a]ny other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of [litigation representation] and is considered to have 'notice of all facts, notice of which can be charged upon the [litigation representative].'"  *Link*, 370 U.S. at 634.  Although *Link* involved an attorney-client relationship, its reasoning applies equally to the relationship between a client and any litigation representative selected to manage court proceedings on the client's behalf.  Indeed, if *Link* were improperly limited to its identical facts, plaintiffs would be incentivized to cede control of their lawsuits to unscrupulous litigation agents and, when the case inevitably goes sideways, merely cut out the agent and pick up where that agent left off with impunity.  This result—which inherently undermines the "representative" system of litigation and simultaneously undermines the integrity of judicial proceedings—is what the Supreme Court in *Link* sought to prevent.

214.    The Supreme Court's conclusion in *Link* that parties are responsible for the misconduct of their freely selected litigation representatives has been recognized and applied in numerous cases in the Fifth Circuit.  *See Ben E. Keith Co. v. Dining Alliance, Inc.*, 80 F.4th 695, 702 n.7 (5th Cir. 2023) (citing *Link* for the proposition that a "party may not 'avoid the consequences of the acts or omissions of [his] freely selected agent" when that agent's "conduct falls substantially below what is reasonable under the circumstances"); *In re Vioxx Prods. Liab. Litig.*, 509 F. App'x 383, 386–87 (5th Cir. 2013) (citing *Link* to explain that a party cannot "avoid

the consequences of the acts or omissions" of its "freely selected [litigation] agent," regardless of any purported "unfairness" it may breed).  Indeed, in *Pryor v. U.S. Postal Service*, the Fifth Circuit expressly recognized that "it has long been held, particularly in civil litigation, that the mistakes of … the legal agent of the client[] are chargeable to the client, no matter how 'unfair' this on occasion may seem."  769 F.2d 281, 288–89 (5th Cir. 1985) (citation omitted).

215.    That rule applies regardless of whether the party itself is "personally culpable" or innocent in its litigation representative's misconduct, especially when dismissal remains the only adequate remedy to cure the harm caused by the misconduct.  *Mayorga v. Ronaldo*, 606 F. Supp. 3d 1003, 1030 (D. Nev. 2022) ("The more the misconduct prejudiced the opposing party, the more appropriate dismissal becomes as a sanction.").  A litigation representative's "abuses and flagrant circumvention of the proper litigation process" causes the party to lose its "opportunity to pursue [the] case."  *Id.* at 1031.  That is particularly true when the misconduct involves "ill-gotten information" that "saturate[s]" the party's "claims and other filings" to such a "depth and breadth" that no sanction short of dismissal "will purge the taint that has permeated [the] case from its very inception and preserve the integrity of the litigation process."  *Id.*

216.    For example, in *Mayorga*, a court determined that a party was bound by its litigation representative's "deliberate circumvention of the discovery process to obtain and conceal stolen, privileged documents for his client," which "undermine[d] the integrity of [the] proceedings and the tribunal's ability to justly decide [the] case."  *Id.* at 1030.  The court determined that the "contamination [would] continue to give [the party] an unfair advantage and prejudice the defense as long as [its] claims [were] pending, regardless of who acts as [its litigation representative]" or carries on the case as plaintiff. *Id.*  As a result, irrespective of whether the party itself was culpable

in its litigation representative's improper scheme, the court in *Mayorga* determined dismissal with prejudice was the only appropriate remedy for the misconduct that had occurred. *Id.* at 1030–31.

217.   The Fifth Circuit has recognized that keeping a lawsuit "alive merely because [the] plaintiff should not be penalized" for the acts of its litigation agent "would be visiting the sins of [the] plaintiff's [agent] upon the ***defendants***." *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995) (emphasis in original) (editorial mark omitted).

218.   In *Propat International Corp. v. Rpost, Inc.*, the Federal Circuit remarked that "the rights to sue and grant licenses" accords the entity holding those rights "broad authority to act as [the patent owner's] agent." 473 F.3d 1187, 1192 (Fed. Cir. 2007).

e.     Law of Breach of Fiduciary Duty

219.   While the types of misconduct described above are sufficient to warrant unclean hands even if they did not make out a viable tort claim, when the conduct also rises to the level of a tort that further supports unclean hands.

220.   The Court previously determined that New York and California law apply to the torts at issue. *See* Dkt. No. 731 at 5; *see also* Dkt. No. 852.

221.   Under New York law, breach of fiduciary duty is established if: (1) a fiduciary relationship existed in which the defendant owed the plaintiff a specific duty; (2) the defendant breached that duty; and (3) that breach caused harm to the plaintiff. *Fin. Freedom Senior Funding Corp. v. Bellettieri, Fonte & Laudonio, P.C.*, 852 F. Supp. 2d 430, 435 (S.D.N.Y. 2012).

222.   Similarly, under California law, breach of fiduciary duty is established by showing "the existence of a fiduciary relationship, breach of [that relationship], and damages." *Talkdesk, Inc. v. Pham*, No. 2:22-cv-05961, 2023 WL 6890747, at *2 (C.D. Cal. Sept. 29, 2023) (quoting *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1120 (Cal. 2011)).

223.    "The relationship between an attorney and client is a fiduciary relationship of the very highest character." *Id.* (quoting *Kotlar v. Hartford Fire Ins. Co.*, 100 Cal. Rptr. 2d 246, 251 (Cal. Ct. App. 2000); *see also Beltrone v. Gen. Schuyler & Co.*, 675 N.Y.S.2d 198, 199 (N.Y. App. Div. 1998) ("[A]n attorney stands in a fiduciary relationship to the client which relationship is imbued with ultimate trust and confidence that imposes a set of special and unique duties."); *Judwin Props., Inc. v. Griggs & Harrison*, 911 S.W.2d 498, 506 (Tex. App. 1995) ("The attorney-client relationship is highly fiduciary in nature.  This relationship carries the utmost good faith." (citation omitted)).  Among attorneys' fiduciary duties owed to their clients are "the duties of loyalty and confidentiality," which form the "essential basis for trust and security in the attorney-client relationship."  *Talkdesk*, 2023 WL 6890747, at *2; *see also Beltrone*, 675 N.Y.S.2d at 199 (stating fiduciary duties of an attorney to its client include "maintaining confidentiality, avoiding conflicts of interest, safeguarding client property and honoring the client's interest over that of the attorney").

224.    In all relevant jurisdictions, an attorney's fiduciary duties to his or her former client bar that attorney from switching sides on substantially related matters.  Under the New York Rules of Professional Conduct ("New York Rules") and California Rules of Professional Conduct ("California Rules"), "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  N.Y. R. Prof. Cond. § 1.9(a); *accord* Cal. R. Prof. Cond. § 1.9(a).  The American Bar Association's Model Rules of Professional Conduct ("ABA Rules"), Texas Disciplinary Rules of Professional Conduct ("Texas Rules"), and Virginia Rules

of Professional Conduct ("Virginia Rules") are substantially similar.  *See* Am. Bar Ass'n Ann.

Mod. R. Prof. Cond. § 1.9(a); Tex. R. Prof. Cond. § 1.09(a); Va. R. Prof. Cond. § 1.9(a).

225.    Additionally, in all relevant jurisdictions, an attorney's fiduciary duties to his or her

former client also bar that attorney from using or revealing a former client's confidential

information.  Under the New York Rules,

> A lawyer who has formerly represented a client in a matter or whose present or
> former firm has formerly represented a client in a matter shall not thereafter:
>
> (1) use confidential information of the former client protected by Rule 1.6 to the
> disadvantage of the former client, except as these Rules would permit or require
> with respect to a current client or when the information has become generally
> known; or
>
> (2) reveal confidential information of the former client protected by Rule 1.6 except
> as these Rules would permit or require with respect to a current client.

N.Y. R. Prof. Cond. § 1.9(c); *see id.* cmt. [8] ("Paragraph (c) generally extends the confidentiality

protections of Rule 1.6 to a lawyer's former clients.").  Similarly, under the California Rules:

> A lawyer who has formerly represented a client in a matter or whose present or
> former firm has formerly represented a client in a matter shall not thereafter:
>
> (1) use information protected by Business and Professions Code section 6068,
> subdivision (e) and rule 1.6 acquired by virtue of the representation of the former
> client to the disadvantage of the former client except as these rules or the State Bar
> Act would permit with respect to a current client, or when the information has
> become generally known; or;
>
> (2) reveal information protected by Business and Professions Code section 6068,
> subdivision (e) and rule 1.6 acquired by virtue of the representation of the former
> client except as these rules or the State Bar Act permit with respect to a current
> client.

Cal. R. Prof. Cond. § 1.9(c) (asterisks omitted).  The ABA Rules, Texas Rules, and Virginia Rules

are substantially similar.  *See* Am. Bar Ass'n Ann. Mod. R. Prof. Cond. § 1.9(c); Tex. R. Prof.

Cond. §§ 1.05(a), (b)(1), (b)(3); Va. R. Prof. Cond. § 1.09(c).

226.     These attorney obligations "apply equally to information learned before, during, and after the representation." *Sealed Party v. Sealed Party*, No. Civ. A H-04-2229, 2006 WL 1207732, at *12 (S.D. Tex. May 4, 2006); *see also* State Bar of Nev., Standing Comm. on Ethics & Prof. Resp., Formal Op. No. 41, at 3–4 (June 24, 2009) (stating an attorney's confidentiality obligations apply "[r]egardless of **when** the lawyer learned of the information – even before or after the representation" (emphasis in original) (citing Charles W. Wolfram, Modern Legal Ethics § 6.7.2, at 298 (1986))).

### 2.     *Application of Law to the Facts of the Case*

227.     The patent case should be dismissed with prejudice pursuant to the doctrine of unclean hands because the inequitable and bad-faith misconduct of Synergy, Ahn, and Cho— including stealing and using Samsung's privileged and confidential information to construct the pleadings and develop the plaintiffs' patent case strategy—constitutes unclean hands, which is properly imputed to Techiya because Synergy, acting through Ahn and Cho, was Techiya's agent.

a.     <u>Synergy's Unclean Hands</u>

228.     Synergy—a plaintiff in the patent case at all times from the filing of the complaint on November 5, 2021, through Magistrate Judge Payne's recommendation that Synergy be dismissed as a plaintiff on October 18, 2023—had unclean hands, which infected the case from and before its inception and warrants its dismissal.

229.     Synergy acted inequitably, acted in bad faith, and failed to "act[] fairly and without fraud or deceit as to the controversy in issue." *Gilead*, 888 F.3d at 1239.  Synergy is controlled by Dr. Ahn, who is its Chief Executive Officer and, along with his wife, has a 90% equity interest in the company.  Day 2 Trial Tr. (Ahn) 7:25–8:4; (Dkt. No. 895 at 10).  Mr. Cho has the remaining 10% equity interest in Synergy and is a Director of the company.  Day 2 Trial Tr. (Ahn) 8:5–8:6; (Dkt. No. 895 at 10).  Dr. Ahn and Mr. Cho executed a scheme that, by any metric, is dishonest,

unfair, deceitful, and repugnant to the Rule of Law. The stain upon Synergy, Ahn and Cho is a stain upon Techiya and it precludes enforcement of the patents-in-suit against Samsung.

230.    The evidence presented at trial demonstrates that, in August 2021 before filing the complaint in this case, Dr. Ahn and Mr. Cho acquired the Techiya Status Report containing Samsung's privileged assessment of the Techiya patents—including the majority of the patents asserted in the complaint—from a Samsung employee, Chunghyo Lee, who lacked authority to access the Techiya Status Report. DBTX-0036; DBTX-0037; DBTX-0038; DBTX-0042; DBTX-0061.0036; Day 1 Trial Tr. (Kang) 140:6-15, 141:17-142:19. Dr. Ahn admitted that this "internal file"—which he called "[t]he Techiya evaluation" that "Lee sent"—was "sent … using an unconventional method," and that he was "concern[ed]" about "whether that will show up" if someone copied or took Synergy's "files in Korea." DBTX-0035.0013; Day 1 Trial Tr. (Lim) 90:15-91:1. Dr. Ahn and Mr. Cho discussed the contents of Samsung's privileged Techiya Status Report—including Samsung's patent infringement and patent validity assessments—in August 2021 before filing the complaint. *See, e.g.*, DBTX-0035.0015-0017; Day 1 Trial Tr. (Lim) 87:23-89:4. In fact, Dr. Ahn admits that he received Samsung's privileged Techiya Status Report from Chunghyo Lee, that he "called Sungil Cho to discuss . . . some of the contents of the documents," and that he knew he was not supposed to have the document. DBTX-0061.0036-0037; Day 2 Trial Tr. 30:6-10, 31:9-15. For his part, Mr. Cho admitted copying Samsung's privileged patent infringement and validity analysis from the Techiya Status Report "verbatim" into an Excel document that Mr. Cho drafted and used to prepare the case strategy and complaint. DBTX-0098.0019-0020.

231.    The evidence presented at trial further demonstrates that misappropriating this privileged information from its anticipated litigation opponent was not enough for Dr. Ahn and

Mr. Cho.  After filing the complaint, in the midst of discovery in this case, Dr. Ahn and Mr. Cho

reviewed Samsung's privilege log containing additional Samsung privileged documents. They

devised concocted a plan to ask Chunghyo Lee about them, and only an hour or so later Chunghyo

Lee had downloaded these documents from Samsung's privilege log to his laptop.   DBTX-

0035.0029-0032; Day 1 Trial Tr. (Lim) 98:1-100:4; Day 1 Trial Tr. (Kang) 132:12-24.   These

documents were prepared for the Head of Samsung's IP Center and included patent assessments

and discussions of key legal issues.  Day 1 Trial Tr. (Lim) 94:14-16; DBTX-0039.0011-0012;

DBTX-0040.0011-0012.  Hours after Chunghyo Lee downloaded these privileged documents to

his laptop, Dr. Ahn and Mr. Cho had another call during which Mr. Cho indicated to Dr. Ahn that

Mr. Chunghyo Lee "saw three [weekly] reports" and **discussed their contents with Mr. Cho**.

DBTX-0041.0016-0017; Day 1 Trial Tr. (Kang) 131:13-132:11.

232.      Dr. Ahn and Mr. Cho's misconduct was inequitable and constitutes bad faith.

233.      Indeed, Synergy's acts of "surreptitiously acquir[ing] an opposing party's property

outside of the discovery process" are exactly the type of misconduct many courts have held

constitute bad faith.   *Xyngular*, 200 F. Supp. 3d at 1317, 1327; *see also Site 2020*, 2023 WL

4060099, at *10–14; *Jackson*, 211 F.R.D. at 431–32.

234.      The level of misconduct that occurred here—including stealing the opponent's

privileged and confidential analyses of the patents-in-suit both before and during the litigation—

exceeds the misconduct that warranted application of the unclean hands doctrine in the Supreme

Court and Federal Circuit precedent.   None of *Keystone*, *Precision*, and *Hazel-Atlas*, which

involved suppression or manufacture of evidence and perjury, involved a plaintiff stealing the

defendant's privileged analysis of patents that the plaintiff anticipated asserting against that

defendant in litigation. Even so, lesser misconduct in those cases compelled dismissal or vacatur

of a judgment. *See Keystone*, 290 U.S. at 245; *Precision*, 324 U.S. at 808–14; *Hazel-Atlas*, 322 U.S. at 250. Although the *Gilead* case involved improperly obtaining an opponent's confidential technology to influence the scope of patent claims that were later asserted against that opponent in litigation, it did not involve the plaintiff stealing the defendant's attorney-client privileged assessment of its infringement and validity position with respect to patents that would later be asserted in the litigation. *See Gilead*, 888 F.3d at 1240–41.

235.    Further, Dr. Ahn and Mr. Cho stole this information from, and used it for Techiya and against, their former, long-time client to whom they owed fiduciary duties. *See* § III.A.1.e, *supra*. Dr. Ahn and Mr. Cho breached fiduciary duties they owed to Samsung as Samsung's former in-house counsel on substantially related matters. As U.S.-barred attorneys who formerly served as Samsung's in-house counsel, Dr. Ahn and Mr. Cho owed ethical duties to Samsung. *See* DBTX-0015.0004; Day 1 Trial Tr. (Lim) 75:17-24, (Kang) 137:20-136:3, (Injung Lee) 172:19-21, 172:25-173:3, 187:24-188:1, (Cho) 213:10-25, 214:25-215:7; Day 2 Trial Tr. (Ahn) 17:5-6; *see also* § III.A.1.e, *supra*. They breached those duties both by switching sides on matters substantially related to ones for which they previously represented Samsung and by using and/or disclosing Samsung confidential information to gain an unfair advantage. *See* DBTX-0028; DBTX-0033; DBTX-0081; CCDX-0026; Day 2 Trial Tr. (Keady) 108:13-23, 113:5-24, 116:13-117:1. When Techiya first approached Samsung with an offer to buy Techiya's patents, Dr. Ahn was the head of Samsung's IP Center and was responsible for the patent analysis team's work related to the Techiya patents. He was ultimately responsible for Samsung's decision not to go forward with the proposed acquisition. *See* Day 1 Trial Tr. (Injung Lee) 179:23-180:16, 181:1-14, 184:7-13, 184:4-17; DBTX-0004; DBTX-0022; DBTX-0024. While Dr. Ahn was the head of Samsung's IP Center, he worked on matters involving the same Bixby functionality in Samsung's products that

are accused of infringement in this case, even leading an "AI Patent Task Force" created by Samsung to help secure patents relating to this functionality. DBTX-0002; DBTX-0005; *see also* Day 1 Trial Tr. (Injung Lee) 174:5-7, 174:12-175:23; DBTX-0056.0010-0022, 0025-0029, 0034-0038, 0044-0064, 0069-0072; *see generally* (Dkt. No. 1). Dr. Ahn also oversaw and was involved in the analysis relating to patent infringement claims relating to Bixby while he worked at Samsung. *See* DBTX-0003.0004-0006; DBTX-0006.0013; Day 1 Trial Tr. (Injung Lee) 177:17-22, 178:5-9. Mr. Cho was an in-house patent expert on Samsung's technology and patent analysis team, which included tasks such as reviewing patents for infringement and validity, managing patent prosecutions, and managing patent litigation in various U.S. jurisdictions. Day 1 Trial Tr. (Cho) 213:10-25; DBTX-0015.0004. The evidence in this case shows that Dr. Ahn and Mr. Cho disclosed Samsung's confidential information to Techiya and Techiya's counsel. *See* DBTX-0048.0001; DBTX-0053.0001; DBTX-0098.0034-0035; DBTX-0097.0004, 0042. Samsung was harmed by having to defend itself against the infected case that was built on this misconduct. This establishes breach of fiduciary duty. *See, e.g.*, *Talkdesk*, 2023 WL 6890747, at *2–5; *Fin. Freedom Senior Funding*, 852 F. Supp. 2d at 435.

236.    For that reason among others, Dr. Ahn and Mr. Cho, who are U.S.-licensed attorneys who had extensive experience overseeing U.S. litigations during their decades of representing Samsung, knew their conduct was wrong, "appreciated the advantages that can flow to a litigant who comes into possession of an opponent's attorney-client communications," "knew that privileged documents generally cannot be obtained by the adverse party through discovery," and "subsequently engaged in efforts to cover [their] tracks." *Ponte v. Sage Bank*, 255 F. Supp. 3d 344, 348–49, 351 (D.R.I. 2015); *see also* DBTX-0041.0028; DBTX-0015.0004; Day 1 Trial

Tr. (Kang) 134:12-136:7, (Injung Lee) 172:19-21, (Cho) 214:25-215:7; Day 2 Trial Tr. (Ahn) 17:5-6, 27:2-28:11.

237.    Dr. Ahn and Mr. Cho lied in their answer to Samsung's counterclaims about possessing Samsung's privileged information.  *Compare* (Dkt. No. 94 at 48 ¶ 20 (Samsung alleging Dr. Ahn and Mr. Cho possessed Samsung's confidential information)), *with* (Dkt. No. 373 ¶ 20 (denying Samsung's allegations)).

238.    Dr. Ahn and Mr. Cho lied under oath in their depositions about receiving Samsung privileged and confidential information after leaving Samsung.  *See* Day 2 Trial Tr. (Ahn) 15 ("Q. Since you left Samsung, has Mr. Lee shared with you any Samsung privileged information? A. No privileged -- no privileged information. Q. And no confidential information? A. No confidential."); Trial Tr. Day 1 (Cho) 220 ("Q. Have you received any Samsung confidential information since leaving Samsung? A. No.").

239.    Dr. Ahn and Mr. Cho spoliated evidence.  Both Dr. Ahn and Mr. Cho used thumb drives and external storage devices with their laptops, including to download files relevant to this case, all of which "disappeared" during discovery before they could be forensically imaged.  Day 1 Trial Tr. (Cho) 224:15–225:16.  Hours after the Court ordered Mr. Cho to sequester his devices for forensic examination at a hearing on February 10, 2023, Mr. Cho installed on his mobile phone an application called "Andro Shredder" that permanently destroys files and makes data recovery impossible.  DTBX-0041.0042-0045; Day 1 Trial Tr. (Kang) 145:10-146:12.  Mr. Cho also downloaded and executed a program called CCleaner on his Synergy laptop.  Day 1 Trial Tr. (Cho) 226:16-17, 226:23-24.  Further, a note seized from Mr. Cho's place of residence included phrases such as "overwrite w/ random data," "Can file type, date of creation, date of deletion be determined," and "If deleted after adjusting the system clock, can the adjustment be identified?"

DBTX-0041.0039.  When Mr. Cho was asked "have you ever taken any actions to try to delete files in a way that would not be detected," the most that Mr. Cho could come up with is "I don't know.  I don't remember." Day 1 Trial Tr. (Cho) 227:10–12.  Mr. Cho and Dr. Ahn even discussed destroying evidence from Chunghyo Lee's computer, with Dr. Ahn expressing concern that Samsung's internal investigation into Mr. Lee might "expose" Dr. Ahn.  DBTX-0041.0028; Day 1 Trial Tr. (Kang) 134:12-136:7; *see also* DBTX-0041.0027-0028.  Furthermore, Dr. Ahn admits to "destroying" the copy of the Techiya Status Report that he illicitly obtained.  DBTX-0041.0037. While Dr. Ahn apparently intended this to be an exculpating assertion, it does nothing more than show he compounded his misconduct with spoliation.

240.   Dr. Ahn and Mr. Cho recorded themselves discussing ways to subvert the discovery process in this case.  *See* DBTX-0041.0031–0034 (Dr. Ahn and Mr. Cho scheming on how Mr. Lee should answer questions in response to a Samsung interrogation as part of its internal investigation); DBTX-0041.0024-0025 (Dr. Ahn and Mr. Cho discussing what Samsung might find in Mr. Lee's emails); DBTX-0041.0026-0027 (Dr. Ahn and Mr. Cho discussing file deletion and whether any "slipped through"); *see also* DBTX-0041.0038 (pages from Mr. Lee's work notebook).

241.   Synergy's bad faith actions have an "immediate and necessary relation" to the patent case, in which Dr. Ahn and Mr. Cho played a critical role.  *Gilead*, 888 F.3d at 1240.  They helped select the patents-in-suit, *see* DBTX-0097.0041-0042, helped construct and edit the complaint, *see* Day 1 Trial Tr. (Cho) 219:5-6; Day 2 Trial Tr. (Ahn) 228:16-17, (Firestone) 186:20-187:4, signed off on the patents and products included in the complaint, *see* Day 2 Trial Tr. (Ahn) 18:24-19:1, approved its filing, *see* Day 2 Trial Tr. (Keady) 78:19-25, managed the litigation strategy, *see* Day 2 Trial Tr. (Firestone) 187:14-21, (Staton) 217:10-218:17; analyzed Samsung's

alleged infringement, *see* Day 1 Trial Tr. (Cho) 217:5-13, 218:10-18, assessed patent validity and damages, *see* Day 1 Trial Tr. (Cho) 218:19-24, selected PV Law as outside patent counsel to jointly represent Synergy and Techiya, *see* Day 2 Trial Tr. (Keady) at 85:16-21, 134:17-135:8, communicated extensively with Techiya and Techiya's outside patent counsel, *see* Day 1 Trial Tr. (Cho) 216:6-11, 219:7-14; Day 2 Trial Tr. (Ahn) 18:13-17, (Keady) 140:8-10, 140:22-141:2, and funded this litigation, Day 2 Trial Tr. (Firestone) 161:16-22.

242.    Further, Mr. Cho used Samsung's Techiya Status Report to, among other things, evaluate the prior art relating to the Techiya Patents (including patents-in-suit) and shared prior art identified in the Techiya Status Report with the litigation funder in this case, Purplevine, before filing the complaint. DBTX-0098.0034-0035.  Dr. Ahn admitted that Mr. Cho sent patents and relevant claim charts to PV Law—Techiya's patent counsel in this case—based on selections from Samsung's privileged Techiya Status Report. DBTX-0097.0042.  Dr. Ahn stated that Mr. Cho provided the litigation funder in this case, Purplevine, as well as PV Law with the prior art identified by Samsung in its privileged Techiya Status Report. DBTX-0097.0043.  Dr. Ahn admitted Mr. Cho "appears to have referred to the Techiya Status Report document" when prioritizing the Techiya patents and "selecting the patents for filing lawsuits." DBTX-0097.0040.

243.    Performing these actions with Samsung's internal, privileged, and confidential analysis of the Techiya patents in hand is conduct that irreversibly "enhance[d] [Synergy's and Techiya's] position regarding legal rights that are important to the litigation" (i.e., their patent claims). *Gilead*, 888 F.3d at 1240.

> b.  Synergy's Agency Relationship with Techiya Necessitates
> Dismissal of the Patent Case Due to Unclean Hands

244.    Synergy's unclean hands are imputed to Techiya as its litigation agent, supporting

dismissal of the patent case.  *See Agape Fam.*, 2016 WL 3003207, at *2; *Queiroz*, 220 Ariz. at

275; *see also Rogers*, 521 F.3d at 385, 394.

245.    Under traditional agency principles, Synergy was Techiya's agent for the following

reasons:

246.    Techiya granted authority to Synergy to act as Techiya's agent in licensing and

litigation.  In both the November 2020 and October 2021 License Agreements between Techiya

and Synergy, Techiya granted Synergy "the exclusive right to sublicense" the Techiya patents and

the "exclusive right to enforce" the Techiya patents.   DBTX-0028.0005; DBTX-0033.0006.

Techiya's primary shareholder testified that he, Mr. Firestone, and Dr. Keady jointly decided to

hire Synergy.   Day 2 Trial Tr. (Staton) at 213:1-5.   Techiya's CEO testified that Synergy's

responsibilities included "to manage litigation" and to find funding for it, that Synergy represented

Techiya "as a licensing agent," and that Techiya engaged Dr. Ahn and Mr. Cho "as Techiya's

lawyers."   Day 2 Trial Tr. (Firestone) 161:16-22, 163:4-6, 182:11-19.   Although Mr. Firestone

quickly modified that testimony at trial, Mr. Staton confirmed that Techiya in fact thought Dr. Ahn

and Mr. Cho were Techiya's lawyers.   At his deposition, Mr. Staton was instructed not to answer

a question about "why Doctor Ahn started negotiations on behalf of Techiya with senior level

people at Apple" because it "call[ed] for privileged information," and Mr. Staton followed that

instruction.   Day 2 Trial Tr. (Staton) 216:13-217:1.   Moreover, in the non-disclosure agreement

between Samsung, Techiya, and Synergy, Techiya indicated that it had given Synergy the "right

to discuss and negotiate with potential licensees regarding the license terms and conditions to the

Techiya Patents."   CCDX-0034.0006.

247.    Additionally, Synergy agreed to serve as Techiya's agent in licensing and litigation. Synergy signed the November 2020 and October 2021 License Agreements, *see* DBTX-0028; DBTX-0033, asserted the Techiya patents against Samsung, *see* CCDX-0026; Day 2 Trial Tr. (Keady) 116:13-117:1, and filed the complaint in this case as a co-plaintiff with Techiya, *see* (Dkt. No. 1).   Synergy also signed the non-disclosure agreement between Samsung, Techiya, and Synergy, which stated that Synergy would discuss and negotiate with Samsung regarding a potential license to the Techiya patents.  CCDX-0034.0006.

248.    However, Techiya did not cede all control of the Techiya patents to Synergy, leaving Techiya without any say, as Techiya contends.  Instead, the evidence presented at trial demonstrates that, contrary to Techiya's assertions, Techiya maintained control over key aspects of Synergy's undertaking.  Although the Techiya-Synergy License Agreements state that Synergy will have "sole control" and that Synergy is an "independent contractor[]," DBTX-0028.0006; DBTX-0028.0011;  DBTX-0033.0006;  DBTX-0033.0012, contractual provisions are not dispositive of the actual relationship between parties and courts must look at the conduct of the parties in determining whether an agency relationship exists.  *See Murray Hill*, 1987 WL 14918, at *3; *see also Pac. Gas & Elec.*, 838 F.3d at 1359; *Cleveland*, 448 F.3d at 523; *Stripling*, 234 F.3d at 870; *JVJ Pharm.*, 630 B.R. at 404; RESTATEMENT (THIRD) OF AGENCY § 1.02 (2006).  Indeed, contrary to the language in the License Agreements, Dr. Ahn testified that "in practice I don't have the sole control."  Day 2 Trial Tr. (Ahn) 17:23-18:8.

249.    Here, Techiya's and Synergy's conduct gives rise to an agency relationship.  *See Interocean Shipping*, 523 F.2d at 537; *see also Stripling*, 234 F.3d at 870; *IOT Innovations*, 2023 WL 6318049, at *6; *Murray Hill*, 1987 WL 14918, at *3–4.  Like the principal in *Murray Hill*, Techiya supervised the details of Synergy's work and thereby created an agency relationship.  *See*

*Murray Hill*, 1987 WL 14918, at *3–4.  The evidence demonstrates that Techiya took part in each stage of the work, directed Synergy's negotiations with Samsung, *see* DBTX-0047; Day 2 Trial Tr. (Keady) 121:14-25, offered suggestions during the negotiations with Samsung, *see* DBTX-0048; Day 2 Trial Tr. (Keady) 128:12-18, planned settlement offer numbers with Synergy, *see* DBTX-0047; Day 2 Trial Tr. (Keady) 128:19-25, 129:3-10, instructed Synergy to file suit against Samsung, *see* DBTX-0053; Day 2 Trial Tr. (Keady) 131:21-132:1, 132:5-11; Day 2 Trial Tr. (Firestone) 184:13-185:7, provided written consent to sue Samsung as required by the parties' License Agreements, DBTX-0077; DBTX-0028; DBTX-0033; Day 2 Trial Tr. (Keady) 133:8-134:5, 136:17-137:19, 137:24-25, 138:1-20, revised the complaint along with Synergy, Day 2 Trial Tr. (Keady) 139:13-140:7, attended meetings to discuss the scope and development of negotiations with Samsung and then the litigation against Samsung, *see* DBTX-0081; Day 1 Trial Tr. (Cho) 216:6-11; Day 2 Trial Tr. (Keady) 62:15-63:13, and assisted Synergy in managing the litigation, *see* Day 2 Trial Tr. (Firestone) 187:14-21; Day 2 Trial Tr. (Staton) 217:10-218:17; *see also* §§ II.B, II.C, *supra*.

250.   Moreover, further exercising control over its relationship with Synergy, Techiya terminated the Techiya-Synergy License Agreement.  Day 2 Trial Tr. (Keady) 84:12-23.  Techiya terminated that Agreement because, in its view, Synergy was "not doing the part of the job that they were hired to do" after the Court's disqualification order.  Day 2 Trial Tr. (Keady) 84:24-85:2.  That was leverage that Techiya always had, and in part why Synergy did not have "sole control" over anything.

251.   Techiya ignores that "the control asserted need not 'include control at every moment," and that "its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective.'"  *Cleveland*, 448 F.3d at 522 (quoting RESTATEMENT (SECOND) OF

AGENCY § 14 cmt. a). The record contains ample evidence that Techiya maintained control over Synergy's work with respect to the Techiya patents. Dr. Keady's testimony to the contrary simply is not credible.

252. Further, Techiya's contention that Synergy cannot be an agent because it is an independent contractor according to the terms of the parties' License Agreements is without merit. Independent contractors and agents are not mutually exclusive. *See* RESTATEMENT (SECOND) OF AGENCY § 14N (1958); *see also Thomas*, 377 F.3d at 238 (rejecting argument that an individual "was an independent contractor and not an agent" because "an independent contractor may also be an agent"). Here, the conduct of the parties demonstrates that Synergy was Techiya's agent regardless of the language in the License Agreements. *See, e.g.*, *Burrell*, 2022 WL 16755840, at *7 (concluding vendor was an agent of the county even though bid documents concerning the relationship between them stated the vendor would be an "independent contractor").

253. Magistrate Judge Payne's conclusion at summary judgment that the Techiya-Synergy License Agreement is a license and not an assignment, which this Court adopted, further supports the Court's conclusion that Synergy was Techiya's agent. (Dkt. No. 718 at 14); (Dkt. No. 766). In *Propat International Corp. v. Rpost, Inc.*, the Federal Circuit concluded that a license agreement was not an assignment and remarked that "the rights to sue and grant licenses" under that agreement accorded the entity holding those rights "broad authority to act as [the patent owner's] agent." 473 F.3d at 1192. Here, like in *Propat*, Techiya's grant of rights to Synergy to sue and grant licenses accorded Synergy "broad authority to act as [Techiya's] agent." *Id.*; *see also* DBTX-0028; DBTX-0033.

254. Techiya's argument that Dr. Ahn and Mr. Cho's litigation misconduct cannot be attributed to Techiya because such actions were taken outside of the scope of the agency

relationship is unavailing. The actions of Dr. Ahn and Mr. Cho were taken with the purpose of improving the position of Synergy, Ahn, Cho, and Techiya with respect to Samsung in this litigation, with the ultimate goal of obtaining as large a payment for Synergy, Ahn, Cho, and Techiya as possible. *See* DBTX-0080.0001. Techiya supercharged any ordinary incentive for Synergy, Ahn, and Cho to do whatever it took to succeed by setting their percentage of any recovery at nearly fifty percent (50%).

255.    Moreover, the misconduct that occurred here is a predictable result of Techiya's intent to rely on former Samsung attorneys and insiders as leverage to extract a patent license from Samsung. Although Techiya claims that it did not intend to leverage Synergy's inside knowledge for its own financial gain, the evidence squarely shows the opposite.

256.    Specifically, the evidence presented at trial demonstrates that Techiya knew Dr. Ahn and Mr. Cho were lawyers, *see* DBTX-0015.0004; Day 2 Trial Tr. (Firestone) 161:1-2, 171:16-172:2, knew they were Samsung employees who worked on IP-related litigation matters, *see* DBTX-0046.0001; Day 2 Trial Tr. (Keady) 109:25-110:4, (Firestone) 159:20-24, 161:3-4, 172:3-16, knew Dr. Ahn had been the head of Samsung's IP Center, *see* Day 2 Trial Tr. (Ahn) 20:25-21:18, and wanted Dr. Ahn and Mr. Cho as exclusive agents with control over litigation against Samsung precisely because of their insider knowledge. Indeed, Dr. Keady admitted at trial that "Doctor Ahn's relationship with Samsung certainly had something to do . . . with Techiya's decision to hire Synergy." Day 2 Trial Tr. (Keady) 100:3-14. Techiya's CEO confirmed that he and Dr. Keady "had discussions about Synergy's background" when Techiya "made the joint decision about hiring Synergy," which makes sense for a company that was about to provide an exclusive license to its entire patent portfolio. Day 2 Trial Tr. (Firestone) 170:3-6. Techiya's CEO further testified "it was valuable to me that [Dr. Ahn] had access" to Samsung's senior executives.

Day 2 Trial Tr. (Firestone) 172:19-174:4. Tellingly, Techiya was willing to pay Synergy double what it paid its prior agents. *Compare* CCDX-0001.0005 (agreeing to pay S4S, Techiya's first agent, up to 20%), *with* DBTX-0028.0003-0004 (agreeing to provide Synergy with up to nearly 50% of licensing fees obtained). Techiya was willing to take this different tack with Synergy in no small part because Techiya understood the value of having former Samsung insiders asserting the Techiya patents against Samsung.

257. Moreover, Techiya was willing to pay Synergy even more money in their second License Agreement, signed shortly before this lawsuit was filed and after Dr. Ahn and Mr. Cho had obtained the Samsung's privileged information about the Techiya patents. *See* DBTX-0033. By that time, and with Samsung's privileged information in Dr. Ahn's and Mr. Cho's hands, Techiya required that "[w]ith the ***mutual agreement***" of both Synergy and Techiya, Synergy "***shall*** initiate a legal proceeding to enforce the License Patents against a third-party infringer." *Id.* (emphasis added); Day 2 Trial Tr. (Keady) 136:17-137:19, 137:24-138:20.

258. Techiya's response to this issue at trial was that Techiya purported to bury its head in the sand while its licensing and litigation representative—Synergy—did exactly what Techiya intended that it do. Techiya admits that, although it knows what a conflicts check is, it never did any sort of conflicts check with respect to Synergy, Dr. Ahn, and Mr. Cho. *See* Day 2 Trial Tr. (Keady) 141:19-142:8, (Firestone) 189:2-9; *see also* Day 2 Trial Tr. (Firestone) 189:14-18. Further, Mr. Cho could not recall Techiya having ever asked Synergy about potential conflicts, even though Techiya knew about Dr. Ahn's and Mr. Cho's former roles at Samsung relating to IP litigation matters. *See* Day 1 Trial Tr. (Cho) 219:15-19; *see also* DBTX-0015.0004; Day 2 Trial Tr. (Keady) 109:25-110:4, (Firestone) 159:20-24, 161:1-4, 171:16-172:16. Nor did Techiya ever consider whether using Samsung's former lawyers—Dr. Ahn and Mr. Cho—might pose ethical

questions.   Day 2 Trial Tr. (Firestone) 189:14-18.   And when Techiya was put on notice of Synergy's wrongdoing through Samsung's counterclaims filed in February 2022, Techiya had a chance to investigate but instead consistently chose to do nothing, not even asking Dr. Ahn and Mr. Cho whether Samsung's allegations were true.   *See* Day 1 Trial Tr. (Cho) 219:23-25; Day 2 Trial Tr. (Firestone) 190:2-4.   Indeed, Techiya "laughed" at the disqualification motion and called it an "absolute joke."   Day 2 Trial Tr. (Staton) 218:18-219:4.   Techiya then waited half a year after Samsung filed its counterclaims to screen Dr. Ahn and Mr. Cho from the patent case and, even then, waited another half a year before terminating its relationship with Synergy as to this case. *See* CCDX-0080; CCDX-0081; CCDX-0085; CCDX-0086; Day 2 Trial Tr. (Firestone) 190:7-16. This evidence does not support Techiya as a blameless actor. It supports the opposite conclusion.

259.   In fact, untroubled by Dr. Ahn and Mr. Cho's misconduct and unethical behavior, Techiya continued engaging Dr. Ahn and Mr. Cho to strategize about how to assert the Techiya patents against other potential targets even after Dr. Ahn and Mr. Cho were disqualified from this case.   *See* Day 1 Trial Tr. (Cho) 221:7-18 (stating, after the disqualification order, Q.   "So you're continuing to work with Techiya on other potential licensees?  A.  Yes.  Q.  So you're planning the strategy for asserting the Techiya patents against another -- … potential licensee?  A.  Yes.").

260.   The evidence presented at trial demonstrates that, far from being innocent, Techiya was the recipient (and knew the impact) of numerous communications from Dr. Ahn in which he shared information about Samsung's internal processes, including for example how to evaluate the level of risk Samsung attributed to Techiya's patent portfolio based on Samsung's negotiation position, DBTX-0048.0001, and how to pressure Samsung to settle by exploiting its internal risk assessments, DBTX-0053.0001.   Despite knowing Dr. Ahn's willingness to provide insight into Samsung confidential information, Techiya pressed forward with its use of Synergy and even

expressed to Dr. Ahn that it would be valuable to have Samsung's patent invalidity analysis. *See* DBTX-0080.0002.

261.     Furthermore, Techiya willingly selected Synergy as its litigation agent (i.e., Techiya's representative in litigation). *See* DBTX-0028; Day 2 Trial Tr. (Keady) 108:13-23, (Firestone) 161:16-22, (Staton) at 213:1-5. Techiya gave Synergy the right to sue and grant licenses to the Techiya patents. DBTX-0028.0005; DBTX-0033.0006. Techiya cannot "avoid the consequences of the acts or omissions of [its] freely selected agent," even if the plaintiff's claims will be forever discharged. *Link*, 370 U.S. at 633–34; *see Ben E. Keith*, 80 F.4th at 702 n.7. As such, dismissal remains the only adequate remedy to "purge the taint" based on "the depth and breadth with which the ill-gotten information has saturated [the patent] claims and other filings" here. *Mayorga*, 606 F. Supp. 3d at 1031. "This contamination will continue to give [Techiya] an unfair advantage and prejudice the defense as long as [its] claims are pending, regardless of who acts as [its litigation representative]" or carries on the case as plaintiff. *Id.* at 1030. Allowing cases like this to proceed would also incentivize plaintiffs to cede control of their lawsuits to unscrupulous litigation agents and, when the case goes awry, merely cut out the agent and pick up where that agent left off with impunity. That result "would be wholly inconsistent with our system of representative litigation." *Link*, 370 U.S. at 634.

262.     Charging Techiya with responsibility for Synergy's unclean hands is particularly appropriate here, where the same counsel—PV Law—represented both Techiya and Synergy with respect to the patent case for the entirety of this litigation. In *Gilead*, the Federal Circuit concluded that the patent owner was "properly charged … with the consequences of the testimony … that the court found to be intentionally false," even though the testimony was provided by an individual who was no longer employed by the patent owner at the time of the statements. 888 F.3d at 1246.

96

The Federal Circuit reasoned that such imputation of the individual's misconduct to the patent owner was appropriate at least in part because the patent owner's counsel also "appear[ed] as counsel for [the individual]" who provided the intentionally false testimony.  The same result should apply here, especially because the same counsel for both Techiya and Synergy—PV Law— evidenced its intent to use Dr. Ahn's "intimate knowledge of Samsung" to "stay one step ahead of it on this case."  DBTX-0096

263.   For those reasons, Synergy was Techiya's agent with respect to the Techiya patents, and thus Synergy's unclean hands can and should be imputed to Techiya.

264.   Furthermore, dismissal with prejudice is the only appropriate remedy in this case. In light of the bad-faith conduct demonstrated by the evidence presented at trial, no lesser sanction than dismissal with prejudice would serve the best interests of justice.  The patent case has been infected by Dr. Ahn and Mr. Cho's bad-faith acts.  Given that Dr. Ahn and Mr. Cho reviewed Samsung's privileged analysis about the Techiya patents *before* preparing and filing the patent claims in this case, the only relief "sufficiently remedying [Samsung's] prejudice" is dismissal with prejudice. *Xyngular*, 200 F. Supp. 3d at 1324; *Mayorga*, 606 F. Supp. 3d at 1031.  Mr. Cho used the Techiya Status Report to, among other things, evaluate the prior art relating to the Techiya Patents (including patents-in-suit) and shared prior art identified in the Techiya Status Report with the litigation funder in this case, Purplevine, before filing the complaint.  DBTX-0098.0034-0035. Dr. Ahn admitted that Mr. Cho sent patents and relevant claim charts to PV Law—Techiya's patent counsel in this case—based on selections from Samsung's privileged Techiya Status Report. DBTX-0097.0042.  Dr. Ahn stated that Mr. Cho provided the litigation funder in this case, Purplevine, as well as PV Law with the prior art identified by Samsung in its privileged Techiya Status Report.  DBTX-0097.0043.  Dr. Ahn admitted Mr. Cho "appears to have referred to the

Techiya Status Report document" when prioritizing the Techiya patents and "selecting the patents for filing lawsuits." DBTX-0097.0040. The stolen Samsung privileged information plainly infected the pleadings.

265. Not only did Dr. Ahn and Mr. Cho rely on Samsung's internal analysis in picking the patents to assert and drafting the complaint, but the evidence demonstrates that during discovery they stole additional Samsung privileged reports about this case that Samsung had identified on its privilege log. *See* DBTX-0035.0029-0032; DBTX-0041.0016-0017; Day 1 Trial Tr. (Lim) 98:1-100:4; Day 1 Trial Tr. (Kang) 131:13-132:24. This evidence further supports dismissal as the warranted sanction.

266. Further supporting dismissal is that Dr. Ahn and Mr. Cho communicated extensively with Techiya and outside counsel throughout the case at least until Dr. Ahn and Mr. Cho were disqualified several months before fact discovery closed. *See, e.g.*, DBTX-0081; Day 1 Trial Tr. (Cho) 216:6-11; Day 2 Trial Tr. (Keady) at 62:15-63:13. For that additional reason, anything less than dismissal would allow Techiya to benefit from Dr. Ahn and Mr. Cho's misconduct to Samsung's prejudice.

267. Sanctions less than dismissal "would not be more effective" because it is impossible to know the full extent of the improperly obtained evidence's use, and it would allow the case to move forward with the infection of that information, allow the plaintiffs here "to circumvent the discovery process" while reaping the benefits of Synergy's bad faith misconduct, and "fail[] to cure the prejudice" to Samsung. *Xyngular*, 200 F. Supp. 3d at 1325. Monetary sanctions alone would not "sufficiently punish or deter this misconduct," cure the irreparable harm to Samsung, or restore the integrity of this proceeding. *Id.* at 1326; *see Site 2020*, 2023 WL 4060099, at *17–18.

268.     Moreover, the maturity of this case, and the unfairness it would work on Samsung to be subjected to the same claims in the public patent complaint derived from bad-faith misconduct, further supports dismissal with prejudice.  Given the manner in which the evidentiary record demonstrates the stolen Samsung privileged information about the Techiya patents has embedded itself in public filings in this case, it would be unjust for anyone—let alone Techiya and Synergy—to assert the Techiya patents in the complaint against Samsung.

**B.      Other Defenses Raised by Techiya**

**1.      *Samsung Has Not Waived Its Counterclaims And Defenses.***

a.     <u>Legal Standard</u>

269.     Under the applicable attorney conflict rules in every relevant jurisdiction, an attorney must obtain informed consent—typically in writing—before the attorney can be adverse to a former client on a substantially related matter.  *See* Am. Bar Ass'n Ann. Mod. R. Prof. Cond. § 1.9(a); N.Y. R. Prof. Cond. § 1.9(a); Cal. R. Prof. Cond. § 1.7(b); Tex. R. Prof. Cond. § 1.06 cmts. 2 & 8.

270.     The ABA Rules state "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives ***informed consent, confirmed in writing***."  *See* Am. Bar Ass'n Ann. Mod. R. Prof. Cond. § 1.9(a).  "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  *Id.* § 1.0(e).  "'Confirmed in writing,' when used in reference to the informed consent of a person, denotes informed consent that is given in writing by the person or a writing that a lawyer promptly transmits to the person confirming an oral informed consent. See paragraph (e) for the definition

of 'informed consent.' If it is not feasible to obtain or transmit the writing at the time the person gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter." *Id.* § 1.0(b).

271.    The New York Rules require that "the former client gives **informed consent, confirmed in writing**," before a lawyer who has represented that client "represent[s] another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." *See* N.Y. R. Prof. Cond. § 1.9(a). "The provisions of this Rule are for the protection of former clients and can be waived if the client gives informed consent, which consent must be confirmed in writing under paragraph (a)." *Id.* § 1.9 cmt. [9]. Under Rule 1.0(j), "'[i]nformed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives." *Id.* § 1.0(j).

272.    The California Rules provide that "[a] lawyer shall not, **without informed written consent** from each affected client and compliance with paragraph (d), represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person, or by the lawyer's own interests." Cal. R. Prof. Cond. § 1.7(b) (asterisks omitted). "'Informed consent' means a person's agreement to a proposed course of conduct after the lawyer has communicated and explained (i) the relevant circumstances and (ii) the material risks, including any actual and reasonably foreseeable adverse consequences of the proposed course of conduct." *Id.* § 1.0.1(e) (asterisks omitted). "'Informed written consent' means that the disclosures and the consent required by paragraph (e) must be in writing." *Id.* § 1.0.1(e-1) (asterisk omitted).

273.     The Texas Rules state that, "as a general proposition loyalty to a client prohibits undertaking representation directly adverse to the representation of that client in a substantially related matter unless that client's ***fully informed consent*** is obtained and unless the lawyer reasonably believes that the lawyer's representation will be reasonably protective of that client's interests."  Tex. R. Prof. Cond. § 1.06 cmt. 2.  "Disclosure and consent are not formalities. . . . While it is not required that the disclosure and consent be in writing, it would be prudent for the lawyer to provide potential dual clients with ***at least a written summary of the considerations disclosed***."  *Id.* § 1.06 cmt. 8.

274.     Waiver "is the intentional relinquishment or abandonment of a known right." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

275.     Waiver of a conflict of interest caused by a former client's delay requires "evidence of unreasonable delay" and "prejudice to the present client," wherein "the delay and the ensuing prejudice must be extreme."  *Zurich Am. Ins. Co. of Illinois v. VForce Inc.*, No. 2:18-CV-02066-TLN-CKD, 2021 WL 1193963, at *8 (E.D. Cal. Mar. 30, 2021).

276.     Courts generally will not find waiver—including based on any alleged delay by a client in raising a conflict of interest—unless it is either in writing or clearly disclosed.  *See Bird v. Metro. Cas. Ins. Co.*, No. C10-991Z, 2011 WL 149861, at *2 (W.D. Wash. Jan. 18, 2011) (refusing to find conflict of interest was waived by "delay" in moving to disqualify counsel because "there [was] no written consent," the client did not "have specific and/or actual knowledge of [the attorney's] concurrent representation," and the attorney never "affirmatively disclose[d] its conflict of interest or request[ed] consent in writing"); *GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*,

101

644 F. Supp. 2d 333, 337 (S.D.N.Y. 2009), *aff'd in part*, 618 F.3d 204 (2d Cir. 2010) ("[D]isqualification must follow absent the most express of waivers.").

277.     Courts generally also will not find a waiver of a conflict of interest despite a multi-year delay in seeking disqualification when there is no pending litigation relating to the matter at the time of the alleged delay. *See Montgomery Acad. v. Kohn*, 82 F. Supp. 2d 312, 319 (D.N.J. 1999) ("During the two-year 'delay' asserted by plaintiff, there was no lawsuit to which Kohn could object. Kohn had no practical forum in which to assert Weeks' conflict of interest before she actually became the target of plaintiff's lawsuit."); *Zurich*, 2021 WL 1193963, at *8 (similar).

278.     Courts have concluded that no waiver is found when a former client puts an attorney "on notice of his objection to its presence before [a] case even began." *United Micronesia Dev. Ass'n, Inc. v. Wickline*, No. 1:14-CV-00003, 2014 WL 12694772, at *5 (D. N. Mar. I. Dec. 5, 2014).

### b.     Law of the Case Doctrine

279.     The law of case doctrine provides "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983); *accord In re AKD Invs.*, 79 F.4th 487, 491 (5th Cir. 2023).

280.     The doctrine applies to bar relitigation in the case of any issue that was either "explicitly decided" or "decided by 'necessary implication.'" *AKD Invs.*, 79 F.4th at 491 (quoting *Alpha/Omega Ins. Servs. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001)).

281.     "The law-of-the-case doctrine 'is based on the salutary and sound public policy that litigation should come to an end.'" *AKD Invs.*, 79 F.4th at 491 (quoting *White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967)).

c.     Application of the Law to the Facts of This Case

282.     Samsung has not waived its conflict-of-interest objection to Dr. Ahn and Mr. Cho being adverse to their former client—Samsung—in this matter.

283.     To begin, this issue already having been twice decided against Techiya and in favor of Samsung, the law of the case doctrine bars Techiya's attempt at a third bite of the waiver apple. *See Arizona*, 460 U.S. at 618; *AKD Invs.*, 79 F.4th at 491. The first time this Court concluded that Samsung had not consented to or otherwise waived the duties and obligations that Dr. Ahn and Mr. Cho owe Samsung as former counsel was in the Magistrate Judge Payne's Disqualification Order on November 16, 2022. (Dkt. No. 183 at 3). The Court overruled Techiya's objections to that Order on December 12, 2022. (Dkt. No. 208). The second time this Court concluded that Samsung had not waived its objections to Dr. Ahn and Mr. Cho being adverse to Samsung in this matter was in Magistrate Judge Payne's Order resolving Techiya's summary judgment motion on November 20, 2023. (Dkt. No. 731 at 9). The Court overruled Techiya's objections to that Order on March 1, 2024. (Dkt. No. 852). These decisions constitute law of the case and foreclose Techiya's waiver argument. "[S]alutary and sound public policy" provide that Techiya's repeated litigation of this issue "should come to an end." *AKD Invs.*, 79 F.4th at 491.

284.     Moreover, Techiya's assertion that Samsung waived its objections and consented to Dr. Ahn and Mr. Cho being adverse to Samsung in this case is belied by the record. Under the ABA Rules, the California Rules applicable to Dr. Ahn (an attorney barred in California), and the New York Rules applicable to Mr. Cho (an attorney barred in New York), an attorney is barred from representing another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of a former client unless the attorney obtains informed consent in writing from the former client. *See* Am. Bar Ass'n Ann. Mod. R. Prof. Cond. § 1.9(a); N.Y. R. Prof. Cond. § 1.9(a); Cal. R. Prof. Cond. § 1.7(b). The Texas Rules

are similar, requiring informed consent under such circumstances. *See* Tex. R. Prof. Cond. § 1.06 cmt. 2. Here, Samsung provided no such consent, let alone in writing.

285. There is no evidence that Dr. Ahn or Mr. Cho provided the requisite information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct, in order to permit Samsung to provide the "informed" consent contemplated by the attorney ethics rules. *See* Am. Bar Ass'n Ann. Mod. R. Prof. Cond. § 1.0(e); N.Y. R. Prof. Cond. § 1.0(j); Cal. R. Prof. Cond. § 1.0.1(e).

286. Regardless, the evidence presented at trial demonstrates that Samsung did object to Dr. Ahn asserting others' patents against Samsung, including the Techiya patents. Injung Lee testified that Samsung objected to Dr. Ahn's assertion of the Techiya patents against Samsung at the parties' first meeting in February 2021 and "several times" thereafter. Day 1 Trial Tr. (Injung Lee) 185:9-16, 209:16-20. Before that time, Samsung had also provided Dr. Ahn with a written letter containing a general objection stating: "Samsung has not, and does not, consent to any waiver of the duties and obligations you owe it as a former leader and an attorney of the IP Group." DBTX-0085.0001. Dr. Ahn agreed that, in this letter, Samsung made it "crystal clear" that Samsung does not consent to any waiver of the duties and obligations which Dr. Ahn owes to Samsung. Day 2 Trial Tr. (Ahn) 28:13-25. Given this evidence, Techiya has failed to demonstrate that Samsung made any "intentional relinquishment or abandonment of a known right." *Morgan*, 596 U.S. at 417.

287. Although Techiya contends that Samsung's continued negotiations with Dr. Ahn and Mr. Cho—who were acting on behalf of Synergy—demonstrated that Samsung had no issue with its former in-house attorneys being adverse to Samsung in this matter, that contention is again belied by the record evidence. Mr. Injung Lee testified that he objected to Dr. Ahn's assertion of

the Techiya patents against Samsung at the parties' first meeting in February 2021. Day 1 Trial Tr. (Injung Lee) 185:9-16. Mr. Injung Lee testified that he objected to Dr. Ahn's assertion of the Techiya patents "several times," but ultimately believed he "had no other choice" than to continue negotiating with Dr. Ahn's company—Synergy—with respect to the Techiya patents because Synergy "had the exclusive right to not just negotiate, but litigate." Day 1 Trial Tr. (Injung Lee) 209:19–210:4. The non-disclosure agreement that Samsung, Techiya, and Synergy signed supports that understanding, stating "Whereas, Techiya has granted Synergy IP an exclusive right to discuss and negotiate with potential licensees regarding the license terms and conditions to the Techiya patents." CCDX-0034.0006; Day 1 Trial Tr. (Injung Lee) 210:22–211:1 ("Q. How did this provision, this 'whereas' provision, impact your understanding of who you could negotiate with? A. Throughout -- I thought that we just had to negotiate with Doctor Ahn. We have to deal with this exposure through Doctor Ahn.").

288. The record evidence also contradicts Techiya's claims that Samsung's failure to put Techiya on notice of its objections should constitute a waiver by Samsung of those objections. The evidence demonstrates that Techiya *was* on notice of Samsung's objection to Dr. Ahn being adverse to Samsung in this matter. On May 12, 2021, well before this lawsuit was filed, Dr. Ahn told Techiya that "Samsung asked whether they can negotiate directly with Techiya." DBTX-0047.0001. Dr. Ahn stated that he "made it clear that Synergy has an exclusive sublicensing right." *Id.* That comports with Mr. Injung Lee's testimony at trial that, when he objected to Dr. Ahn's involvement in the Techiya patent assertion, Dr. Ahn said "he got an exclusive license from Techiya and that he was the only one who can license and litigate the portfolio." Day 1 Trial Tr. (Injung Lee) 185:17-21. Instead of taking action to rectify the issue, Techiya approved of

Dr. Ahn's approach, telling Dr. Ahn "Yes need to make this very clear so that they [Samsung] stay focus [*sic*] on negotiating with Synergy IP."  DBTX-0047.0001.

289.    Regardless, Techiya was certainly on notice of Samsung's objections by the time that Samsung filed its counterclaims on February 10, 2023, alleging breach of fiduciary duty against Dr. Ahn and Mr. Cho, aiding and abetting that breach of fiduciary duty against Synergy and Techiya, conspiracy against Dr. Ahn, Mr. Cho, Synergy, and Techiya, and trade secret misappropriation against Dr. Ahn, Mr. Cho, Synergy, and Techiya.  Dkt. No. 27 at 62-67.  In response, Techiya did nothing.  In fact, although Techiya feigned confusion "like three goats on astro turf," Day 1 Trial Tr. (Opening) at 45, the evidence shows Techiya never even asked Synergy if the allegations in the counterclaims were true.  Day 1 Trial Tr. (Cho) 219:23-25.  Nor did Techiya sever its ties with Synergy, Dr. Ahn, and Mr. Cho at that time, instead opting to keep them involved up until Samsung sought to disqualify them from the patent case.  This evidence belies Techiya's argument that it supposedly would have acted differently had it known Samsung objected to Techiya using former Samsung in-house attorneys to assert the Techiya patents against their former client.

290.    For those reasons, and consistent with the Court's prior rulings on this matter, Techiya's waiver argument is held to be without merit.  Samsung did not waive the duties and obligations that Dr. Ahn and Mr. Cho owe Samsung as its former in-house counsel.

### 2.    *Samsung's Evidence Presented At Trial Is Admissible*

#### a.    Legal Standard

291.    "The admission or exclusion of evidence at trial is a matter committed to the discretion of the trial court."  *United States v. George*, 201 F.3d 370, 373 (5th Cir. 2000); *see also United States v. Rice*, 652 F.2d 521, 528 (5th Cir. 1981) ("Admissibility of evidence is within the broad discretion of District Court."); *Bennett v. GEO Grp., Inc.*, No. 12-60017, 2013 WL 5916765,

at *5 (5th Cir. May 22, 2013) ("The district court 'has broad discretion in its decisions to admit evidence. We will not disturb these rulings unless we find an abuse of discretion.'").

292.    The Federal Rules of Evidence provide that public records "are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness." Fed. R. Evid. 803(8).  Under that hearsay exception, "[a] record or statement of a public office" is admissible if "it sets out … a matter observed while under a legal duty to report … or … in a civil case …, factual findings from a legally authorized investigation" and "the opponent does not show that the source of the information or other circumstances indicate a lack of trustworthiness." *Id.*

293.    For purposes of Rule 803(8)(A)(ii), whether a record or statement sets out a matter observed while under a "legal duty to report" turns on "whether the creation and maintenance of the record at issue is appropriate to the function of the relevant government office, given the nature of the responsibilities assigned to that office." *United States v. Fryberg*, 854 F.3d 1126, 1131 (9th Cir. 2017) (internal quotation marks omitted).

294.    "Police reports are generally admissible under Rule 803(8) as public records that set forth factual findings from a legally authorized investigation. . . . Public records, including police reports, 'are presumed to be trustworthy and admissible; therefore, it is the burden of the party opposing admission to demonstrate a lack of trustworthiness.'" *Sanders v. Sky Transp., LLC*, 569 F. Supp. 3d 455, 458 (E.D. Tex. 2021); *see also Rodriguez v. City of Houston*, 250 F. Supp. 2d 691, 700 n.2 (S.D. Tex. 2003) (concluding factual findings in the form of witness statements in a government investigative report were admissible under the public records exception).

295.    Courts have found that "portions of investigatory reports" may be admissible under the public records exception. *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170 (1988).  "As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness

requirement, it should be admissible along with other portions of the report." *Id.* For example, a court has held that an "investigatory report" prepared by a country's prosecutors was "admissible under the public records exception to the hearsay rule." *Mamani v. Berzain,* 309 F. Supp. 3d 1274, 1295 (S.D. Fla. 2018).

296.    Statements against interest by unavailable declarants are not hearsay. *See* Fed. R. Evid. 804(b)(3). A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability," and which "is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." *Id.* For purposes of this Rule, "[a] declarant is considered to be unavailable as a witness if the declarant . . . refuses to testify about the subject matter despite a court order to do so" or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure . . . the declarant's attendance or testimony." Fed. R. Evid. 804(a)(2), (a)(5).

297.    "The fact that the statement was made to a friend and cellmate has no relevance to the determination whether the statement was against the declarant's penal interest." *United States v. Bagley*, 537 F.2d 162, 165 (5th Cir. 1976).

298.    A statement that is offered against an opposing party is not hearsay if it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). "The statement must be considered but does not by itself establish … the existence or scope of the relationship" for purposes of this Rule. *Id.*

299.     Federal Rule of Evidence 801(d)(2)(D) "simply requires a statement made on a matter within the scope of the agency relationship.  This requirement is met when the declarant makes the statement while performing his or her agency duties, even if the declarant may have lacked authorization to make the specific statement at issue, so long as the statement 'relate[s] to' those duties."  *Cruz v. Farmers Ins. Exch.,* 42 F.4th 1205, 1213 (10th Cir. 2022) (citation omitted).

300.     The residual exception to the hearsay rule provides that "a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804" if "the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement" and "it is more probative on the point for which it is being offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a).

301.     "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Evidence satisfying this authentication requirement includes "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker."  Fed. R. Evid. 901(b)(5).

302.     The best evidence rule provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."  Fed. R. Evid. 1002.  However, the Rules also provide that "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if" any one of the following four circumstances apply:

(a) all the originals are lost or destroyed, and not by the proponent acting in bad faith;

(b) an original cannot be obtained by any available judicial process;

(c) the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or

(d) the writing, recording, or photograph is not closely related to a controlling issue.

Fed. R. Evid. 1004.

b.     Application of Law to the Facts of the Case

303.    The witness statements relating to the Korean prosecutor's criminal investigation into matters relating to this case—DBTX-0035, DBTX-0041, DBTX-0097, and DBTX-0098—are admissible under the Federal Rules of Evidence.

304.    These witness statements are public records under Rule 803(8).  Magistrate Judge Payne previously determined that the witness statements qualify as public records under Rule 803(8).  *See* (Dkt. No. 862 (Hr'g Tr.) at 13:15-17, 28:18-19).  Techiya objected, (Dkt. No. 876), and the Court overruled those objections.  (Dkt. No. 894).  The Court's previous determination as to the admissibility of these witness statements stands and is proper.

305.    Each of the witness statements from the Korean prosecution—DBTX-0035, DBTX-0041, DBTX-0097, and DBTX-0098—are records or statements of a public office (the Seoul Central District Prosecutor's Office).   The witness statements set out the Korean prosecutor's office's factual findings from a legally authorized investigation.  The laws of the Republic of Korea empower the Seoul Central District Prosecutor's Office to investigate potential crimes.  *See* Prosecutors' Office Act of Korea, art. 2(1) ("Prosecutors' offices shall exercise overall control over prosecutorial affairs."); *id.* art. 4(1) (charging prosecutor with duty and authority to investigate crimes and institute and maintain public prosecution); Criminal Procedure Act of

Korea, art. 195 ("Where there is a suspicion that an offense has been committed, a prosecutor shall investigate the offender, the facts of the offense, and the evidence."); *see also* Day 1 Trial Tr. (Jongmin Lee) 49:22-50:7 ("Under Korean law, when there are criminal charges that have been verified, they can initiate the investigation and in this case as well, those charges, they are confirmed that there were those charges, so they started the investigation.").  Here, the witness statements themselves state that they were prepared as part of the Korean prosecutor's investigation into potential crimes.  *See* DBTX-0035.0001 (stating the interview was conducted "in connection with a suspected criminal case concerning, among others, violations of the Unfair Competition Prevention and Trade Secret Protection Act (trade secret misappropriation, etc.) by [*redacted*] Ahn and others"); DBTX-0041.0001 (similar); DBTX-0097.0001 (similar); DBTX-0098.0001 (similar); *see also* Day 1 Trial Tr. (Jongmin Lee) 48:10-25, 53:6-10.  Korean law requires that the prosecutor records the investigation process for interrogations of individuals, including by recording the time at which the person arrived at the interrogation place, the time at which the interrogation began and ended, and other matters necessary for confirming the developments of the interrogation process.  Criminal Procedure Act of Korea, art. 244-4.  Techiya does not dispute that there is an ongoing criminal investigation in the Republic of Korea regarding Dr. Ahn and Mr. Cho.  Day 1 Trial Tr. 50:13-20.  These witness statements relate to that legally authorized investigation.

306.    These witness statements set out matters observed while under a legal duty to report.  Creation and maintenance of these witness statements is appropriate to the function of the Seoul Central District Prosecutor's Office, given the nature of the responsibilities assigned to that office.  *See Fryberg*, 854 F.3d at 1131.

307.     As a matter of law, public records created by a government actor such as the witness statements here are entitled to a presumption of trustworthiness.  *See Est. of Manus v. Webster Cty., Miss.*, No. 1:11-CV-00149-SA-DAS, 2014 WL 3866608, at *5 (N.D. Miss. Aug. 6, 2014) ("Because there is a presumption in favor of admissibility and trustworthiness, the party seeking to exclude such evidence bears the burden of showing a lack of trustworthiness.").  "The justification for this exception to the hearsay rule is the assumption that public officials will perform duties properly and the unlikelihood that they will remember details independent of the record."  *Eason v. Fleming Cos., Inc.*, 4 F.3d 989, 1993 WL 360736, at *3 n7 (5th Cir. 1993).  As a result, Techiya bears the burden to establish that the source of the information or other circumstances indicate a lack of untrustworthiness.  *See* Fed. R. Evid. 803(8)(B).

308.     Techiya has failed to satisfy its burden to show a lack of trustworthiness with respect to the witness statements generated by the Korean prosecutor.  Samsung presented testimony from a Korean criminal attorney—Mr. Jongmin Lee, who has been involved in over 100 witness interviews by the Korean prosecutor's office and who attended Mr. Lim's witness interview reflected in DBTX-0035—that witness interview statements generated by the Korean prosecutor, such as DBTX-0035, DBTX-0041, DBTX-0097, and DBTX-0098, are a common part of Korean criminal investigations.  *See* Day 1 Trial Tr. (Jongmin Lee) 52:6-13, 52:22-53:9.  Both Mr. Lim and Mr. Lee were present at the Korean prosecutor's November 29, 2023 interview of Mr. Lim, both reviewed the witness statement after it was completed by the Korean prosecutor, and both signed the interview statement as true and accurate.  DBTX-0035.0036-0037, 0069-0070; Day 1 Trial Tr. (Jongmin Lee) 55:11-25.  Similarly, Ms. Kang was present at the Korean prosecutor's December 18, 2023 interview of herself, reviewed the witness statement, and signed it after confirming it was accurate.  DBTX-0041.0050-0052, 0093-0094; Day 1 Trial Tr. (Kang)

129:12-16. Moreover, Techiya had the opportunity to cross-examine three individuals who attended the interviews relating to DBTX-0035 and DBTX-0041, including Mr. Lim, Mr. Jongmin Lee, and Ms. Kang, and failed to show that these witness statements are in any way untrustworthy. Magistrate Judge Payne's previous determination that Techiya had not shown "anything in this case to persuade me that [DBTX-0035 and DBTX-0041] are not trustworthy" remains correct. 3/8/2024 Hr'g Tr. 28:22-23.

309. Given that Dr. Ahn's and Mr. Cho's witness interview statements (DBTX-0096 and DBTX-0097) appear to have been generated by the same Korean prosecutor in the same manner, by the same process, and with respect to the same criminal investigation as DBTX-0035 (Lim) and DBTX-0041 (Kang), Techiya has similarly failed to show that DBTX-0096 or DBTX-0097 are in any way untrustworthy.

310. Further, Techiya's argument that the witness statements are incomplete—which is not supported by the evidence of record—go to the weight to be afforded to the witness statements rather than their admissibility. *See Est. of Manus*, 2014 WL 3866608, at *5 ("[C]omplaints that [a] report is incomplete or inaccurate go to the weight afforded the report rather than to its admissibility." (quoting *Eason*, 4 F.3d 989, 1993 WL 360736, at *3)).

311. The *Optional Capital, Inc. v. Kim*, No. 2:04-cv-03866-ABC-PLA, Dkt. No. 294 (C.D. Cal. July 5, 2006), case is inapposite. In that case, the court considered a motion *in limine* "seeking to introduce witness statements and investigative reports prepared by the Ministry of Justice for the Republic of Korea during its investigation of crimes by former officers and directors of Plaintiff." *Id.* at 1. The court held the witness statements were not admissible under Federal Rule of Evidence 803(8)(B), and did not consider whether they were admissible under Rule 803(8)(C). *Id.* at 4–5. Although the court held that the investigative reports did not qualify as

public records under Rule 803(8)(C), it based that determination only on a finding in that case that the reports lacked the requisite trustworthiness. *Id.* at 5–6. It reasoned that "the motives of the prosecutors during its investigation call into question the reliability of the reports at issue" and the lack of a witness available for cross-examination regarding the contents of reports provided "another indication of the untrustworthy nature of the reports." *Id.* at 6. Here, unlike the facts in *Optional Capital*, Samsung introduces witness statements—not investigative reports—and does so for the evidence (and factual findings) embedded within those witness statements. Samsung does not rely on the witness's answers to questions posed by the prosecutor. Further, unlike in *Optional Capital*, Samsung made the declarants in both witness statements—DBTX-0035 and DBTX-0041—available for cross-examination by Techiya at the trial and for pre-trial depositions. Techiya has failed to demonstrate that DBTX-0035 or DBTX-0041 and the factual findings and embedded evidence they contain are in any way untrustworthy.

312.    Samsung does not offer DBTX-0035 or DBTX-0041 for the truth of the matter asserted as to the Samsung witness's answers to questions from the Korean prosecutor.

313.    The embedded audio transcription and other evidence in those witness statements—including the Korean prosecutor's statements regarding those audio transcriptions and other embedded evidence in the witness statements—constitute factual findings pursuant to Rule 803(8).

314.    Additionally, as to any of the embedded evidence constituting statements offered for the truth of the matter asserted in the witness statements (including the contents of the embedded audio transcriptions and other embedded evidence), the Court further finds that it is a non-hearsay statement of an agent of Techiya and/or it is a statement against interest of an unavailable declarant.

315.    Dr. Ahn and Mr. Cho are unavailable pursuant to Federal Rule of Evidence 804(a). Dr. Ahn and Mr. Cho both reside in Seoul, South Korea.  (Dkt. No. 94 at 43 (¶¶ 5-6)); (Dkt. No. 373 ¶¶ 5-6).  Since Samsung uncovered Dr. Ahn's and Mr. Cho's misconduct through an interview with the Korean prosecutor on November 29, 2023, Dr. Ahn and Mr. Cho have refused to sit for depositions or otherwise testify regarding the subject matter uncovered as part of the Korean criminal investigation.  *See* (Dkt. No. 839 at 5 (Samsung seeking trial depositions of Dr. Ahn and Mr. Cho)); (*id.* at 10 (counsel for Synergy, Dr. Ahn, and Mr. Cho stating that "Synergy, Ahn, and Cho have been instructed by their Korean counsel not to provide testimony during the pendency of the Korean criminal investigation")); 3/8/24 Hr'g Tr. 69:9-17 (counsel for Synergy, Dr. Ahn, and Mr. Cho reiterating that, if compelled to testify as Samsung was continuing to seek, "they will follow the advice of counsel in Korea and refuse to sit for a deposition in Korea, whether it's remote or in person, until the conclusion of the investigation"); *id.* 70:10-17 (Magistrate Judge Payne stating he "typically would not order the witnesses to appear to do what their counsel has told them they're going to do").  Dr. Ahn and Mr. Cho were absent from trial.  Samsung has not been able, by process or other reasonable means, to procure Dr. Ahn's and Mr. Cho's attendance at the trial or testimony.  The parties previously agreed as of at least February 2024 that Dr. Ahn and possibly Mr. Cho "are legally restricted from travel to the U.S. at this time" in light of the Korean criminal investigation.  (Dkt. No. 840 at 1 (citing (Dkt. No. 839 at 5))).

316.    The statements of Dr. Ahn and Mr. Cho in the witness statements—including their statements in DBTX-0097, in DBTX-0098, and in the embedded documents such as audio transcriptions in those witness statements as well as in DBTX-0035 and DBTX-0041—constitute statements against interest under Federal Rule of Evidence 804(b)(3).  A reasonable person in Dr. Ahn's and Mr. Cho's position would have made the statements contained therein only if they

believed it to be true because, when made, it was so contrary to their proprietary and pecuniary interests and had a great tendency to expose them to civil and criminal liability. In fact, it is understood that Dr. Ahn and Mr. Cho are under criminal investigation in Korea at least in part based on the evidence uncovered by the Korean prosecutor and embedded in the witness statements.

317. Moreover, in view of the entire trial record and evidence presented, those statements by Dr. Ahn and Mr. Cho further constitute non-hearsay statements of Techiya's agents offered by Samsung against Techiya. Dr. Ahn and Mr. Cho—acting through their company Synergy—were agents of Techiya for the reasons explained above. *See* § III.A.2.b, *supra*. Those statements were on matters within the scope of that agency relationship and while it existed. In particular, the statements were made while Dr. Ahn and Mr. Cho were performing duties on behalf of Techiya and relate to negotiations and litigation against Samsung regarding the Techiya patents.

318. Samsung authenticated the audio transcriptions by providing testimony from witnesses with personal knowledge of and familiarity with Dr. Ahn's and Mr. Cho's voices, and who heard the audio recordings at their witness interviews and confirmed the accuracy of the audio transcriptions as they are reflected in DBTX-0035 and DBTX-0041. *See* DBTX-0035.0012-0014, 0015-0020, 0028-0029; Day 1 Trial Tr. (Lim) 75:5-12, 83:15-25, 84:1-4, (Kang) 127:13-23, 128:3-13, 128:22-129:11. In fact, both Mr. Lim and Ms. Kang read an audio transcription as the audio recordings were played during their witness interviews with the Korean prosecutor to further confirm the accuracy of the audio transcriptions. *See* Day 1 Trial Tr. (Lim) 83:22-4, (Kang) 127:13-19, 128:18-129:11. With respect to DBTX-0035, Mr. Jongmin Lee also confirmed that the audio transcripts contained in that witness interview statement are true and correct. *See* Day 1

Trial Tr. (Jongmin Lee) 57:2-20. Techiya has not provided any evidence or basis for finding otherwise.

319. The audio transcriptions and other embedded evidence in the witness statements (DBTX-0035, DBTX-0041, DBTX-0097, and DBTX-0098) satisfy the best evidence rule. An original of these writings, recordings, and photographs was not required—and instead the witness statements themselves are admissible—at least because the originals cannot be obtained by any available judicial process. Samsung moved to compel production of the audio files, (Dkt. No. 767), the Court ordered their production, (Dkt. No. 844), and Dr. Ahn and Mr. Cho refused to produce them, (Dkt. No. 851). For similar reasons, because the other embedded evidence in the witness statements is in Korea in the custody of the Korean prosecutor, it is unavailable to Samsung and Techiya short of Dr. Ahn and Mr. Cho requesting it and obtaining it. To date, Dr. Ahn and Mr. Cho have shown a complete unwillingness to do so (even in the face of compulsion), including because their Korean counsel has advised them not to produce any more evidence in this case while the Korean criminal investigation remains ongoing. *See* 3/8/24 Hr'g Tr. 69:9-17 (counsel for Synergy, Dr. Ahn, and Mr. Cho stating "until the Korean prosecutor concludes the investigation, their Korean counsel has instructed them not to provide anymore evidence").

## IV. CONCLUSION

320. For the foregoing reasons, the Court finds that Samsung's unclean hands equitable defense is well taken; that Techiya's asserted patent claims against Samsung herein are thus unenforceable; and consequently, the Court **DISMISSES WITH PREJUDICE** Techiya's asserted patent claims herein. The parties are directed to jointly prepare a redacted version of this opinion for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within ten (10) business days of this opinion. Further, the Court, in light of the indefensible conduct of Dr. Ahn and Mr. Cho, **ORDERS** the Clerk of this Court to transmit to the

state bars of New York and California a redacted public copy of this opinion for consideration of disciplinary action regarding Dr. Ahn and Mr. Cho. An unredacted version of this opinion will be provided to the chief disciplinary counsel for the state bars of New York and California upon receipt by the Clerk of the Court of a completed and signed copy of Appendix A to the Court's Protective Order (Dkt. No. 74) from the chief disciplinary counsel of each respective bar association.

**So Ordered this**

**May 9, 2024**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE